## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| PRONERVE HOLDINGS, LLC, et al.,[1] | Case No. 15-_____ (___) |
| Debtors. | (Joint Administration Requested) |

### DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING; (II) AUTHORIZING USE OF CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION; AND (IV) SCHEDULING A FINAL HEARING

ProNerve Holdings, LLC and each of its wholly-owned direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (these "Chapter 11 Cases"), hereby submit this motion (the "Motion") for entry of an interim order, substantially in the form attached hereto as **Exhibit A** (the "Interim DIP Order"), and a final order (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders"),[2] (a) authorizing the Debtors to obtain postpetition financing on a senior secured, priming, superpriority basis; (b) authorizing the Debtors to use Cash Collateral (as defined below); (c) granting adequate protection to the Prepetition Lender (as defined below) for the priming of the Prepetition Liens (as defined below) and the Debtors' use of the Cash Collateral;

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: ProNerve Holdings, LLC (1653); ProNerve, LLC (2155); Boulder Intraoperative Monitoring, LLC (9147); Colorado Intraoperative Monitoring, LLC (5837); Denver South Intraoperative Monitoring, LLC (3164); Eugene Intraoperative Monitoring, LLC (0718); ProNerve Technologies, LLC (1814); Riverside Intraoperative Monitoring, LLC (6963); and Topeka Intraoperative Monitoring, LLC (6151). The location of the Debtors' corporate headquarters and the service address for all Debtors is 7600 E. Orchard Road, Suite 200 N, Greenwood Village, Colorado 80111.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the DIP Credit Agreement (as defined herein) or the DIP Orders, as applicable.

and (d) scheduling a Final Hearing on the Motion. In support of this Motion, the Debtors respectfully state as follows:[3]

## Jurisdiction

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

4.      Pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is determined that the Court would lack Article III jurisdiction to enter such final order or judgment absent consent of the parties.

## Background

5.      On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

6.      The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7.      No trustee, examiner, creditors' committee, or other official committee has been appointed in these Chapter 11 Cases.

---

[3] The facts and circumstances supporting this Motion are set forth in the *Declaration of George D. Pillari in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith.

#32674289 v1

8.      A description of the Debtors' business, capital structure, and the circumstances leading to the chapter 11 filings is set forth in the First Day Declaration filed contemporaneously herewith and incorporated herein by reference.

### The Debtors' Prepetition Loan

9.      The Debtors' prepetition long-term secured debt obligations total approximately $43,176,850.17 million (the "Prepetition Loan"), all of which represents obligations arising under that certain Credit Agreement (the "Prepetition Credit Agreement"), dated December 20, 2012, between the Debtors, certain affiliated practice entities (the "Affiliated Practices"), General Electric Capital Corporation ("GECC"), as agent, and GECC and Regions Capital Markets, as lenders (the "Initial Lenders"), among others.

10.     The Prepetition Loan is secured by liens on substantially all of the assets of the Debtors and the Affiliated Practices (the "Prepetition Liens") pursuant to that certain Guaranty and Security Agreement, dated December 20, 2012, between the Debtors, the Affiliated Practices, and GECC, as agent.

11.     Shortly prior to the Petition Date, SpecialtyCare IOM Services, LLC (the "Prepetition Lender") acquired from the Initial Lenders all outstanding debt under the Prepetition Credit Agreement.

### Immediate Need for Use of Cash Collateral and Financing

12.     As set forth above, the Prepetition Loan is secured by liens on substantially all of the Debtors' assets, including the Debtors' "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, the "Cash Collateral"). Without access to the Cash Collateral and the proposed secured debtor in possession financing facility (the "DIP Credit Facility") described herein, the Debtors will not have sufficient liquidity from unencumbered property to operate their business during these Chapter 11 Cases. Indeed, without immediate access to the Cash

-3-

Collateral and the DIP Credit Facility, the Debtors would face imminent shut-down and liquidation, which would destroy millions of dollars of the Debtors' value as a going concern and put the Debtors' employees out of work.

**Relief Requested**

13.    By this Motion, the Debtors request entry of the DIP Orders authorizing the Debtors to borrow under the DIP Credit Facility—which consists of a term loan in an aggregate principal amount of up to $2.5 million—pursuant to that certain Debtor In Possession Credit Agreement, in substantially the form attached hereto as **Exhibit B** (the "DIP Credit Agreement" and, together with all related DIP Credit Facility documents, the "DIP Loan Documents"), between the Debtors and SpecialtyCare IOM Services, LLC (the "DIP Lender"), on the terms set forth in the Interim DIP Order or Final DIP Order, as applicable.

14.    Pursuant to Bankruptcy Rules 4001(b), (c), and (d), the following is a concise statement and summary of the proposed material terms of the DIP Loan Documents and DIP Orders.[4] As discussed in greater detail below, each of these terms are justified by the absence of alternative financing on superior terms, and because the DIP Lender insisted upon the inclusion of such terms as a condition to extending the financing discussed herein.

      a.    Maturity: The DIP Credit Facility matures on the earliest to occur of:[5]

            i.    the Closing Date;

            ii.    the closing of an Alternative Transaction; and

            iii.    60 days after the Petition Date.

      b.    Interest Rate: Seven percent (7%) per annum.[6]

---

[4] The below summary is provided for informative purposes only. To the extent there is any discrepancy between the terms contained in this summary and the terms of the Interim DIP Order (or Final DIP Order, as applicable) or DIP Credit Agreement, the terms of the Interim DIP Order, Final DIP Order, or DIP Credit Agreement, as applicable, shall control.

[5] DIP Credit Agreement § 1.1 (definition of "Maturity Date").

#32674289 v1

c.     Commitments:

i.     Interim Borrowing Limit: The lesser of $800,000 and the amount authorized to be lent by the DIP Lender to the Debtors under the Interim DIP Order.[7]

ii.     Final Borrowing Limit: $2.5 million (less the amount already drawn pursuant to the Interim Borrowing Limit).[8]

d.     Events of Default: Along with customary events of default for a debtor in possession financing facility, the DIP Credit Agreement includes an event of default upon Debtors' failure to comply with certain obligations under the Asset Purchase Agreement, when such failure to comply is attributable to Debtors' willful misconduct or gross negligence.[9]

e.     Budget: The DIP Credit Agreement and the Interim DIP Order impose restrictions on the Debtors' operations by requiring the Debtors to comply with a detailed budget (the "Budget"), subject to certain permitted variances, which is attached to the Interim DIP Order as **Exhibit 1**.[10] The Debtors are permitted to use the proceeds of the DIP Credit Facility in accordance with the Budget, and the Debtors are required to submit a forecast of the weekly cash flows of the Debtors delivered on a weekly basis starting on the then prior week and a reconciliation of actual expenses to the Budget.

f.     DIP Liens and Superpriority Claims: As security for the obligations under the DIP Credit Agreement, the DIP Lender will receive the following liens and claims:[11]

i.     Senior security interest in and lien upon or pledge of (subject to the Carve-Out) all pre- and postpetition encumbered property of the Debtors (the "DIP Superpriority Claims"); and

ii.     First priority senior security interest and lien upon or pledge of all unencumbered property and assets of the Debtors, excluding claims and causes of actions ("Avoidance Actions") arising under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code (together with the DIP Superpriority Claims, the "DIP Liens").

g.     Adequate Protection for Prepetition Lender: As adequate protection for any diminution in value of the Prepetition Liens,[12] the Prepetition Lender will receive

---

[6] DIP Credit Agreement §§ 1.1 (definition of "Base Rate"), 2.4.

[7] DIP Credit Agreement § 1.1 (definition of "Interim Loan Amount").

[8] DIP Credit Agreement § 2.1(a).

[9] DIP Credit Agreement § 6.1(h).

[10] DIP Credit Agreement §§ 1.1 (definition of "DIP Budget"), 5.1(f); Interim DIP Order ¶¶ 6, 15.

[11] DIP Credit Agreement § 2.7; Interim DIP Order ¶ 9.

[12] Interim DIP Order ¶ 16.

replacement security interests in and Liens upon all pre- and postpetition encumbered property of the Debtors, excluding Avoidance Actions (the "Adequate Protection Liens"), which shall be junior only to the Carve-Out, the DIP Credit Facility, and the Permitted Liens.

      h.    Carve-Out: The DIP Credit Facility, Prepetition Loan, the DIP Superpriority Claims, and Adequate Protection Liens are subject to a carve out (the "Carve-Out") for:[13]

      i.    the unpaid fees of the U.S. Trustee or the Clerk of the Bankruptcy Court pursuant to 28 U.S.C. § 1930(a) and (b); and

      ii.    all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtors (including pursuant to section 363 of the Bankruptcy Code) and any statutory committees appointed in the Chapter 11 Cases (each, a "Committee") in an amount not to exceed $300,000 in the aggregate.

      i.    Stipulations: The Interim DIP Order contains stipulations related to the Prepetition Loan by the Debtors, on behalf of all parties and entities, including stipulations that:[14]

      i.    As of the Petition Date, the Debtors were indebted and liable to the Prepetition Lender under the Prepetition Loan.

      ii.    The Debtors have represented that the Prepetition Loan (i) constitutes the legal, valid, and binding obligation of the Debtors, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (ii) no portion of the Prepetition Loan is subject to avoidance, recharacterization, recovery, or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law, and (iii) is secured by valid, binding, perfected, enforceable, first-priority liens and security interests over substantially all of the assets of the Debtors. The Debtors have waived any right to challenge the Prepetition Loan and the Prepetition Liens on any grounds, including those set forth above.

      j.    Relief from Automatic Stay: The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Lender to exercise, upon five (5) Business Days' notice to the Debtors and counsel to any Committee formed of the occurrence of an Event of Default, all rights and remedies, including, without limitation, against the DIP Collateral, without the need for obtaining a further order of this Court. Notwithstanding the foregoing, the Debtors may continue to use cash in accordance with the DIP Budget until five (5) Business Days after

---

[13] Interim DIP Order ¶ 8.

[14] Interim DIP Order ¶¶ F, G.

notice of the occurrence of an Event of Default from the DIP Lender to the Debtors and counsel to any Committee formed.[15]

15.    Rule 4001-2 of the Local Rules requires that certain provisions contained in the DIP Credit Agreement and the DIP Orders be highlighted and that the Debtors provide justification for the inclusion of such highlighted provision(s).

**Local Rule 4001-2(a)(i)(A)**

16.    Local Rule 4001-2(a)(i)(A) requires disclosure of provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law). The DIP Credit Agreement does not contain any such provisions.

**Local Rule 4001-2(a)(i)(B)**

17.    Local Rule 4001-2(a)(i)(B) requires disclosure of provisions that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters. Section 25 of the Interim Order binds the estates and all other parties in interest with respect to the validity, perfection or amount of the Prepetition Credit Agreement, but is subject to the rights of any party in interest with requisite standing for a period of the earlier of (i) the date that is the earlier of (x) the date of entry of an order of this Court approving the sale of a substantial portion of the collateral securing the Prepetition Liens (the "Prepetition Collateral")

---

[15] Interim DIP Order ¶ 11.

-7-

and (y) the date that is seventy-five (75) days after entry of the Final Order (or, with respect to a Committee, sixty (60) days after the date of its formation), and (ii) if such a Challenge is brought, the date of a final judgment on such Challenge or, in each case, such later date (x) as has been agreed to, in writing, by the Prepetition Lender in its sole discretion or (y) as has been ordered by the Court. The Debtors believe that the Prepetition Loans and the Prepetition Liens are valid and fully enforceable.

*Local Rule 4001-2(a)(i)(C)*

18.    Local Rule 4001-2(a)(i)(C) requires explicit disclosure of provisions that constitute a waiver, without notice, of the estates' rights under Bankruptcy Code section 506(c). The Interim Order does not contain any such provisions.

*Local Rule 4001-2(a)(i)(D)*

19.    Local Rule 4001-2(a)(i)(D) requires disclosure of provisions under which the Debtors immediately grant the prepetition secured lenders liens on the Avoidance Actions. The Interim Order does not contain any such provisions.

*Local Rule 4001-2(a)(i)(E)*

20.    Pursuant to Local Rule 4001-2(a)(i)(E), a movant must describe provisions of the proposed debtor-in-possession facility that deem prepetition secured debt to constitute postpetition debt. The Interim Order does not contain any such provisions.

*Local Rule 4001-2(a)(i)(F)*

21.    Pursuant to Local Rule 4001-2(a)(i)(F), a movant must describe provisions of the proposed debtor-in-possession facility that provide disparate treatment for professionals retained by a creditors' committee with respect to a professional fee carve-out. Section 8 of the Interim Order provides a professional fee carve-out for the Debtors' professionals and professionals

#32674289 v1

hired by any official committee of unsecured creditors. The Interim Order also provides in Section 25 that the professional fee carve out cannot be used to pay any allowed professional fees or any other fees or expenses incurred by any professional in connection with certain actions, but that that the Committee may expend up to $10,000 for the fees and expenses incurred in connection with the investigation of, but not litigation, objection or any challenge to, any prepetition secured claims and liens under the Prepetition Credit Agreement. The Debtors submit that the treatment of the Debtors' and any Committee's professionals under the Carve-Out is substantially similar and that the limits with respect to certain actions by the Committee are fair and reasonable.

***Local Rule 4001-2(a)(i)(G)***

22.    Pursuant to Local Rule 4001-2(a)(i)(G), a movant must describe provisions of the proposed debtor-in-possession facility that contemplates a priming of any secured lien without the consent of that lienor.

23.    The DIP Credit Facility is a "priming" facility inasmuch as the DIP Credit Facility will be secured by first priority, senior, priming, perfected lien on and security interest in all of the Debtors' right, title and interest in, to and under the DIP Collateral (as defined in the Interim Order) that is subject to or encumbered by a validly perfected, unavoidable security interest or lien on the Petition Date or subsequently perfected thereafter. The Prepetition Lender has consented to the terms of the DIP Credit Agreement and the Interim and Final Orders, including the priming of the liens granted pursuant to the Prepetition Credit Agreement.

***Local Rule 4001-(2)(a)(i)(H)***

24.    Pursuant to Local Rule 4001-2(a)(i)(H), a movant must describe provisions of the proposed debtor-in-possession facility that seek to affect the Court's power to consider the

equities of the case under section 552(b)(1) of the Bankruptcy Code.  Section 10 of the Interim

Order provides that upon entry of a Final Order, the DIP Lender shall not be subject to (a) the

equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP

Collateral or (b) an "equities of the case" claim under section 552(b) of the Bankruptcy Code

against the DIP Lender with respect to proceeds, product, offspring, or profits of any of the DIP

Collateral.  Because this provision will only be effective upon entry of the Final Order and to the

extent such order so provides, the Debtors respectfully submit that parties in interest will have an

opportunity to be heard with respect to this provision.

### Basis for Relief

I.      **The Court Should Authorize the Debtors to Obtain Postpetition Financing through the DIP Loan Documents.**

      A.      **Entering into the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment.**

25.     The Court should authorize the Debtors, as an exercise of the Debtors' sound

business judgment, to enter into the DIP Loan Documents, obtain access to the DIP Credit

Facility, and continue using the Cash Collateral.

26.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or

superpriority financing under certain circumstances, as described in greater detail below.

Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and

policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting

in accordance with its sound business judgment in obtaining such credit. See, e.g., In re CB

Holding Corp., 447 B.R. 222, 227 (Bankr. D. Del. 2010) ("[T]he terms of the Post-Petition

Financing appear to be fair and reasonable, are ordinary and appropriate for secured financing to

debtors in possession, reflect the Debtors' exercise of prudent business judgment consistent with

their fiduciary duties, and are supported by reasonably equivalent value and fair consideration);

In re Local Insight Media Holdings, Inc., No. 10-13677, 2010 WL 5272396, at *5 (Bankr. D. Del. Nov. 19, 2010) ("The terms of the DIP Financing and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Order are fair and reasonable, reflect the Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties, are appropriate under the circumstances and constitute reasonably equivalent value and fair consideration."); In re Barbara K Enters., Inc., No 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.), 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment . . . ."); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); see also Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

27.    Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006); see also In re L.A. Dodgers LLC, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("Under the [business

judgment] rule, courts will not second-guess a business decision, so long as corporate management exercised a minimum level of care in arriving at the decision. The business judgment rule under Delaware law and the law of numerous other jurisdictions establishes a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.").

28.     The Debtors submit that this Court should approve their entry into the DIP Credit Facility and execution of the DIP Loan Documents as an exercise of their sound business judgment. Prior to the Petition Date, the Debtors and their advisors undertook an analysis of the Debtors' projected financing needs during the pendency of these Chapter 11 Cases and determined that the Debtors would require postpetition financing to support their operational and restructuring activities while pursuing a sale of all or substantially all of the their assets (a "Sale"). Without the financing to be provided by the DIP Credit Facility, the Debtors would almost immediately lack sufficient liquidity to continue operations, to the detriment of the Debtors, their employees, and other stakeholders.

29.     Accordingly, the Debtors negotiated the DIP Credit Facility with the DIP Lender in good faith, at arm's-length, and with the assistance of their advisors, to obtain the required postpetition financing on terms favorable to the Debtors.  Based on the advice of the Debtors' professionals and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Credit Facility provides the necessary liquidity on comparatively more favorable terms than any other reasonably available alternative.  Although the Debtors have determined that the DIP Credit Facility is the only sufficient financing available to them, the DIP Credit Facility contains terms that are fair and reasonable under the circumstances.

30.     Because the Prepetition Lender has liens on substantially all of the Debtors'

assets, there is no possibility of the Debtors being able to secure DIP financing on an unsecured

or junior basis.  Also, the Debtors do not have sufficient unencumbered assets to serve as

collateral for senior secured DIP financing.  All potential lenders other than the Prepetition

Lender would certainly have demanded that any DIP financing provided be secured by priming

liens, to which the Prepetition Lender would not consent without the provision of adequate

protection with respect to their interests in the Prepetition Liens, as required pursuant to section

364(d) of the Bankruptcy Code.  Given the lack of sufficient unencumbered assets and the

Debtors' financial projections over the course of these Chapter 11 Cases, providing adequate

protection to the Prepetition Lender on a non-consensual basis would have been difficult, if not

impossible.

31.     As a result of the foregoing, the Debtors, in the exercise of their sound business

judgment, have determined that the DIP Credit Facility provides the best available financing for

the Debtors (indeed, the only available financing).  Moreover, the Debtors and their advisors

have determined that the financing provided by the DIP Credit Facility is fair and reasonable

under the circumstances and sufficient to permit the Debtors to conduct an auction process,

consummate the Sale, and wind-down in chapter 11.

**B.     The Debtors Should Be Authorized to Obtain Postpetition Financing on a Senior Secured and Superpriority Basis.**

32.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain

circumstances, postpetition financing on a secured or superpriority basis, or both.  Specifically,

section 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and

a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative

expense under section 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

-13-

> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

33.    To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. Snowshoe, 789 F.2d at 1088; Suntrust Bank v. Den-Mark Construction, Inc. (In re Den-Mark Construction, Inc.), 406 B.R. 683, 691 (E.D.N.C. 2009) ("Although a debtor is not required to seek credit from every possible source . . . a debtor must show that it made a 'reasonable effort' to obtain post-petition financing from other potential lenders on less onerous terms and that such financing was unavailable.") (internal citation omitted). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Snowshoe, 789 F.2d at 1088; see also Pearl-Phil GMT (Far E.) Ltd. v. Caldor Corp., 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense). When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also In re Garland Corp., 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy

-14-

court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

34.    The DIP Lender was not willing to offer financing on an unsecured or administrative expense basis. For these reasons and those set forth elsewhere in this Motion, the Debtors submit that they have satisfied the standards of section 364(c) with respect to the DIP Credit Facility.

### C.    The Debtors Should Be Authorized to Obtain Postpetition Financing Secured by First Priority Priming Liens.

35.    In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lienholders, if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected. See 11 U.S.C. § 364(d)(1).

36.    When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtors' assets. Courts consider a number of factors, including, without limitation, whether:

    (a)    alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

    (b)    the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

    (c)    the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

    (d)    the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of

sound and reasonable business judgment and in the best
interest of the debtors' estates and their creditors.

See, e.g., Ames, 115 B.R. at 37-39; Bland v. Farmworker Creditors, 308 B.R. 109, 113-14 (S.D.

Ga. 2003); In re Farmland Indus., Inc., 294 B.R. 855, 862-79 (Bankr. W.D. Mo. 2003); In re

Lyondell Chem. Co., No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); Barbara K Enters., 2008

WL 2439649, at *10. The DIP Loan Documents satisfy each of these factors.

37.     *First*, as described above, the DIP Credit Facility is the best and only option for

obtaining the postpetition financing that the Debtors require. The Debtors and their advisors

conducted arm's-length negotiations with the DIP Lender regarding the terms of the DIP Credit

Facility, and the DIP Credit Agreement reflects the most favorable terms on which the DIP

Lender was willing to offer financing.

38.     *Second*, the Debtors require the DIP Credit Facility to preserve the value of their

estates for the benefit of all creditors and other parties in interest. Specifically, the Debtors need

liquidity to maintain their operations while they pursue the Sale. Absent the DIP Credit Facility

and use of the Cash Collateral, the Debtors will be unable to operate their business and

imminently forced to liquidate, to the detriment of their creditors, employees, and other parties-

in-interest.

39.     *Third*, the DIP Credit Facility will provide the Debtors with access to sufficient

postpetition financing to allow the Debtors to maintain their operations and key business

relationships, notwithstanding the commencement of these Chapter 11 Cases. The DIP Orders

also provide the Debtors with authority to continue using the Cash Collateral, which the Debtors

urgently require to continue their operations, pay their restructuring expenses (including

professional fees and expenses and other administrative costs), and preserve their going concern

value. The DIP Credit Facility is reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these Chapter 11 Cases.

40.     *Fourth*, as described in greater detail above, the Debtors and the DIP Lender negotiated the DIP Loan Documents in good faith and at arm's-length, and the Debtors' entry into the DIP Loan Documents is an exercise of their sound business judgment and is in the best interests of their estates, creditors, and other parties in interest.

41.     *Fifth*, the Prepetition Lender has consented to the use of Cash Collateral and the priming liens provided under the DIP Credit Facility in exchange for the various forms of adequate protection described herein and in the Interim DIP Order.

D.     **The Interests of the Prepetition Lender Are Adequately Protected.**

42.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed. 11 U.S.C. § 364(d)(1)(B). What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. See, e.g., In re Cont'l Airlines, Inc., 154 B.R. 176, 180-81 (Bankr. D. Del. 1993); In re Columbia Gas Sys., Inc., Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); see also In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case . . . ."); In re Realty Sw. Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (internal citation omitted).

43.     The agreed-upon adequate protection package provided to the Prepetition Lender consists primarily of the Adequate Protection Liens, as required under the Prepetition Credit Agreement. Under the circumstances, the Debtors submit that the proposed adequate protection is appropriate and should be approved.

**II.     The Debtors Should Be Authorized to Use the Cash Collateral.**

44.     Section 363(c) of the Bankruptcy Code restricts a debtor's use of a secured creditor's cash collateral. Specifically, that provision provides, in pertinent part, that: the trustee may not use, sell, or lease cash collateral . . . unless:

> (A)     each entity that has an interest in such cash collateral consents; or
>
> (B)     the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Further, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and should be authorized to use the Cash Collateral.

45.     Here, as set forth in the DIP Loan Documents, the Prepetition Lender has consented to the Debtors' use of the Cash Collateral, satisfying section 363(c)(2)(A) of the Bankruptcy Code.  Accordingly, the Debtors submit that the Court should authorize the Debtors to use the Cash Collateral under the terms set forth in the DIP Orders.

**III.     The DIP Lenders Should Be Deemed Good Faith Lenders Under Section 364(e).**

46.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

-18-

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

47.     As explained above, the DIP Credit Facility is the result of arm's-length and good faith negotiations between the Debtors and the DIP Lender. The Debtors submit that the terms and conditions of the DIP Loan Documents are fair and reasonable, and the proceeds of the DIP Credit Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein. Accordingly, the Court should find that the DIP Lender is a "good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and entitled to all of the protections afforded by that section.

## IV.     Modification of the Automatic Stay Is Warranted.

48.     The Interim DIP Order proposes that the automatic stay provisions of section 362 of the Bankruptcy Code be vacated and modified to the extent necessary to permit the DIP Lender to exercise, upon five (5) Business Days' notice to the Debtors and counsel to any Committee formed of the occurrence of an Event of Default, all rights and remedies, including, without limitation, against the DIP Collateral, without the need for obtaining a further order of this Court.

49.     Stay modification provisions of this type are ordinary and usual features of DIP financing and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Loan Documents and the DIP Orders.

## V.     The Debtors Require Immediate Access to the Cash Collateral and DIP Credit Facility.

50.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).

51.     Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain postpetition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

52.     In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. See, e.g., In re Ames, 115 B.R. at 36; In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985).

53.     Under this standard, the Debtors' request for entry of the DIP Orders, in the time periods and for the financing amounts requested herein, is appropriate. Courts in this jurisdiction have granted similar relief in numerous other chapter 11 cases. See, e.g., In re Corrozi-Fountainview, LLC, No. 10-11090 (Bankr. D. Del. June 6, 2011) [Docket No. 172]; In re Ambassadors Int'l, Inc., No. 11-11002 (Bankr. D. Del. Apr. 28, 2011) [Docket No. 160]; In re Atrium Corp., No. 10-10150 (Bankr. D. Del. Mar. 17, 2010) [Docket No. 400]; In re Constar

Int'l Inc., No. 11-10109 (Bankr. D. Del. Mar. 10, 2011) [Docket No. 258]; In re Appleseed's

Intermediate Holdings LLC, No. 11-10160 (Bankr. D. Del. Feb. 23, 2011) [Docket No. 315]; In

re ACG Holdings, Inc., No. 08-11467 (Bankr. D. Del. Jul. 16, 2008) [Docket No. 40]; In re Hilex

Poly Holding Co. LLC, No. 08-10890 (Bankr. D. Del. May 7, 2008) [Docket No. 48]; In re

Holley Performance Prods. Inc., No. 08-10256 (Bankr. D. Del. Feb. 12, 2008) [Docket No. 50];

In re Remy Worldwide Holdings, Inc., No. 07-11481 (Bankr. D. Del. Oct. 10, 2007) [Docket No.

39]; In re Foamex Intl Inc., No. 05-12685 (Bankr. D. Del. Sept. 20, 2005) [Docket No. 44].

54.    The Debtors and their estates will suffer immediate and irreparable harm if the

interim relief requested herein, including authorization for the Debtors to use the Cash Collateral

and to borrow under the DIP Credit Facility, is not granted promptly after the Petition Date.  To

continue to operate their business, maintain operations, and fund their cash management system

to a sufficient level, the Debtors require access to the Cash Collateral and DIP Credit Facility.  In

addition, the Debtors must wind down their operations following the contemplated sale of the

Debtors' assets to the Buyer.  To fund this wind down, upon completion of a Sale, the Debtors

will be entitled to fund an account (the "Wind Down Account") in an amount equal to $790,000

to pay such wind down expenses.  Absent authorization both to use the Cash Collateral and to

borrow under the DIP Credit Facility, the Debtors will immediately lack the funds needed to

continue business operations while pursuing an orderly and value-maximizing sale process.

55.    The Debtors have an immediate and urgent need for access to liquidity to, among

other things, continue the operation of their business, maintain their relationships with vendors

and healthcare facilities, meet payroll, and otherwise satisfy their administrative expenses and

operational needs, all of which is required to move forward with the Sale and preserve and

maintain the Debtors' enterprise value for the benefit of all parties in interest.

#32674289 v1

### Request for a Final Hearing

56.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, which is no sooner than 14 days after the Petition Date but no later than 30 days after the entry of the Interim DIP Order, to hold a hearing to consider entry of the Final DIP Order and the permanent approval of the relief requested in this Motion. The Debtors also request authority to serve a copy of the signed Interim DIP Order, which fixes the time and date for the filing of objections, if any, to entry of the Final DIP Order, by first class mail upon the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final DIP Order under Bankruptcy Rule 4001(c)(2).

### Reservation of Rights

57.    Nothing contained herein is intended or should be construed as an admission of the validity of any claim against the Debtors, a waiver of the Debtors' or any other party's rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code. If this Court grants the relief sought herein, any payment made pursuant to this Court's order is not intended and should not be construed as an admission of the validity of any claim or a waiver of the Debtors' or any other party's rights to dispute such claim subsequently.

### Notice[16]

58.    The Debtors have provided notice of this Motion on the date hereof via facsimile, overnight delivery, and/or hand delivery to: (a) the Office of the United States Trustee for the District of Delaware (Attn: Tiiara N.A. Patton); (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d);

---

[16] Capitalized terms used but not defined in this Notice section shall have the meanings set forth in the First Day Declaration.

#32674289 v1

(c) counsel to the Buyer; (d) the Internal Revenue Service; (e) the Office of the United States Attorney for each state in which the Debtors operate; (f) the Office of the Attorney General for each state in which the Debtors operate; (g) the National Association of Attorneys General; (h) the Securities and Exchange Commission; and (i) all parties entitled to notice pursuant to Local Rule 9013-1(m). The Debtors submit that, under the circumstances, no other or further notice is required.

## **No Prior Request**

59.    No prior request for the relief sought in this Motion has been made to this or any other court.

#32674289 v1

WHEREFORE, the Debtors respectfully request that the Court enter an order granting the

relief requested herein and granting such other further relief as is just and proper.

Dated: February 24, 2015          Respectfully submitted,
      Wilmington, Delaware

                                   /s/  Donald J. Detweiler
                                   PEPPER HAMILTON LLP
Donald J. Detweiler (DE No. 3087)
John H. Schanne II (DE No. 5260)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
Telephone: (302) 777-6500
Facsimile:  (302) 421-8390
Email:      detweilerd@pepperlaw.com
              schannej@pepperlaw.com

-and-

MCDERMOTT WILL & EMERY LLP
Timothy W. Walsh (*pro hac vice* pending)
Darren Azman (*pro hac vice* pending)
340 Madison Avenue
New York, New York 10173-1922
Telephone:(212) 547-5400
Facsimile: (212) 547-5444
Email:      twwalsh@mwe.com
              dazman@mwe.com

*Proposed Counsel to the Debtors and Debtors in Possession*

#32674289 v1