$2,500,000

DEBTOR IN POSSESSION CREDIT AGREEMENT

by and between

PRONERVE HOLDINGS, LLC
PRONERVE, LLC
BOULDER INTRAOPERATIVE MONITORING, LLC
EUGENE INTRAOPERATIVE MONITORING, LLC
DENVER SOUTH INTRAOPERATIVE MONITORING, LLC
COLORADO INTRAOPERATIVE MONITORING, LLC
RIVERSIDE INTRAOPERATIVE MONITORING, LLC
TOPEKA INTRAOPERATIVE, LLC
PRONERVE TECHNOLOGIES, LLC

jointly and severally
as debtors and debtors in possession

and

SPECIALTYCARE IOM SERVICES, LLC,
as lender

Dated as of February 24, 2015

## TABLE OF CONTENTS

Page

1. DEFINITIONS ........................................................................................................... 1

    1.1    Definitions ...................................................................................... 1
    1.2    Certain Terms ................................................................................ 6
    1.3    Accounting Terms ......................................................................... 6
    1.4    Internal Cross References .............................................................. 6
    1.5    Legislation .................................................................................... 6

2. AMOUNT AND TERM OF THE LOAN ............................................................... 6

    2.1    The Loan ........................................................................................ 6
    2.2    Use of Proceeds ............................................................................ 7
    2.3    Repayment of Loan; Evidence of Debt ........................................ 7
    2.4    Interest ........................................................................................... 7
    2.5    Payments and Computations ......................................................... 8
    2.6    Illegality ....................................................................................... 8
    2.7    Priming Liens ............................................................................... 8

3. CONDITIONS TO LENDING AND EFFECTIVENESS ..................................... 9

    3.1    Conditions Precedent to the Effectiveness of this Agreement and to
           the Initial Loan ............................................................................. 9
    3.2    Conditions Precedent to Weekly Draw ........................................ 9
    3.3    Conditions Precedent to Final Draw ............................................ 10

4. REPRESENTATIONS AND WARRANTIES ....................................................... 11

    4.1    Representations and Warranties of the Borrowers ....................... 11

5. COVENANTS OF THE BORROWERS ................................................................ 12

    5.1    Affirmative Covenants ................................................................. 12
    5.2    Negative Covenants ...................................................................... 13

6. EVENTS OF DEFAULT ........................................................................................ 13

    6.1    Events of Default .......................................................................... 13

7. MISCELLANEOUS ............................................................................................... 14

    7.1    Amendments, Etc .......................................................................... 14
    7.2    Headings ........................................................................................ 15
    7.3    Notices, Etc ................................................................................... 15
    7.4    No Waiver; Remedies ................................................................... 15
    7.5    Costs, Expenses and Taxes ........................................................... 15
    7.6    Binding Effect; Assignment ......................................................... 16
    7.7    Execution in Counterparts ............................................................ 16
    7.8    Entire Agreement; Severability of Provisions ............................. 16
    7.9    Indemnification ............................................................................. 16
    7.10   Governing Law ............................................................................. 17

**TABLE OF CONTENTS**
(continued)

Page

7.11    Consent to Jurisdiction ........................................................................... 17
7.12    Confidentiality ....................................................................................... 18

DEBTOR IN POSSESSION CREDIT AGREEMENT, dated as of February 24, 2015, by and between PRONERVE HOLDINGS, LLC, a Delaware limited liability company, PRONERVE, LLC, a Delaware limited liability company, BOULDER INTRAOPERATIVE MONITORING, LLC, a Colorado limited liability company, EUGENE INTRAOPERATIVE MONITORING, LLC, a Delaware limited liability company, DENVER SOUTH INTRAOPERATIVE MONITORING, LLC, a Delaware limited liability company, COLORADO INTRAOPERATIVE MONITORING, LLC, a Delaware limited liability company, RIVERSIDE INTRAOPERATIVE MONITORING, LLC, a Delaware limited liability company, TOPEKA INTRAOPERATIVE MONITORING, LLC, a Delaware limited liability company, and PRONERVE TECHNOLOGIES, LLC, a Delaware limited liability company, jointly and severally, as debtors and debtors in possession under chapter 11 of the Bankruptcy Code (as defined below) (each, a "*Borrower*" and collectively, the "*Borrowers*") and SPECIALTYCARE IOM SERVICES, LLC, a Delaware limited liability company, as lender under chapter 11 of the Bankruptcy Code (together with its successors and permitted assigns, the "*Lender*").

## RECITALS:

A.    On February 24, 2015 (the "*Petition Date*"), each of the Borrowers filed a voluntary petition for relief (collectively, the "*Chapter 11 Cases*") under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") with the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*").

B.    The Borrowers are continuing to operate their respective businesses and manage their respective properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

C.    The Borrowers have requested that the Lender provide a secured term loan facility to the Borrowers in total principal amount of $2,500,000 in order to ensure ample liquidity to the Borrowers as debtors in possession under the Bankruptcy Code.

D.    The Lender is willing to make available to the Borrowers, jointly and severally, such postpetition loan upon the terms and subject to the conditions set forth herein.

NOW, Therefore, in consideration of the premises and the covenants contained herein, the parties hereto hereby agree as follows:

1.    DEFINITIONS

1.1    *Definitions.* As used in this Agreement, the following terms have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"*Affiliate*" means, with respect to any Person, each officer, director or general partner of such Person and any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person. For purpose of this definition, "*control*" means the possession of either (a) the power to vote, or the beneficial ownership of, 10% or more of the Voting Stock of such Person or (b) the power to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"*Agreement*" means this Agreement, as the same may be amended, supplemented or otherwise modified from time to time.

"*Agreement Effective Date*" has the meaning specified in *Section 3.1*.

"*Asset Purchase Agreement*" means that certain Asset Purchase Agreement by and among SpecialtyCare IOM Services, LLC and the Borrowers dated as of February 24, 2015.

"*Base Rate*" means a rate per annum equal to seven percent (7%).

"*Business Day*" means a day of the year on which banks are not required or authorized to close in New York City.

"*Carve-Out*" means (i) the unpaid fees of the U.S. Trustee or the Clerk of the Bankruptcy Court pursuant to 28 U.S.C. § 1930(a) and (b); and (ii) all accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Borrowers (including pursuant to section 363 of the Bankruptcy Code) and any statutory committees appointed in the Chapter 11 Cases, in an amount not to exceed $300,000 in the aggregate (the "*Carve-Out Amount*") to the extent allowed by the Bankruptcy Court at any time; provided, that (w) the Lender may at any time, in its sole and absolute discretion, agree to increase the Carve-Out Amount; (x) no portion of the Carve-Out shall be used, either directly or indirectly, for any services or expenses arising from or relating to the investigation, initiation, or prosecution of any action (a) contesting the validity, priority, or extent of the claims or Liens asserted by the Lender or the Liens securing the Prepetition Loan, (b) asserting claims or causes of action of any sort whatsoever (including, without limitation, avoidance claims) against the Lender or any Person affiliated with the Lender, (c) preventing, hindering, or delaying the Lender from enforcing any of its rights or remedies or realizing upon the assets that serve as collateral for the Obligations, or (d) seeking to modify any of the rights of the Lender provided for in the Loan Documents or the DIP Orders; (y) as long as no Default or Event of Default shall have occurred and be continuing, the Borrowers shall be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, and such payments shall not reduce the Carve-Out; and (z) to the extent the dollar limitation in clause (ii) above is reduced as a result of payment of such fees and expenses during the continuation of an Event of Default, if such Event of Default is subsequently cured or

waived, the limitation in clause (ii) above shall be increased by an amount equal to the amount by which it had so been reduced.

"*Claim*" has the meaning specified in section 101(5) of the Bankruptcy Code.

"*Closing Date*" has the meaning set forth in the Asset Purchase Agreement.

"*Debt*" means (a) indebtedness for borrowed money, (b) obligations evidenced by bonds, debentures, notes or other similar instruments and obligations to pay for the deferred purchase price of property or services, in each case other than obligations to make milestone, progress and similar payments, obligations under trade credit incurred in the ordinary course of business, and other credit from suppliers incurred in the ordinary course of business in connection with the goods or services supplied (whether or not evidenced by a promissory note or a credit agreement), (c) obligations as lessee under leases that have been recorded as capital leases in accordance with GAAP and the present value of all future rental payments under all synthetic leases and (d) obligations under direct or indirect guaranties in respect of, and obligations (contingent or otherwise) to purchase or otherwise acquire, or otherwise to assure a creditor against loss in respect of, obligations of others of the kinds referred to in *clauses (a)* through *(c)* above.

"*Default*" means an event which, with the giving of notice or lapse of time, or both, would constitute an Event of Default.

"*DIP Budget*" means the budget for the payment of expenses incurred in the ordinary course of the Borrowers' business annexed hereto as Exhibit "A".

"*DIP Orders*" means both the Interim DIP Order and the Final DIP Order.

"*Dollars*" and "*$*" mean the lawful currency of the United States of America.

"*Event of Default*" has the meaning specified in *Section 6.1*.

"*Final DIP Order*" means an order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure and pursuant to sections 363 and 364 of the Bankruptcy Code, in form and substance satisfactory to the Lender, which, on a final basis, among other things, approves this Agreement and the other Loan Documents, as to which no stay has been entered and that has not been reversed, modified, supplemented, vacated or overturned without the prior written consent of the Lender; *provided*, *however*, that, if such consent is obtained, "*Final DIP Order*" shall then include such supplement, reversal, and other modification.

"*Final Draw Amount*" means the difference between $2,500,000 and the sum of the Interim Loan Amount and the Weekly Draw Amounts.

"*GAAP*" means generally accepted accounting principles in the United States of America as in effect from time to time set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and the statements and pronouncements of the Financial Accounting Standards Board, or in such other statements by such other entity as may be in general use by significant segments of the accounting profession, that are applicable to the circumstances as of the date of determination, applied consistently with the principles used in the preparation of the latest financial statements of the Borrowers delivered to the Lender prior to the date hereof.

"*Indemnitees*" has the meaning specified in *Section 7.9*.

"*Interim DIP Order*" means an order of the Bankruptcy Court entered in the Chapter 11 Cases pursuant to sections 363 and 364 of the Bankruptcy Code, in form and substance satisfactory to the Lender, which, on an interim basis, among other things, approves this Agreement and the other Loan Documents.

"*Interim Loan Amount*" means the lesser of $800,000 and the amount authorized to be lent by the Lender to the Borrowers under the Interim DIP Order.

"*Law*" means any federal, state, local, municipal, foreign, international, multinational or other constitution, statute, law, rule, regulation, ordinance, code, principle of common law or treaty.

"*Lien*" means any mortgage, deed of trust, pledge, hypothecation, assignment, charge, deposit arrangement, encumbrance, easement, lien (statutory or other), security interest or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever, including any conditional sale contract or other title retention agreement, the interest of a lessor under a capital lease, and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"*Loan*" has the meaning specified in *Section 2.1*.

"*Loan Documents*" means this Agreement and any other document or instrument executed and delivered by the Borrowers to the Lender in connection with this Agreement.

"*Maturity Date*" means the earliest of (a) the Closing Date, (b) the closing of an Alternative Transaction (as such term is defined in the Asset Purchase Agreement) and (c) sixty (60) days from the Petition Date.

"*New York Courts*" has the meaning specified in *Section 7.11*.

"*Obligations*" means all loans, advances, debts, liabilities, obligations, covenants and duties of any kind or nature, present or future, whether or not evidenced by any note, guaranty or other instrument, due to the Lender or to any other Indemnitee from the Borrowers and arising under any Loan Document, whether or not for the payment of money, whether arising by reason of an extension of credit, guaranty, indemnification, or in any other manner, whether direct or indirect (including those acquired by assignment), absolute or contingent, due or to become due, now or hereafter arising and however acquired, including all interest, charges, expenses, fees (including attorneys' fees) and other amounts chargeable to the Borrowers under any Loan Document.

"*Person*" means any individual, partnership, corporation (including a business trust and a public benefit corporation), joint stock company, estate, association, firm, enterprise, trust, limited liability company, unincorporated association, joint venture and any other entity or Governmental Authority.

"*Permitted Liens*" means all of the following:

(a)     statutory liens for Taxes not yet due,

(b)     statutory liens of landlords, carriers, warehousemen, mechanics and materialmen incurred in the ordinary course of business for sums not yet due,

(c)     liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security,

(d)     zoning Laws and other land use restrictions that do not materially impair the present or anticipated value or use of the encumbered asset, and

(e)     in the case of leased property, all matters, whether or not of record, affecting the title of the lessor (and any underlying lessor) that do not materially impair the present or anticipated value or use of the encumbered asset.

"*Prepetition Loan*" means the loan held by SpecialtyCare IOM Services, LLC as the successor lender under that certain Credit Agreement dated as of December 12, 2012, by and among ProNerve, LLC, as the borrower and the lenders party thereto.

"*Tax*" means (i) all income taxes (including any tax on or based upon net income, or gross income, or income as specially defined, or earnings, or profits, or selected items of income, earnings, or profits) and all gross receipts, estimated, sales, use, ad valorem, transfer, franchise, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, or windfall profit taxes, unpaid property taxes, environment, alternative, or add-on minimum taxes, custom duties or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts and (ii) any obligation to indemnify or otherwise assume or succeed to any liability described in clause (i) hereof

of any other Person whether by contract or under common law doctrine of de facto merger and successor liability or otherwise.

"*Voting Stock*" means capital stock of any Person having ordinary power to vote in the election of members of the board of directors, managers, trustees, or other controlling Persons, of such Person (irrespective of whether, at the time, capital stock of any other class shall have or might have voting power by reason of the occurrence of any contingency).

"*Weekly Draw*" means draws authorized to be made by the Borrowers on a weekly basis in an amount not to exceed the Weekly Draw Amount, subject to *Section 2.2 (Use of Proceeds)*, upon the date of the entry of the Final DIP Order until the Closing Date.

"*Weekly Draw Amount*" means, for any week from and after entry of the Final DIP Order and the Closing Date, the lesser of (a) the remaining undrawn amount under this Agreement and (b) the amount authorized to be lent by the Lender to the Borrowers as set forth in the DIP Budget, subject to Section 2.2.

1.2     *Certain Terms.*  In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "*from*" means "from and including," the words "*to*" and "*until*" each mean "to but excluding," and the word "*through*" means "to and including." The words "*include*," "*includes*," and "*including*" mean, respectively, "include without limitation," "includes without limitation," and "including without limitation." The word "*or*" does refer to an exclusive choice.

1.3     *Accounting Terms.*  All accounting terms not specifically defined herein shall be construed in conformity with GAAP, and all accounting determinations required to be made pursuant hereto shall, unless expressly otherwise provided herein, be made in conformity with GAAP.

1.4     *Internal Cross References.*    The words "*herein*," "*hereof*," and "*hereunder*" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section, subsection, or clause in this Agreement.

1.5     *Legislation.*    Unless the context otherwise requires, references to any legislation or administrative rule or regulation include references to any amendment or modification of such legislation, rule, or regulation, to any successor legislation, rule, or regulation and to any subordinate legislation, rule, or regulation made thereunder.

2.     AMOUNT AND TERM OF THE LOAN

2.1     *The Loan.* (a) The Lender agrees, on the terms and subject to the conditions hereinafter set forth, to make a term loan to the Borrowers in the aggregate principal amount of two million five hundred thousand Dollars ($2,500,000) (the "*Loan*"). Amounts repaid may not be reborrowed.

(b)       Upon fulfillment of the applicable conditions set forth in *Article 3 (Conditions to Lending and Effectiveness)*, the Lender shall make the Loan available to the Borrowers upon the entry of the Interim DIP Order in the Interim Loan Amount. Upon the entry of the Final DIP Order until the day prior to the Closing Date, the Lender shall make Weekly Draws available to the Borrowers. On the Closing Date, the Lender shall make the Final Draw Amount available to the Borrowers.

2.2    *Use of Proceeds.* The Borrowers shall apply proceeds of the Loan to fund (a) postpetition operating expenses of the Borrowers incurred in the ordinary course of business and (b) working capital, capital expenditures, and other general corporate purposes of the Borrowers strictly in accordance with the amounts and categories set forth in the DIP Budget applicable to the period covered by the Weekly Draw. The Lender acknowledges that actual expenditures may not be exactly the same as those projected in the DIP Budget, and agrees that the actual expenditures in any given two-week period for any category may exceed the amounts set forth for such corresponding category in the DIP Budget, so long as the actual expenditure for such category does not exceed the amount in the DIP Budget for that category by fifteen percent (15%), as measured over a two-week period, and the actual total expenditures for all categories covered by the Weekly Draw do not exceed the DIP Budget by fifteen percent (15%), as measured over a two-week period. To the extent the Borrowers do not draw the full amount available to be drawn in a week pursuant to the DIP Budget, such amount shall be added to the amount available under the DIP Budget for the subsequent week.

2.3    *Repayment of Loan; Evidence of Debt.* (a) The Borrowers shall repay the Loan in full, in immediately available Dollars, on the Maturity Date.

(b)       The Lender shall, in accordance with its customary practices, maintain an account evidencing all Debt of the Borrowers to the Lender resulting from the Loan, including, without limitation, the amounts of principal and interest payable and paid to the Lender or credited against the Loan from time to time under this Agreement. The entries made in such account shall, absent manifest error and to the extent permitted by applicable law, be prima facie evidence of the existence and amounts of the obligations recorded therein; *provided, however*, that the failure of the Lender to maintain such an account or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loan in accordance with its terms.

2.4    *Interest.*

(a)       *Rate of Interest.* The Loan and the outstanding principal balance of all other Obligations shall bear interest on the unpaid principal amount thereof from the date such Loan was made and such other Obligations are due and payable until paid in full, except as otherwise provided in *Section 2.4(c) (Default Interest)* and except that such interest rate shall not exceed the maximum rate permitted by applicable law, at a rate per annum equal to the Base Rate.

(b)     *Interest Payments.* Interest shall accrue and be payable at maturity whether by acceleration or by the occurrence of the Maturity Date.

(c)     *Default Interest.* Notwithstanding the rates of interest specified in *Section 2.4(a) (Rate of Interest)* or elsewhere in this Agreement, effective immediately upon (i) the occurrence of an Event of Default described in *Section 6.1* or (ii) the occurrence of any other Event of Default and notice from the Lender of the effectiveness of this *Section 2.4(c)*, and in either case, for as long thereafter as such Event of Default shall be continuing, the principal balance of all Obligations shall bear interest (except that such interest rate shall not exceed the maximum rate permitted by applicable law) at a rate that is two percent (2%) per annum in excess of the Base Rate.

2.5     *Payments and Computations.*   (a)   Except as provided in the Asset Purchase Agreement, the Borrowers shall make each payment under any Loan Document of principal of and interest on the Loan and other Obligations, without set off, counterclaim, condition or reservation of right, in immediately available Dollars, not later than 5:00 P.M. (New York City time) on the day when due to the Lender at its address referred to in *Section 7.3 (Notices, Etc.)* or such address in the United States as may be notified by the Lender to the Borrower.

(b)     All computations of interest shall be made by the Lender on the basis of a year of 365 or 366 days, as applicable, and the actual number of days elapsed (including the first day but excluding the last day).

(c)     Whenever any payment under any Loan Document shall be otherwise required to be made on a day other than a Business Day, such payment shall be required to be made on the next succeeding Business Day, and such extension of the time shall in such case be included in the computation of payment of interest; *provided, however,* that if such extension would cause payment of interest on or principal of the Loan to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

2.6     *Illegality.*   Notwithstanding anything to the contrary contained herein, if the Lender determines in its reasonable judgment that it has become unlawful for the Lender to make, fund, or maintain the Loan, then the Lender may give the Borrowers notice thereof, at which time the Borrowers shall pay or prepay the Loan (without premium or penalty), together with all accrued interest thereon and all fees and other amounts payable to the Lender under any Loan Document.

2.7     *Priming Liens.*   All Obligations shall be secured by first priority priming liens under section 364(d) of the Bankruptcy Code, as more fully set forth in the Interim DIP Order or the Final DIP Order, as applicable, subordinate only to Permitted Liens.

3. CONDITIONS TO LENDING AND EFFECTIVENESS

3.1 *Conditions Precedent to the Effectiveness of this Agreement and to the Initial Loan.* This Agreement shall be effective on the date of fulfillment of (the "*Agreement Effective Date*"), and the obligation of the Lender to make the Loan hereunder is subject to the fulfillment (or waiver in writing by the Lender) of, all of the following conditions precedent on and as of such date:

(a) the Interim DIP Order has been entered and is in full force and effect;

(b) the representations and warranties made in *Article 4 (Representations and Warranties)* shall be true and correct on and as of such date, before and after giving effect to the Loan and to the application of the proceeds therefrom, as though made on and as of such date;

(c) no Default or Event of Default shall be continuing or would result from the Loan or the application of the proceeds therefrom as of such date;

(d) the Lender shall have received all of the following on or before such date, each in form and substance satisfactory to it:

(i) this Agreement duly executed by each of the Borrowers;

(ii) true and complete copies of the certificate of formation and the operating agreement of each of the Borrowers and certified copies of the written consent of the duly authorized representative of each of the Borrowers approving all Loan Documents to be delivered on or before such date and certified copies of all documents evidencing other necessary limited liability company action and governmental approvals, if any, with respect to such Loan Documents;

(iii) a certificate, signed by a duly authorized officer of each Borrower and dated such date, stating that the conditions set forth in *clauses (b)* and *(c)* above and *clause (e)* below have been satisfied as of such date; and

(iv) a Manager's Certificate from ProNerve Holdings, LLC, certifying the names and true signatures of the Persons authorized to sign the Loan Documents on behalf of each Borrower; and

(e) the Asset Purchase Agreement shall be in full force and effect subject to its approval by the Bankruptcy Court.

Upon the satisfaction of the foregoing conditions, the Lender shall make a loan to the Borrowers in an amount equal to the Interim Loan Amount.

3.2 *Conditions Precedent to Weekly Draw.* From and after entry of the Final DIP Order and until the day before the Closing Date, the Borrowers may make a

Weekly Draw by giving written notice to the Lender on the last Business Day of each week stating that it intends to make a draw in the Weekly Draw Amount, which will be funded on the first Business Day of the subsequent week. The Lender's obligation to fund the Weekly Draw shall be subject to the following conditions:

(a)    the Final DIP Order has been entered by the Bankruptcy Court and is in full force and effect;

(b)    the representations and warranties made in *Article 4 (Representations and Warranties)* shall be true and correct in all material respects on and as of such date, before and after giving effect to the Weekly Draw and to the application of the proceeds therefrom, as though made on and as of such date;

(c)    no Default or Event of Default shall be continuing or would result from the Weekly Draw or the application of the proceeds therefrom as of such date;

(d)    either (i) if the Bankruptcy Court determines that an Auction (as such term is defined in the Asset Purchase Agreement) is necessary, entry of the Bid Procedures Order (as such term is defined in the Asset Purchase Agreement) or (ii) entry of the Sale Order (as such term is defined in the Asset Purchase Agreement);

(e)    the Asset Purchase Agreement shall be in full force and effect; and

(f)    a certificate, signed by a duly authorized officer of each of the Borrowers and dated such date, certifying that the Weekly Draw Amount has been calculated in accordance with the DIP Budget subject to Section 2.2, providing details showing the calculation of the Weekly Draw Amount subject to Section 2.2, and stating that the conditions set forth in *clauses (a)-(e)* of this section have been satisfied as of such date.

3.3    *Conditions Precedent to Final Draw.* The obligation of the Lender to fund the Final Draw shall be subject to the occurrence of the following:

(a)    the Final DIP Order has been entered by the Bankruptcy Court and is in full force and effect;

(b)    the representations and warranties made in *Article 4 (Representations and Warranties)* shall be true and correct in all material respects on and as of such date, before and after giving effect to the Final Draw and to the application of the proceeds therefrom, as though made on and as of such date;

(c)    no Default or Event of Default shall be continuing or would result from the Final Draw or the application of the proceeds therefrom as of such date;

(d)    either (i) if the Bankruptcy Court has determined that an Auction (as such term is defined in the Asset Purchase Agreement) is necessary, the Bid Procedures Order (as such term is defined in the Asset Purchase Agreement) has been

entered or (ii) the Sale Order (as such term is defined in the Asset Purchase Agreement) has been entered;

        (e)    the Asset Purchase Agreement shall be in full force and effect; and

        (f)    a certificate, signed by a duly authorized officer of each of the Borrowers and dated such date, stating that the conditions set forth in *clauses (a)-(e)* of this section have been satisfied as of such date.

        4.    REPRESENTATIONS AND WARRANTIES

    4.1   *Representations and Warranties of the Borrowers.* Each of the Borrowers represents and warrants on and as of the date hereof and the Agreement Effective Date as follows:

        (a)    Such Borrower is duly incorporated, validly existing and in good standing under the laws of its jurisdiction of organization and has the limited liability company power and authority to own its assets and to transact the business in which it is now engaged or proposed to be engaged.

        (b)    The execution, delivery, and performance by such Borrower of the Loan Documents have been duly authorized by all necessary limited liability company actions and do not and will not (i) contravene its organizational documents, (ii) violate any provision of, or require any filing, registration, consent or approval under, any material law, rule, regulation, order, writ, judgment, injunction, decree, determination, or award applicable to such Borrower, (iii) result in a breach of, or constitute a default or require any consent or result in the creation of a Lien under, any material indenture, lease, instrument, or other agreement to which such Borrower is a party or by which such Borrower or its properties may be bound or affected.

        (c)    Each of the Loan Documents has been duly executed and delivered by such Borrower and, subject to entry of the DIP Orders, constitutes its legal, valid, and binding obligation enforceable against it in accordance with its terms subject to the Bankruptcy Code.

        (d)    Except in connection with the Chapter 11 Cases, no authorization or approval or other action by, and no notice to or filing with, any governmental authority or regulatory body is required for the due execution, delivery, and performance by such Borrower of the Loan Documents.

        (e)    Except for the Chapter 11 Cases, there is no pending or threatened action, proceeding, or investigation affecting such Borrower before any court, commission, agency, or instrumentality of the federal or any state or municipal government or any agency or subdivision thereof or before any arbitration that purports to materially adversely affect the legality, validity, or enforceability of the Loan Documents.

(f)    After the Agreement Effective Date, (i) pursuant to section 364(d)(1) of the Bankruptcy Code and the DIP Orders, all Obligations constitute allowed claims of the Borrowers in the Chapter 11 Cases  subject, as to priority only, to the Carve-Out and secured by a first priority, priming lien on and security interest in substantially all assets of the Borrowers and specifically excluding avoidance actions under chapter 5 of the Bankruptcy Code, subject only to Permitted Liens, and (ii) the Interim DIP Order (or the Final DIP Order, as applicable) and the transactions contemplated hereby and thereby are in full force and effect and have not been vacated, reversed, modified, amended, or stayed without the prior written consent of the Lender.

5.    COVENANTS OF THE BORROWERS

5.1    *Affirmative Covenants.*    Until all the Obligations (other than contingent obligations) are paid in full, the Borrowers shall do all of the following unless the Lender shall otherwise consent in writing:

(a)    at all times maintain its limited liability company existence and preserve and keep in full force and effect its rights, privileges, and franchises necessary or desirable to its business;

(b)    comply in all respects with all material applicable laws, rules, regulations, orders, permits, and licenses;

(c)    maintain at all times insurance in such amounts and against such risks as is common industry practice;

(d)    keep proper books of record and account in which entries in conformity with GAAP shall be made of all dealings and transactions in relation to its business and activities;

(e)    permit the Lender and its representatives, during normal business hours and with reasonable prior notice and (other than during the continuance of a Default or Event of Default) at the Lender's expense, to inspect its facilities and its books and records and to discuss its affairs, finances and accounts with its officers and employees;

(f)    furnish to the Lender a forecast of the weekly cash flows of the Borrowers delivered on a weekly basis starting on the then prior week and a reconciliation of actual expenses to the DIP Budget; and

(g)    execute and deliver from time to time to the Lender all such further documents and instruments and do all such other acts and things as may be reasonably required by the Lender to enable the Lender to exercise and enforce its rights hereunder and under the other Loan Documents.

5.2 *Negative Covenants.* As long as any Obligation (other than contingent obligations) remain outstanding, the Borrowers agree that it will not do any of the following without the written consent of the Lender:

(a)　create or suffer to exist any Lien upon or with respect to any of its property, whether now owned or hereafter acquired, or assign any right to receive income, in each case to secure or provide for the payment of any Debt of any Person, other than Permitted Liens;

(b)　directly or indirectly create, incur, assume or otherwise become or remain directly or indirectly liable with respect to any Debt, except for (i) the Obligations, (ii) any Debt existing on the date hereof, (iii) any short-term Debt entered into in the ordinary course of business, (iv) any Debt secured by Permitted Liens, and (v) to the extent constituting Debt, indemnification obligations in respect of warranty and similar claims; and

(c)　except as expressly contemplated hereby, engage in any transaction with any Affiliate on terms more favorable to such Affiliate than would have been obtainable in an arm's-length dealing except for (i) transactions in the ordinary course of business that do not materially adversely affect the ability of the Borrowers to repay the Obligations when due and  (ii) transactions existing on the date hereof and approved by the Bankruptcy Court.

6.　EVENTS OF DEFAULT

6.1 *Events of Default.* If any of the following shall occur and be continuing (each an "*Event of Default*"):

(a)　any representation or warranty made by the Borrowers in any Loan Document or in any certificate agreement or statement delivered to the Lender in connection with any Loan Document shall prove to have been incorrect in any material respect when made; or

(b)　the Borrower shall fail to observe (i) any provision of Section 5.2 (Negative Covenants) or (ii) any provision of any Loan Document (other those described in Section 6.1(a) or clause (i) of this Section 6.1(b)) for more than five (5) Business Days; or

(c)　without the consent of the Lender, any Loan Document shall, at any time after its execution and delivery, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability of any such Loan Document shall be contested by the Borrowers, or the Borrowers shall deny that the Lender has any further liability or obligation under any such Loan Document; or

(d)　(i) the Chapter 11 Cases shall be dismissed (or the Bankruptcy Court shall make a ruling requiring the dismissal of such Chapter 11 Cases) or converted

DEBTOR IN POSSESSION CREDIT AGREEMENT
PRONERVE HOLDINGS, LLC

to cases under chapter 7 of the Bankruptcy Code, (ii) any order shall be entered permitting, or the Borrowers shall file any pleading requesting any such relief, or (iii) the Borrowers shall have any obligation to make adequate protection payments, or otherwise provide adequate protection, other than as approved by the Lender; or

(e) (i) the DIP Orders shall cease to be in full force and effect, (ii) the Borrowers shall fail to comply with the terms of the DIP Orders in any material respect, (iii) the Final DIP Order shall be amended, supplemented, stayed, reversed, vacated, or otherwise modified (or the Borrowers shall apply for authority to do so) without the written consent of the Lender or (iv) any Obligation shall cease to be an allowed secured claim of the Borrowers in the Chapter 11 Cases pursuant to clause (d)(1) of Section 364 of the Bankruptcy Code and the DIP Orders; or

(f) the Bankruptcy Court shall enter an order appointing a trustee as set forth in section 1104 of the Bankruptcy Code, in any of the Chapter 11 Cases;

(g) the Borrowers shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party in interest executed by or on behalf of the Borrower) any other Person's motion to, disallow in whole or in part any claim of the Lender in respect of the Obligations or in respect of the Prepetition Loan;

(h) the Borrowers shall fail to comply with the conditions of Buyer's obligations set forth in *Article VI.* of the Asset Purchase Agreement, when such failure to comply is attributable to the Borrower's willful misconduct or gross negligence; or

(i) the Interim DIP Order is not entered by five (5) Business Days from the Petition Date and the Final DIP Order is not entered by twenty-eight (28) Business Days from the Petition Date.

then, and in any such event, the Lender may, by notice to the Borrower, declare all or part of any Obligation to be forthwith due and payable, whereupon such Obligation or such part shall become and be forthwith due and payable, without presentment, demand, protest, or further notice of any kind, all of which are hereby expressly waived by the Borrower. In addition, subject solely to any requirement of the giving of notice by the terms of the Interim DIP Order or the Final DIP Order, as applicable, the automatic stay provided in Section 362 of the Bankruptcy Code shall be deemed automatically vacated without further action or order of the Bankruptcy Court and the Lender shall be entitled to exercise all of its rights and remedies under the Loan Documents.

7.    MISCELLANEOUS

7.1    *Amendments, Etc.*  No amendment or waiver of any provision of any Loan Document, nor consent to any departure by the Borrowers therefrom, shall be effective unless the same shall be in writing and signed by the Lender, and then such waiver or

consent shall be effective only in the specific instance and for the specific purpose for which given.

7.2 *Headings.* The headings and table of contents are included in this Agreement for convenience only and shall not in any way affect the meaning of or interpretation of this Agreement.

7.3 *Notices, Etc.* All notices and other communications provided for hereunder shall be in writing and mailed, e-mailed, or delivered, as follows:

(a)    if to the Borrowers, addressed to ProNerve Holdings, LLC, Attention: George Pillari, Chief Executive Officer, 7600 E. Orchard Road, Suite 200 N, Greenwood Village, CO 80111, E-Mail: gpillari@alvarezandmarsal.com,

with copy to

McDermott Will & Emery LLP, Attention: Timothy W. Walsh, 340 Madison Avenue, New York, NY 10173, E-mail: twwalsh@mwe.com.

(b)    If to the Lender, at its address at SpecialtyCare IOM Services, LLC, Attention: Eric Schondorf, General Counsel, 299 Park Avenue, 34th Floor, New York, NY 10171, E-mail: eschondorf@american-securities.com,

with a copy to

Weil, Gotshal & Manges LLP, Attention: Debra A. Dandeneau, 767 Fifth Avenue, New York, NY 10153, E-Mail: debra.dandeneau@weil.com,

or, as to each party, at such other address as shall be designated by such party in a written notice to the other party. All such notices and communications shall be effective, if e-mailed or telecopied, when e-mailed or telecopied, or, if mailed or delivered, when actually received.

7.4 *No Waiver; Remedies.* No failure on the part of the Lender to exercise, and no delay in exercising, any right under any Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right. The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

7.5 *Costs, Expenses and Taxes.* Each of the Borrowers agrees to pay after an Event of Default on demand, subject to any necessary court approvals, all costs and expenses, if any (including fees and expenses of counsel), in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of any Loan Document, including, without limitation, reasonable counsel fees and expenses in connection with the enforcement of rights under this *Section 7.5*. In addition, each of

the Borrowers shall pay any and all stamp and other taxes payable or determined to be payable in connection with the execution and delivery of any Loan Document to be delivered hereunder and agrees to save the Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay such taxes.

7.6    *Binding Effect; Assignment*.    This Agreement shall be effective as of the Agreement Effective Date and, thereafter, shall be binding upon and inure to the benefit of the Borrowers and the Lender and their respective successors and assigns, except that the Borrowers shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of the Lender. The Lender may assign (including for collateral purposes) all or a portion of its rights and obligations under this Agreement upon notice to the Borrowers.

7.7    *Execution in Counterparts*.    This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement. One or more counterparts of this Agreement (or portions hereof) may be delivered via e-mail, with the intention that they shall have the same effect as an original counterpart hereof (or such portions hereof). All signature pages need not be on the same counterpart.

7.8    *Entire Agreement; Severability of Provisions*.    The Loan Documents contain the entire agreement of the parties hereto and supersede all prior agreements and understandings, oral and otherwise, among the parties hereto with respect to the matters contained in the Loan Documents. If any provision of this Agreement, or the application thereof to any Person or circumstance, is invalid or unenforceable or contravenes any law, regulation or document applicable to such Person, such provision or application shall be deemed ineffective *ab initio*, but the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby, and the provisions of this Agreement shall be severable in any such instances.

7.9    *Indemnification*.    The Borrowers agree to indemnify the Lender and its Affiliates and each of their respective stockholders, directors, officers, agents, attorneys and employees, and the successors and assigns of the foregoing (collectively, "*Indemnitees*"), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against any Indemnitee in any way relating to or arising out of the Loan Documents, any related transactions (whether actual or proposed) or any action taken or omitted by the Lender under the Loan Documents; *provided, however*, that no Borrower shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the bad faith, gross negligence, or willful misconduct of such Indemnitee as finally determined by a court of competent

jurisdiction. The foregoing agreements shall survive the making and repayment of the Loan.

7.10 *Governing Law*. This Agreement shall be governed by, and construed in accordance with, the law of the State of New York and any applicable laws of the United States of America, including the Bankruptcy Code.

7.11 *Consent to Jurisdiction*. The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of the Loan Documents and to decide any claims or disputes that may arise or result from, or be connected with, the Loan Documents, any breach or default thereunder, or the transactions contemplated therein during the pendency of the Chapter 11 Cases. Any and all claims or disputes, causes of action, suits and proceedings relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent and submit to the jurisdiction of the Bankruptcy Court, *provided, however*, that, if the Bankruptcy Court determines that it does not have subject matter jurisdiction over any action or proceeding arising out of or relating to the Loan Documents and the District Court for the District of Delaware also so determines, then each of the parties agrees that all such actions or proceedings may be heard and determined in a federal court of the United States sitting in the City of New York, County of New York, or, if such federal court lacks jurisdiction over such action, in a court of the State of New York sitting in the City of New York, County of New York (the "*New York Courts*"). By execution and delivery of this Agreement, the Borrowers accept for themselves and their property, generally and unconditionally, the jurisdiction of such New York Courts and any related appellate courts, irrevocably agree to be bound by any judgment rendered thereby (other than during the pendency of the Chapter 11 Cases) in any legal or equitable action or proceeding arising out of, in connection with, or related to any Loan Document to which it is a party or the enforcement thereof, and the Borrowers hereby irrevocably consent to the service of process (other than during the pendency of the Chapter 11 Cases) out of any of the aforementioned courts in any such action or proceeding by mailing of copies thereof by registered mail, postage prepaid, such service to become effective three Business Days after such mailing. Each party hereto hereby irrevocably waives any objection it may now or hereafter have as to the venue of any such action or proceeding brought in any of the courts mentioned above or that any such court is an inconvenient forum. Except during the pendency of the Chapter 11 Cases as provided above, nothing herein shall affect the Lender's right to serve process in any other manner prescribed by law or the right to bring legal or equitable actions or proceedings in other competent jurisdictions. Any judicial proceeding by any Borrower against the Lender involving, directly or indirectly, any matter in any way arising out of, related to or connected with any Loan Document shall be brought only in a court sitting in the City of New York, County of New York. EACH OF THE BORROWERS AND THE LENDER HEREBY WAIVES TRIAL BY JURY IN ANY JUDICIAL PROCEEDING BROUGHT BY THE BORROWERS OR THE LENDER INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR

DEBTOR IN POSSESSION CREDIT AGREEMENT
PRONERVE HOLDINGS, LLC

CONNECTED    WITH    THIS    AGREEMENT    OR    THE    TRANSACTIONS
CONTEMPLATED THEREBY.

7.12 *Confidentiality.*  The Lender agrees to maintain the confidentiality of
information obtained by it pursuant to any Loan Document, except that such
information may be disclosed (a) with a Borrower's consent, (b) to Affiliates of the
Lender and employees, agents, representatives, advisors, consultants and agents of the
Lender or such Affiliate that are advised of the confidential nature of such information
and are instructed to keep such information confidential, (c) to the extent such
information presently is or hereafter becomes available to the Lender, on a non-
confidential basis from a source other than a Borrower, (d) as part of the Chapter 11
Cases (or any similar proceeding in foreign jurisdictions) or to the extent disclosure is
required by applicable law or other legal or judicial process or requested or demanded
by any governmental authority, (e) to current or prospective assignees, in each case to
the extent such assignees agree to be bound by the provisions of this *Section 7.12* and
(f) in connection with the exercise of any remedy under any Loan Document; *provided,
however*, that prior to any disclosure pursuant to *clause (d)* or *(f)* above, the Lender
shall use its reasonable efforts and shall cooperate with the Borrowers to ensure the
confidential treatment of the information to be disclosed.

[SIGNATURE PAGES FOLLOW]

**PRONERVE HOLDINGS, LLC**

By: _____
Name: George D. Pillari
Title: Chief Executive Officer


**PRONERVE, LLC**

By:    **PRONERVE HOLDINGS, LLC,** its sole member

    By: _____
    Name: George D. Pillari
    Title:   Chief Executive Officer


**BOULDER INTRAOPERATIVE MONITORING, LLC
EUGENE INTRAOPERATIVE MONITORING, LLC
DENVER SOUTH INTRAOPERATIVE MONITORING, LLC
COLORADO INTRAOPERATIVE MONITORING, LLC
RIVERSIDE INTRAOPERATIVE MONITORING, LLC
TOPEKA INTRAOPERATIVE, LLC
PRONERVE TECHNOLOGIES, LLC**

By:    **PRONERVE, LLC,** its sole member

    By:    **PRONERVE HOLDINGS, LLC,** its sole member

        By: _____
        Name: George D. Pillari
        Title:   Chief Executive Officer


[Signature Page to Debtor In Possession Credit Agreement]

**SPECIALTYCARE IOM SERVICES, LLC,**
as lender

By: _____
    Name: Jeffrey Gray
    Title: Treasurer and Chief Financial
          Officer

**Exhibit A**

Budget

**ProNerve**
Weekly CF ($ in 000s) through Close

| | 2/27/15 | 3/6/15 | 3/13/15 | 3/20/15 | 3/27/15 | 4/3/15 | 2/20 to 4/3 |
|---|---|---|---|---|---|---|---|
| **Beg. Cash** | $756 | $838 | $1,171 | $724 | $905 | $603 | $756 |
| **Total Receipts** | $600 | $600 | $600 | $600 | $600 | $600 | $3,600 |
| ***Cash Outflows*** | | | | | | | |
| Payroll & Benefits | $ (400) | $ (45) | $ (400) | $ (45) | $ (400) | $ (45) | $ (1,335) |
| Tech Variable Bonus | (75) | - | - | - | (75) | - | (150) |
| Health Insurance | (90) | - | (90) | - | - | - | (180) |
| MD Variable Comp | (20) | - | - | - | (20) | - | (40) |
| Contract Labor | (5) | (5) | - | (5) | (5) | (5) | (30) |
| Expense Reports | (20) | (15) | (15) | (15) | (15) | (15) | (95) |
| Other Opex | (85) | (35) | (35) | (35) | (35) | (35) | (260) |
| Medical Supplies | (25) | (25) | (25) | (25) | (25) | (25) | (150) |
| Credentialing | (7) | (7) | (7) | (7) | (7) | (7) | (42) |
| Total Direct | ($727) | ($132) | ($577) | ($132) | ($582) | ($132) | (2,282) |
| Payroll & Benefits | $ (260) | $ (15) | $ (260) | $ (15) | $ (260) | $ (40) | $ (850) |
| Health Insurance | (70) | - | (70) | - | - | - | (140) |
| Contract Labor | (8) | (8) | (8) | (8) | (8) | (8) | (45) |
| Legal, Accounting & Banking | (10) | (10) | (10) | (10) | (10) | (10) | (60) |
| Expense Reports | (10) | (10) | (10) | (10) | (10) | (10) | (60) |
| Other Opex | (83) | (13) | (13) | (13) | (13) | (13) | (148) |
| Rent | (23) | (21) | - | - | - | (21) | (65) |
| Credentialing | (2) | (2) | (2) | (2) | (2) | (2) | (12) |
| Insurance | (90) | (35) | - | - | - | (35) | (160) |
| Marketing & Advertising | (3) | (3) | (3) | (3) | (3) | (3) | (18) |
| Taxes | (13) | (2) | (2) | (2) | (2) | (2) | (23) |
| Total Indirect | (571) | (119) | (378) | (63) | (308) | (144) | (1,581) |
| Adreima / Other* | (20) | (17) | (92) | (224) | (13) | (382) | (748) |
| **Total Outflows from Ops** | ($1,318) | ($267) | ($1,047) | ($419) | ($903) | ($657) | ($4,610) |
| **Operational Burn** | ($718) | $333 | ($447) | $181 | ($303) | ($57) | ($1,010) |
| **Total Other Outflows** | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **DIP (through Close)** | $800 | $0 | $0 | $0 | $0 | $1,700 | $2,500 |
| **Change in Cash** | $82 | $333 | ($447) | $181 | ($303) | $1,643 | $1,490 |
| **Ending Cash** | $838 | $1,171 | $724 | $905 | $603 | $2,246 | $2,246 |

*Reflects Medicare/Medicaid payment at Close.

2/23/2015