## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| PRONERVE HOLDINGS, LLC, *et al.*,[1] | ) | Case No. 15-_____ (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

### DEBTORS' MOTION FOR ENTRY OF (A) A BIDDING PROCEDURES ORDER (I) APPROVING THE BIDDING PROCEDURES, (II) RATIFYING THE SELLERS' ENTRY INTO THE STALKING HORSE AGREEMENT, (III) AUTHORIZING THE PAYMENT OF STALKING HORSE PROTECTIONS, (IV) SETTING THE DATES FOR THE BID DEADLINE, AUCTION (IF NEEDED) AND SALE APPROVAL HEARING, (V) ESTABLISHING NOTICE PROCEDURES AND APPROVING FORMS OF NOTICE, (VI) APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (VII) AUTHORIZING THE SELLERS TO FILE THE CONFIDENTIAL SCHEDULES UNDER SEAL; AND (B) A SALE ORDER (I) APPROVING THE SALE OF THE SELLERS' ASSETS OUTSIDE THE ORDINARY COURSE OF BUSINESS, (II) AUTHORIZING THE SALE FREE AND CLEAR OF ALL LIENS, CLAIMS AND INTERESTS, (III) APPROVING THE STALKING HORSE AGREEMENT; (IV) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (V) GRANTING RELATED RELIEF

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: ProNerve Holdings, LLC (1653); ProNerve, LLC (2155); Boulder Intraoperative Monitoring, LLC (9147); Colorado Intraoperative Monitoring, LLC (5837); Denver South Intraoperative Monitoring, LLC (3164); Eugene Intraoperative Monitoring, LLC (0718); ProNerve Technologies, LLC (1814); Riverside Intraoperative Monitoring, LLC (6963); and Topeka Intraoperative Monitoring, LLC (6151). The location of the Debtors' corporate headquarters and the service address for all Debtors is 7600 E. Orchard Road, Suite 200 N, Greenwood Village, Colorado 80111.

# TABLE OF CONTENTS

**Page**

**UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE** ..............1

Background ...........................................................................................................................2

Preliminary Statement ..........................................................................................................2

Satisfaction of Local Rule 6004-1 ........................................................................................6

Bidding Procedures ..............................................................................................................6

Marketing Process ................................................................................................................7

Auction Qualification Process ..............................................................................................8

Stalking Horse Protections ..................................................................................................12

Basis for Relief ....................................................................................................................20

I.      An Expedited Hearing to Approve the Bidding Procedures is Necessary ...................20

II.     The Bidding Procedures Are in the Best Interests of the Sellers, Their Estates and
        Their Creditors .........................................................................................................22

        A.      The Proposed Noticing of the Bidding Procedures Is Effective and
                Sufficient Notice ............................................................................................22

        B.      The Bidding Procedures Will Maximize Value ...............................................23

        C.      The Stalking Horse Protections are Reasonable and Necessary .....................24

        D.      The Proposed Procedures for the Assumption and Assignment of
                Executory Contracts and Unexpired Leases Are Fair and Adequate ...............27

        E.      The Assumed Contracts Schedule Contains Confidential Commercial
                Information, and Therefore Authorization to File the Confidential
                Schedules Under Seal Is Required and Necessary ..........................................28

III.    A Hearing to Approve the Sale On or Before March 24, 2015 (If No Qualified
        Bids Other than from the Stalking Horse Bidder are Received) or March 31, 2015
        (If a Qualified Bid Other than from the Stalking Horse Bidder is Received) is
        Necessary ..................................................................................................................33

IV.     Approval of the Proposed Sale Transaction Is Warranted and in the Best Interests
        of the Sellers' Estates ................................................................................................33

#32674701 v1

A.    *The Sale of the Stalking Horse Bid Assets is Authorized by Section 363 as a Sound Exercise of the Sellers' Business Judgment* ............................................33

B.    *The Sale of the Stalking Horse Bid Assets Free and Clear of Liens, Claims, Encumbrances, Obligations, Liabilities, Contractual Commitments or Interests of Any Kind or Nature Whatsoever Is Authorized by Sections 105(a) and 363(f)* ............................................................37

C.    *The Stalking Horse Bid Assets and Assumed Contracts Should Be Sold Free and Clear of Any Successor Liability* ............................................................39

D.    *The Stalking Horse Bidder Will Be a Good Faith Purchaser and Is Entitled to the Full Protection of Section 363(m) and the Transfer and Sale of the Acquired Assets Will Not Violate Section 363(n)* ................................42

E.    *Assumption and Assignment of the Assumed Contracts Is Authorized by Section 365 of the Bankruptcy Code* ....................................................................43

F.    *The Court Should Waive or Reduce the Time Periods Set Forth in Rules 6004(h) and 6006(d)* ..............................................................................................46

G.    *The Automatic Stay Should Be Lifted for the Stalking Horse Bidder* ...................47

ProNerve Holdings, LLC ("ProNerve") and each of its wholly-owned direct and indirect subsidiaries, as debtors and debtors in possession (collectively, the "Sellers") in the above-captioned chapter 11 cases (these "Chapter 11 Cases"), hereby submit this motion (the "Motion") for the entry of (a) an order substantially in the form attached hereto as Exhibit A (the "Bidding Procedures Order"), (i) approving procedures, set forth in Annex 1 to the Bidding Procedures Order (the "Bidding Procedures"), in connection with the sale of all or substantially all of the Sellers' assets free and clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature whatsoever, (ii) ratifying the Sellers' entry into an asset purchase agreement in connection therewith, a copy of which is attached as Exhibit B hereto (the "Stalking Horse Agreement"), with SpecialtyCare IOM Services, LLC (the "Stalking Horse Bidder"), (iii) authorizing the payment of Stalking Horse Protections (as defined below), (iv) setting the dates for the Bid Deadline (as defined below), Auction (as defined below) (if needed) and Sale Approval Hearing (as defined below), (v) establishing notice procedures and approving forms of notice, (vi) approving procedures related to the assumption and assignment of executory contracts and unexpired leases and (vii) authorizing the Sellers to file the Confidential Schedules (as defined below) under seal pursuant to Section 107(b) of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure; and (b) an order substantially in the form attached hereto as Exhibit C (the "Sale Order"), (i) approving the sale of the Sellers' assets outside the ordinary course of business, (ii) authorizing the sale of all or substantially all of the Sellers' assets (a "Sale" or "Transaction") free and clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, contractual commitments and interests of any kind or nature whatsoever, (iii) approving the Stalking Horse Agreement and

(iv) approving the assumption and assignment to the Stalking Horse Bidder of certain executory contracts and unexpired leases related to the Transaction. In support of this Motion, the Sellers respectfully state as follows:[2]

## Background

1.      On the date hereof (the "Petition Date"), each of the Sellers filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.      The Sellers continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      No trustee, examiner, creditors' committee, or other official committee has been appointed in these Chapter 11 Cases.

4.      A description of the Sellers' business, capital structure, and the circumstances leading to the chapter 11 filings are set forth in the First Day Declaration filed contemporaneously herewith and incorporated herein by reference.

## Preliminary Statement

5.      Since 2012, the Sellers, together with the Affiliated Practices, have provided intraoperative neurophysiologic monitoring services to health systems, acute care hospitals, specialty hospitals, ambulatory surgical centers, surgeons, and physician groups in more than 25 states. Since that time, the Sellers have faced an array of challenges that ultimately led to the filing of these Chapter 11 Cases. As set forth more fully in the First Day Declaration, the Sellers' operational challenges have included excess turnover of senior management, healthcare

---

[2] The facts and circumstances supporting this Motion are set forth in the *Declaration of George D. Pillari in Support of Debtors' Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

#32674701 v1

regulatory issues, and acquisitions of competitors that have resulted in significant accrued liabilities.

6.     The Sellers and their advisors began exploring strategic alternatives in early 2014. Due to myriad regulatory and financial issues faced by the Sellers, none of the out-of-court restructuring alternatives pursued by the Sellers and their advisors proved viable. After consideration of all reasonably available alternatives, and in light of the Sellers' liquidity constraints and other related business challenges, the Sellers and their respective managers and officers determined, in an exercise of their business judgment, that it would be in the Sellers' best interest to commence these Chapter 11 Cases and pursue a sale of substantially all of the Sellers' assets pursuant to Bankruptcy Code section 363.

7.     In January 2015, A&M and ProNerve's board of managers determined that, given the Sellers' limited liquidity, an acquirer needed to be identified and a sale of ProNerve needed to occur within 30 to 40 days. ProNerve's board of managers determined that there was neither the time nor the available liquidity to interview and retain an investment banker to conduct a traditional investment banking process, and therefore instructed A&M to seek out qualified purchasers who satisfied the size criteria and risk profile to consummate the purchase of a distressed company like the Sellers and also had a familiarity with the Sellers from previous merger and acquisition discussions.

8.     Since January 2015, A&M has contacted eight potential purchasers, comprised of three strategic companies, one individual, and four financial buyers. Of these potential purchasers, one indicated that it is not interested and seven indicated an interest. Of the seven potential purchasers that indicated an interest, six signed confidentiality agreements and obtained

- 3 -

access to confidential information describing the Sellers' operations and historical and projected financial performance. Of these potential purchasers, four submitted a non-binding term sheet.

9.      The Sellers ultimately agreed to a non-binding term sheet, under which the purchaser would acquire substantially all of the Sellers' assets for cash consideration through an auction in these Chapter 11 Cases pursuant to Bankruptcy Code section 363 and serve as the stalking horse bidder. However, several days after executing the term sheet, the purchaser stated its intent to withdraw from the sale process entirely.

10.     Immediately thereafter, the Debtors and their advisors contacted certain affiliates and advisors of the Stalking Horse Bidder, which had previously submitted a non-binding term sheet during the initial sale process. After negotiations between the parties, the Sellers ultimately agreed to a non-binding term sheet with the Stalking Horse Bidder.

11.     Prior to the Petition Date, the Stalking Horse Bidder acquired all of the debt outstanding under the Loan Commitments. Contemporaneously therewith, the Sellers and the Stalking Horse Bidder executed the Asset Purchase Agreement, dated February 24, 2015, under which the Stalking Horse Bidder agreed to acquire substantially all of the Sellers' assets with a credit bid through an auction in these Chapter 11 Cases pursuant to Bankruptcy Code section 363, and serve as the Stalking Horse Bidder. As discussed in more detail in the pleadings filed contemporaneously herewith, the Stalking Horse Bidder also agreed to provide a debtor in possession financing facility to fund the Sellers' operations during these Chapter 11 Cases.

## Jurisdiction

12.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

13.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

#32674701 v1

14.     The statutory bases for the relief requested herein are sections 105(a), 107(b),

362, 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the

"Bankruptcy Code"), Rules 2002, 6004, 6006, 9006, 9007, 9014, and 9018 of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 6004-1 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "Local Rules").

15.     Pursuant to Local Rule 9013-1(f), the Sellers consent to the entry of a final

judgment or order with respect to this Motion if it is determined that the Court would lack

Article III jurisdiction to enter such final order or judgment absent consent of the parties.

### Relief Requested

16.     By this Motion, the Sellers seek entry of (a) the Bidding Procedures Order

(i) approving the Bidding Procedures, (ii) authorizing the Sellers to enter into the Stalking Horse

Agreement, (iii) authorizing the payment of the Stalking Horse Protections, (iv) setting the dates

for the Bid Deadline, Auction (if needed) and Sale Approval Hearing, (v) establishing notice

procedures and approving forms of notice, (vi) approving procedures related to the assumption

and assignment of executory contracts and unexpired leases and (vii) authorizing the Sellers to

file the Confidential Schedules under seal pursuant to Section 107(b) of the Bankruptcy Code

and Rule 9018 of the Federal Rules of Bankruptcy Procedure; and (b) the Sale Order (i)

approving the sale of the Sellers' assets outside the ordinary course of business, (ii) authorizing

the Sale free and clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code),

encumbrances, obligations, liabilities, contractual commitments and interests of any kind or

nature whatsoever, (iii) approving the Stalking Horse Agreement, (iv) approving the assumption

and assignment to the Stalking Horse Bidder of certain executory contracts and unexpired leases related to the Transaction, and (v) granting related relief.

## Satisfaction of Local Rule 6004-1

17.    The following descriptions are intended to, among other things, satisfy the requirements of Local Rule 6004-1. Each of the following descriptions is a summary and each is qualified in its entirety by the underlying document(s) referenced or described below.

## Bidding Procedures

18.    The Sellers intend to solicit bids for the Stalking Horse Bid Assets (as defined below) or all or any portion of the Stalking Horse Bid Assets plus any of the Sellers' assets not included in the Stalking Horse Bid Assets (together with the Stalking Horse Bid Assets, the "Bid Assets") under the Bidding Procedures. The Bidding Procedures describe, among other things, the assets available for sale, the manner in which bids become "qualified," the due diligence available to potential bidders, the receipt and negotiation of bids received, the conduct of any auction, and the selection and approval of the Qualified Bidder (as defined below) that the Sellers determine to have made the highest or otherwise best bid (the "Successful Bidder"). The Sellers will consider all proposals received in accordance with the Bidding Procedures. The price that the Successful Bidder will pay for the Bid Assets and the terms and conditions for the sale of such assets will be established at the Auction, if one is held, all in accordance with the terms of the Bidding Procedures.

19.    The Sellers have determined in their reasonable business judgment that an expedited sale is necessary to prevent the loss of substantial value given the nature of the Sellers' business and in light of the Sellers' liquidity constraints and the nature of the Sellers' business. The Bidding Procedures allow for an expedited sale while simultaneously allowing for an active bidding process for the Bid Assets. The Sellers submit that the proposed Bidding Procedures

- 6 -

will provide for an orderly and fair Auction, if one is necessary, that will generate the highest or otherwise best bid for the Bid Assets.

20.    The following sets forth a summary[3] of the key provisions of the Bidding Procedures:

Marketing Process

(a)    <u>Contact Parties</u>:  The Sellers and their advisors have developed a list of parties the Sellers believe are potentially interested in the Sellers' assets and that have the financial resources necessary to consummate a competing transaction (an "<u>Alternative Transaction</u>").  This list includes parties who previously expressed interest in acquiring the Sellers' assets and that have performed due diligence in connection therewith (the "<u>Contact Parties</u>").  The Sellers will continue to evaluate prospects and may supplement the list of Contact Parties throughout the marketing process, as appropriate.

(b)    <u>Information Package</u>:  The Sellers may distribute to each Contact Party an "<u>Information Package</u>" comprising:

    (i)    a cover letter;

    (ii)    a copy of the Bidding Procedures;

    (iii)    a copy of a confidentiality agreement in form and substance acceptable to the Sellers (the "<u>Confidentiality Agreement</u>"); and

    (iv)    a copy of the Stalking Horse Agreement.

(c)    <u>Access to Diligence Materials</u>:  To participate in the bidding process and receive access to a virtual data room (the "<u>Diligence Materials</u>"), a party must submit an executed Confidentiality Agreement to the Sellers.  A party who qualifies for access to Diligence Materials shall be an "<u>Interested Party</u>."

(d)    For all Interested Parties who are competitors of the Sellers or are affiliated with competitors of the Sellers, the Sellers reserve the right to withhold any Diligence Materials the Sellers determine, in their sole discretion, are business-sensitive or otherwise not appropriate for disclosure to such Interested Party.

---

[3] This description is intended only as a summary and is qualified in its entirety by the Bidding Procedures.  Further, to the extent there are any conflicts between this Motion and the Bidding Procedures, the Bidding Procedures shall control.

<u>Auction Qualification Process</u>

To be eligible to participate in the Auction, each offer, solicitation, or proposal (other than an offer, solicitation, or proposal from the Stalking Horse Bidder) (each, a "Qualified Bid"), and each party (other than the Stalking Horse Bidder) submitting such a Qualified Bid (each, a "Qualified Bidder") must satisfy the conditions listed below. For the avoidance of doubt, the Stalking Horse Bidder is deemed to be a Qualified Bidder for all purposes and at all times, and the bid embodied in the Stalking Horse Agreement (including any subsequent bids at the Auction) is deemed to be a Qualified Bid for the Bid Assets, for all purposes and at all times.

To qualify as a "Qualified Bidder" with respect to bids on the Bid Assets, a bidder must submit a "Qualified Bid" (as described below) no later than **March 20, 2015 at 4:00 p.m. (Eastern Time)** (the "Bid Deadline") and:

(a)     offer to purchase the Bid Assets and assume some, all, or none of the Assumed Liabilities (as defined in the Stalking Horse Agreement);

(b)     provide consideration for the Bid Assets in cash and/or assumed liabilities or, to the extent applicable, in the form of a credit bid under Section 363(k) of the Bankruptcy Code;

(c)     provide a copy of such Qualified Bidder's proposed Asset Purchase Agreement, which shall be modified by such Qualified Bidder from the form of the Stalking Horse Agreement only to the extent necessary to reflect proposed changes, together with a marked copy of the Stalking Horse Agreement reflecting such changes;

(d)     provide a list of contracts and leases for which such Qualified Bidder intends to take assignment;

(e)     other than with respect to a due diligence contingency that may only be exercised up until one (1) day prior to the Auction, not subject its bid to any conditions less favorable to the Sellers, as determined by the Sellers, than those provided for in the Stalking Horse Agreement;

(f)     agree to not revoke its bid until the earlier of the closing of a purchase of the Bid Assets by the Successful Bidder or 30 days after entry of the Sale Order, whichever is earlier, and agree to serve as a Backup Bidder (as defined below);

(g)     stipulate or otherwise provide evidence to the Sellers' satisfaction that such Qualified Bidder's submission, execution, delivery and closing of the marked copy of the Stalking Horse Agreement have been authorized and approved by such Qualified Bidder's board of directors (or comparable governing body);

- 8 -

(h)     state that such Qualified Bidder is financially capable of consummating the transactions contemplated by the marked copy of the Stalking Horse Agreement, and otherwise provide such other information that will allow the Sellers and their advisors to make a reasonable determination as to such Qualified Bidder's ability to consummate the transactions contemplated by the Stalking Horse Agreement, including the Adequate Assurance Package (as defined below);

(i)     not seek any transaction or break-up fee, expense reimbursement, or similar type of payment; and

(j)     provide a Good Faith Deposit (as defined in the Bidding Procedures) by means of a certified bank check from a U.S. bank or by wire transfer of immediately available funds.

A Qualified Bid with respect to the Bid Assets is one that:

(a)     is a proposal determined by the Sellers not to be materially more burdensome or conditional than the terms of the Stalking Horse Agreement (other than with respect to unperformed due diligence); and

(b)     contains a purchase price that provides for payment in cash at Closing (as defined in the Sale Order) in an amount equal to the sum of (the "Qualified Bid Value"):

   i.   $35,000,000, being the Purchase Price under the Stalking Horse Agreement (excluding Cure Costs with respect to Assumed Contracts, and the assumption by the Stalking Horse Bidder of the Assumed Liabilities), *plus*

   ii.  the Stalking Horse Protections, *plus*

   iii. $150,000 (the "Initial Overbid Amount").

In addition to all other provisions hereof, in order to become a Qualified Bidder, all bidders will be required to submit a good faith deposit (the "Good Faith Deposit") with the Sellers on or before the Bid Deadline. Such Good Faith Deposits shall be equal to ten percent (10%) of the cash portion of the Qualified Bidder's proposed purchase price and should be payable to an escrow agent to be designated by the Sellers. Good Faith Deposits of all Qualified Bidders shall be held in a separate interest-bearing account for the Sellers' benefit until the earlier of consummation of a transaction involving any other bidder for the Bid Assets and 30 days after entry of the Sale Order. If a Successful Bidder fails to consummate an approved sale of the Bid Assets because of a breach or failure to perform on the part of such Successful Bidder, such bidder's deposit will be held by the Sellers subject to a ruling by the Bankruptcy Court that the Sellers should be permitted to retain such deposit on account of any damages caused by such bidder's breach. All other deposits will be returned promptly after the earlier of closing of the sale of the Bid Assets to the Successful Bidder and 30 days after entry of the Sale Order (or,

- 9 -

in the case of the Stalking Horse Bidder, in accordance with the terms of the Stalking Horse Agreement).

All Qualified Bidders shall be deemed to have consented to the jurisdiction of the Bankruptcy Court. The Bankruptcy Court shall retain exclusive jurisdiction over any matter or dispute relating to the Sale, the Bidding Procedures, the Sale Approval Hearing, the Auction, the Stalking Horse Agreement and/or any other matter that in any way relates to the foregoing.

Each bidder shall be deemed to acknowledge and represent that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the assets in making its bid; and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Bid Assets, or the completeness of any information provided in connection therewith, except as expressly stated in these Bidding Procedures or, as to the Successful Bidder, the asset purchase agreement with such Successful Bidder.

<u>Auction</u>

If the Sellers timely receive prior to the Bid Deadline, at least one Qualified Bid (in addition to the bid of the Stalking Horse Bidder), then the Sellers shall conduct an auction (the "<u>Auction</u>"). At the Auction, the Sellers will determine and announce which Qualified Bid has been determined to be the highest or otherwise best bid. In determining which Qualified Bid is the Successful Bid, the Sellers will consider, at each stage of the Auction, the net economic effect upon the Sellers' estates after the payment of the Stalking Horse Protections, if applicable; <u>provided</u>, <u>however</u>, that economic considerations shall not be the sole criteria upon which the Sellers may base their decision and the Sellers shall take into account all factors they believe to be relevant in an exercise of their business judgment.

If the Auction is held, it shall take place on **March 27, 2015, commencing at 10:00 a.m. (prevailing Eastern Time)**, at the offices of the Sellers' counsel, McDermott Will & Emery LLP, at 340 Madison Avenue, New York, New York 10173 or such later time on such day or such other place as the Sellers shall notify all Qualified Bidders.

The Auction shall be conducted according to the following procedures:

(a)     No later than 12:00 p.m. (prevailing Eastern Time) on the day prior to the start of the Auction, the Sellers will give the Committee and all Qualified Bidders a copy of what they believe to be the highest or otherwise best Qualified Bid and will inform each Qualified Bidder who has expressed its intent to participate in the Auction the identity of all Qualified Bidders that may participate in the Auction.

(b)     Only Qualified Bidders are eligible to participate in the Auction.

(c)    Only the Sellers, the Stalking Horse Bidder, the Qualified Bidders, the Debtors' creditors, and the Creditors' Committee (if one has been appointed) and their respective advisors may attend the Auction.

(d)    Bidding at the Auction shall begin initially with the highest or otherwise best bid announced by the Sellers.

(e)    Bidding will continue with respect to the Auction until the Sellers, following consultation with the Committee, determine that they have received the highest or otherwise best bid for the Bid Assets.

(f)    Qualified Bidders will be permitted to increase their bids. During the Auction, any overbids after the Initial Overbid Amount shall be in increments of $150,000. All bids received during the Auction, whether oral or written, shall be deemed to constitute valid modifications or amendments to the signed contract previously submitted by such bidder.

(g)    Any subsequent bids by the Stalking Horse Bidder will be credited with the full amount of the Stalking Horse Protections.

(h)    Each Qualified Bidder shall be required to confirm that it has not engaged in any collusive behavior with other bidders with respect to the bidding, the Auction or the Sale.

(i)    The Stalking Horse Bidder shall be entitled to credit bid all or a portion of the aggregate principal amount of the Loan Commitments and the DIP Credit Facility, together with accrued interest and any other claims with respect to the Loan Commitments and the DIP Credit Facility, consistent with section 363(k) of the Bankruptcy Code.

(j)    The Sellers, following consultation with the Committee, will then determine and announce which Qualified Bid has been determined to be the highest or otherwise best bid. No additional bids may be considered after the Auction is closed.

The Sellers, following consultation with the Committee and the Stalking Horse Bidder, reserve the right to (i) extend the deadlines set forth in these Bidding Procedures and/or adjourn the Auction in open court or at the Auction and/or adjourn the Sale Approval Hearing in open court without further notice, (ii) withdraw any asset(s) (the "Withdrawn Assets") from the Sale at any time prior to or during the Auction to make subsequent attempts to market the same, and to request separate hearing(s) by the Bankruptcy Court to approve the sale(s) of some or all of the Withdrawn Assets, (iii) reject any or all bids, other than the Stalking Horse Agreement, if, in the Sellers' reasonable business judgment, no bid is for a fair and adequate price, (iv) seek approval of any separate agreement to sell some or all of the Withdrawn Assets at the Sale Approval Hearing, and (v) modify the Auction and the Bidding Procedures set forth herein, as may be determined to be in the best interests of the Sellers' estates or creditors. For the avoidance of doubt, the Sellers shall not modify the Bidding Procedures without

- 11 -

the written consent of the Stalking Horse Bidder. Any modification to the Auction or the Bidding Procedures shall be announced prior to the start of the Auction. The Auction, the Bidding Procedures and all bids are subject to such other terms and conditions as are announced by the Sellers during the course of the Auction.

If for any reason the entity or entities that submit(s) the highest or otherwise best bid(s) fails to consummate the purchase of the Bid Assets, or any part thereof, the offeror of the second highest or best bid will automatically be deemed to have submitted the highest or best bid (the "Backup Bidder"), and if the Sellers consent, the Sellers and such offeror are authorized to effect the sale of the Bid Assets to such offeror(s) as soon as is commercially reasonable. If such failure to consummate the purchase is the result of a breach by the winning offeror, the Sellers reserve the right to seek all available damages from the defaulting offeror, including, but not limited to, with respect to the Good Faith Deposit. If the Stalking Horse Bidder has terminated the Stalking Horse Agreement as permitted therein, then the Stalking Horse Bidder shall not be obligated to be a Backup Bidder.

Adequate Assurance Package

If any Qualified Bid, other than the Stalking Horse Bidder's bid, requires the assumption and assignment of contracts and leases, then such offeror must identify such contracts and leases to be assumed and assigned and provide evidence of its ability to provide adequate assurance of future performance of such contracts and leases along with the Qualified Bid (an "Adequate Assurance Package").

**Stalking Horse Protections**

21.    In certain circumstances, the Stalking Horse Agreement provides for the Stalking Horse Bidder to receive a combined breakup fee and expense reimbursement of up to $520,000 (the "Stalking Horse Protections").

22.    As provided in the Stalking Horse Agreement, the Stalking Horse Protections are payable if the Stalking Horse Agreement is terminated because an Alternative Transaction (as defined below) is approved by the Bankruptcy Court and such Alternative Transaction closes. The Stalking Horse Protections are comprised of a break-up fee in the amount of $270,000, *plus* reimbursement of actual and documented expenses up to $250,000.

23.    The Stalking Horse Agreement provide that the Sellers shall, no later than three (3) Business Days after the date on which closing of the Alternative Transaction occurs, pay the

- 12 -

Stalking Horse Protections to the Stalking Horse Bidder, and the Stalking Horse Bidder shall have an administrative expense claim against the Sellers for recovery of such amount.

24.     The Stalking Horse Bidder's willingness to go forward with the Stalking Horse Agreement is expressly conditioned on approval of the Stalking Horse Protections. As discussed below, the Sellers believe that the benefits of the Stalking Horse Agreement justify the Stalking Horse Protections and submit that agreeing to these conditions is a reasonable exercise of the Sellers' business judgment.

### Procedures for the Assumption and Assignment of
### Executory Contracts and Unexpired Leases

25.     Contemporaneously with the filing of this Motion, the Sellers will provide written notice, substantially in the form of Exhibit D hereto (a "Notice of Assignment and Cure"), to each of the counterparties (each, a "Counterparty") to the contracts (each, a "Contract") listed on the Assumed Contracts Schedule (as defined in the Stalking Horse Agreement) that, at the option of the Stalking Horse Bidder, the Sellers may assume and assign to the Stalking Horse Bidder such Counterparty's Contract, notifying each such Counterparty of the proposed Cure Costs (as defined in the Stalking Horse Agreement) for such Contract, and advising each such Counterparty of the deadline to object to the assumption or assignment of its Contract or the amount of the Cure Costs arising prior to Closing under such Contract.

26.     The Notice of Assignment and Cure will include (i) a description of the Contract that may be assumed by the Sellers and assigned to the Stalking Horse Bidder, (ii) the name of the Counterparty to such Contract, (iii) any applicable Cure Costs, (iv) that the assignee or its designee is the Stalking Horse Bidder, and (v) the deadline by which any Counterparty must object.

27.    At or before the Closing, the Buyer may elect to exclude any Contract as an Assumed Contract (in which case it shall become an "Excluded Contract") by providing to the Sellers written notice of its election to exclude such Contract.

28.    Any Counterparty that objects to (i) the assignment of its Contract, (ii) the adequate assurance of the Stalking Horse Bidder's ability to perform, or (iii) the cure amount set forth in the Notice of Assignment and Cure must file an objection no later than 14 days after the date on which the Bidding Procedures Order is entered (the "Assignment and Cure Objection Deadline"), which objection (the "Assignment and Cure Objection") must (x) set forth a specific default under the Contract and claim a specific monetary amount that differs from the amount, if any, specified by the Sellers in such Notice of Assignment and Cure and (y) be served on (i) ProNerve, LLC, 7600 E. Orchard Road, Suite 200 N, Greenwood Village, Colorado 80111 (Attention: George D. Pillari), (ii) proposed co-counsel to the Sellers, McDermott Will & Emery LLP, 340 Madison Avenue, New York, New York 10173 (Attention: Timothy W. Walsh & Darren Azman); (iii) proposed co-counsel to the Sellers, Pepper Hamilton LLP, Hercules Plaza, Suite 5100, 1313 Market Street, P.O. Box 1709, Wilmington, Delaware 19899-1709 (Attention: Donald J. Detweiler and John H. Schanne II); (iv) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), 884 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attention: Tiiara N.A. Patton); (v) counsel to the Stalking Horse Bidder, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attention: Debra Dandeneau); and (vi) proposed counsel to any official committee appointed in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (the "Creditors' Committee" and, collectively, the "Service Parties"); so that it is actually received no later than 4:00 p.m. prevailing Eastern Time on the Assignment and Cure Objection Deadline.

- 14 -

29.     If a Counterparty timely objects to the assumption or assignment or the amount of the Cure Costs payable with respect to their Contract, the Sellers will request that the Bankruptcy Court hear and determine such objection on an expedited basis.  If such objection has not been resolved prior to the Closing (whether by an order of the Bankruptcy Court or by agreement of the Stalking Horse Bidder and the Counterparty), the Stalking Horse Bidder may elect, in its sole and absolute discretion, one of the following options: (i) treat such Contract as an Excluded Contract, (ii) defer the Closing until the resolution of such objection (by order of the Bankruptcy Court or by agreement of the Stalking Horse Bidder and the Counterparty), or (iii) temporarily treat the Contract as an Excluded Contract (a "Designated Contract"), proceed to Closing, and determine whether to treat the Designated Contract as an Assumed Contract or an Excluded Contract within two Business Days after resolution of such objection (whether by an order of the Bankruptcy Court or by agreement of the Stalking Horse Bidder and the Counterparty).

30.     If a Counterparty does not timely file and serve an Assignment and Cure Objection with respect to an Assignment and Cure Notice, such Counterparty will be (i) forever barred from objecting to the assignment of their Contract to the Stalking Horse Bidder; (ii) deemed to have waived all pre-closing defaults and breaches under the Contract; (iii) forever barred from objecting to the Stalking Horse Bidder's adequate assurance of future performance, (iv) deemed to have consented, for all purposes, to the assumption and assignment of their Contract to the Stalking Horse Bidder, and (v) forever barred from objecting to the Cure Cost proposed in such Assignment and Cure Notice.

31.     If the Stalking Horse Bidder is not the Successful Bidder at the Auction, then no later than five business days after the Auction concludes, the Sellers will send a subsequent Notice of Assignment and Cure to each counterparty to a contract designated to be assumed and

assigned by the Successful Bidder or the Backup Bidder identifying the Successful Bidder and the Backup Bidder (in each case, an "Assignee") and providing information regarding adequate assurance of future performance by the Assignee. Any order approving a sale to a person other than the Stalking Horse Bidder will address the procedures by which the Sellers will assume and assign the contracts to be assumed and assigned to an Assignee that is not the Stalking Horse Bidder.

## Stalking Horse Agreement

32.    After arm's length negotiations between the Stalking Horse Bidder and the Sellers, the parties reached an agreement shortly before the commencement of these Chapter 11 Cases on the terms of the Stalking Horse Agreement,[4] under which the Stalking Horse Bidder will acquire all or substantially all of the Sellers' assets (the "Stalking Horse Bid Assets"). Subject to the receipt of higher or otherwise better proposals through the Bidding Procedures, the Sellers believe the Stalking Horse Agreement represents the best alternative available for the Sellers, their creditors, and all parties in interest. As described in more detail below, if the Sellers receive any Qualified Bid, other than the Stalking Horse Agreement, they will hold an Auction pursuant to the Bidding Procedures. If the Stalking Horse Bidder is the Successful Bidder, the Sellers shall request at the Sale Approval Hearing that the Bankruptcy Court approve the sale of the Stalking Horse Bid Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement.[5] If no other Qualified Bid is submitted, the Sellers shall not hold the Auction, and instead shall request at the Sale Approval Hearing that the Bankruptcy Court approve the

---

[4] Any description or reference to the Stalking Horse Agreement is intended only as a summary and is qualified in its entirety by the Stalking Horse Agreement. Further, to the extent there are any conflicts between this Motion and the Stalking Horse Agreement, the Staking Horse Agreement shall control.

[5] To the extent the Stalking Horse Bidder is not the Successful Bidder, the relief sought in this Motion shall be deemed sought with respect to such Successful Bidder.

sale of the Stalking Horse Bid Assets to the Stalking Horse Bidder pursuant to the Stalking Horse Agreement.

33.     The base purchase price set forth in the Stalking Horse Agreement is $35 million, in the form of a credit bid pursuant to Bankruptcy Code section 363(k), *plus* the assumption of certain liabilities and the Cure Costs for Assumed Contracts, in each case as set forth in the Stalking Horse Agreement.

### Provisions of the Stalking Horse Agreement to Be Highlighted Under the Local Rules

The Stalking Horse Agreement and/or the Sale Order contain the following terms, conditions, and provisions that are to be highlighted pursuant to Local Rule 6004-1(b):

(1) **Sale to Insider:** Not applicable.

(2) **Management Agreements:** Upon information and belief, the Stalking Horse Bidder has extended offers of employment to a significant number of the Debtors' employees.

(3) **Releases:** The Stalking Horse Agreement provides in Sections 6.11 and 7.4 that, as a condition to the Stalking Horse Bidder's and the Sellers' obligations to consummate the Sale, the Stalking Horse Bidder, on the one hand, and the Affiliated Practices, on the other hand, will execute a release of all claims in favor of each other.

(4) **Private Sale/No Competitive Bidding:** The Stalking Horse Agreement provides in Section 5.1 that, except as may be required by the Bankruptcy Court in connection with higher and better offers or potentially higher and better offers or any related Auction, none of the Sellers nor any of their officers, directors, employees, affiliates, representatives or advisors will, directly or indirectly, initiate, solicit or knowingly encourage (including by way of furnishing non-public information or assistance), or take any other action to facilitate, any inquiries or the making of any bid proposal by any Person other than the Stalking Horse Bidder and its affiliates. A private sale to the Stalking Horse Bidder will occur if no Qualified Bids are received.

(5) **Closing and Other Deadlines:** Section 5.9 of the Stalking Horse Agreement provides that no later than three calendar days after the Petition Date, the Sellers shall file motions in the Bankruptcy Court in form and substance satisfactory to the Stalking Horse Bidder:

    (i) seeking shortened notice for a hearing on entry of the Bid Procedures Order in accordance with Local Rule 6004-1(c) to a date that is no later than ten calendar days after the Petition Date; and

    (ii) requesting that the Bankruptcy Court enter the Bid Procedures Order (the "Bid Procedures Motion") approving the Bidding Procedures, that include a Bid Deadline that is no later than 14 calendar days after the entry of the Bid Procedures Order;

    (iii) requesting that if no Qualified Bid is received by the Bid Deadline, for a hearing on entry of the Sale Order to occur no later than two Business Days after the Bid Deadline, and for the Closing to occur no later than 35 calendar days after the Petition Date;

    (iv) requesting that if a Qualified Bid is received, for a hearing on entry of the Sale Order to occur no later than two Business Days after the Auction is held (if an Auction is held), and for the Closing to occur no later than 60 calendar days after the Petition Date.

(6) **Termination Rights:** The Stalking Horse Agreement sets forth the following termination rights for the Stalking Horse Bidder in Section 8.1:

    (i) By the mutual written consent of the Stalking Horse Bidder and the Company on behalf of the Sellers;

    (ii) By the Stalking Horse Bidder if the Closing has not occurred on or prior to the date that is the earlier of (i) 60 calendar days after the Petition Date and (ii) two Business Days after entry of the Sale Order; provided, however, that the right to terminate this Agreement pursuant to this Section 33(6)(i) shall not be available to the Stalking Horse Bidder if the Stalking Horse Bidder's failure to perform any of the Stalking Horse Bidder's obligations under this Agreement required to be performed by it at or prior to the Closing has been the cause of, or resulted in, the failure of the Closing to occur;

    (iii) By the Stalking Horse Bidder (i) if, other than with respect to deviations from any deadlines or milestones in this Agreement (and except as provided in Section 8.1(i) and this Section 8.1 (ii)(iii)), the Bankruptcy Court refuses to enter the Bid Procedures Order, (ii) if no Auction is held, the Closing has not occurred on or prior to the date that is 35 calendar days after the Petition Date; and (iii) if an Auction is held, the Closing has not occurred on or prior to the date that is 60 calendar days after the Petition Date.

    (iv) By the Stalking Horse Bidder if (i) the Bankruptcy Court issues an order granting leave to any Person to commence an appeal from the Bid Procedures Order; or (ii) if the Bankruptcy Court requires an Auction, the Bid Procedures Order or the Sale Order shall have been stayed, vacated,

- 18 -

modified or supplemented without the Stalking Horse Bidder's prior written consent;

(v) By the Stalking Horse Bidder or the Company on behalf of the Sellers if the Sellers comply with the Bid Procedures Order and accept a Qualified Bid (as defined in the Bid Procedures Order) from a Person other than the Stalking Horse Bidder or its permitted transferee;

(vi) By the Sellers by written notice to the Stalking Horse Bidder if there has been a material breach by the Stalking Horse Bidder of any of the covenants or agreements made by the Stalking Horse Bidder in this Agreement, and such breach (if curable) has not been cured or waived within 10 calendar days after written notice of the same; or

(vii)     By the Stalking Horse Bidder in its sole and absolute discretion, by written notice to the Sellers, for any reason other than as set forth above.

(7) **Good Faith Deposit:** Sections 2.1(c) and 8.2 of the Stalking Horse Agreement provides that proceeds from the DIP Credit Facility, and, to the extent such proceeds are less than $900,000, amounts outstanding under the Credit Agreement in the aggregate amount of $900,000 shall be deemed the Stalking Horse Bidder's Deposit, which may be forfeited if (i) there has been a material breach by the Stalking Horse Bidder of any of the covenants or agreements made by Stalking Horse Bidder in the Stalking Horse Agreement, and such breach (if curable) has not been cured or waived within 10 calendar days after written notice of the same, or (ii) if the Stalking Horse Bidder, in its sole and absolute discretion, terminates the Stalking Horse Agreement by written notice to the Sellers, for any reason other than as set forth in the other termination provisions in the Stalking Horse Agreement.

(8) **Interim Arrangement with the Stalking Horse Bidder:** Not applicable.

(9) **Use of Proceeds:** Pursuant to Section 8.4 of the Stalking Horse Agreement, if the Stalking Horse Agreement is terminated because the Sellers comply with the Bid Procedures Order and accept a Qualified Bid (as defined in the Bid Procedures Order) from a Person other than the Stalking Horse Bidder or its permitted transferee, then the Sellers shall, no later than three (3) Business Days after the date on which closing of the Alternative Transaction occurs, pay the Stalking Horse Bidder the Expense Reimbursement and an amount equal to $270,000.

(10)     **Tax Exemption:** Not applicable.

(11)     **Record Retention:** Section 1.1(a)(xii) of the Stalking Horse Agreement provides that the Sellers shall have the right of reasonable access to and examination of such books and records, including the right to make copies thereof, for a period of three (3) years from the Closing Date (as defined in the Stalking Horse Agreement) upon reasonable notice to the Stalking Horse

Bidder and during normal business hours. Further, Section 5.6(d) of the Stalking Horse Agreement provides that the Stalking Horse Bidder and the Sellers will furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and reasonable assistance relating to the Acquired Assets (including reasonable access to books and records and employees who have direct knowledge regarding the Acquired Assets) as is reasonably necessary for (i) the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax; (ii) winding down the Sellers' operations, and (iii) any other reasonable business purpose relating to (x) the Sellers' ownership of the Acquired Assets or the Assumed Liabilities before the Closing or (y) the Stalking Horse Bidder's ownership of the Acquired Assets or the Assumed Liabilities after the Closing.

(12)    **Sale of Avoidance Actions:** Not applicable.

(13)    **Requested Findings as to Successor Liability:** Section I, I.E., (9), (10), (11), and (12) of the Sale Order contain provisions limiting the Stalking Horse Bidder's successor liability.

(14)    **Sale Free and Clear of Unexpired Leases:** Section C.1 of the Sale Order provides that the Sellers may assume or reject any unexpired lease.

(15)    **Credit Bid:** The Bidding Procedures, attached as an exhibit to the Stalking Horse Agreement, provide that any party exercising its rights to credit bid pursuant to section 363(k) of the Bankruptcy Code must be a Qualified Bidder and submit a Qualified Bid.

(16)    **Relief from Bankruptcy Rule 6004(h):** Section S of the Sale Order contains a finding that time is of the essence in consummating the transaction contemplated by the Stalking Horse Agreement and, accordingly, that there is cause to lift the stay established by Bankruptcy Rule 6004.

<u>Basis for Relief</u>

**I.    An Expedited Hearing to Approve the Bidding Procedures is Necessary**

34.    The Sellers seek an expedited hearing on the Bidding Procedures. Pursuant to Bankruptcy Rule 9006(d), the Court may reduce the notice period normally required for motions. The Sellers have financing under their DIP Credit Agreement until only approximately the third week of April 2015 to fund business operations, run the Auction, and close and consummate the Sale. Further, if the Successful Bidder is not the Stalking Horse Bidder, following the Auction

- 20 -

the Sellers will need additional time to provide notice to counterparties to executory contracts and unexpired leases the Successful Bidder proposes to assume.

35.    The nature of the Sellers' business is such that their continued operation relies to a significant degree on their relationships with various healthcare providers to which the Sellers' provide IOM services (the Sellers' core service offering). The Sellers anticipate that, immediately upon becoming aware of these Chapter 11 Cases, their competitors will attempt to interfere with the Sellers' relationships with these healthcare providers. If successful, this would have a significant adverse impact on the Sellers' ability to continue as a going concern. In fact, the Sellers are already aware of a number of instances in which this has occurred, and shortly prior to the Petition Date, the Debtors filed a complaint and sought emergency injunctive relief against its competitor, Medsurant Holdings, LLC and its CEO, Jordan Klear.

36.    Additionally, the technologists employed by the Sellers and the physicians employed by the Affiliated Practices are critical to the Sellers' ability to continue as a going concern. In fact, one of the conditions to the Stalking Horse Bidder's obligation to consummate the Sale is that a certain minimum number of individuals who are offered employment by the Stalking Horse Bidder must accept such employment. The Sellers have no doubt that, immediately upon becoming aware of these Chapter 11 Cases, their competitors will attempt to poach the technologists and physicians employed by the Sellers and the Affiliated Practices. Again, the Sellers are already aware of several instances where this has happened in the weeks leading up to the Petition Date.

37.    Lastly, as described more fully in the First Day Declaration, the Sellers' senior management has experienced a significant amount of turnover, including four different CEOs and four different CFOs over the past three years. Any delay in these Chapter 11 Cases to

#32674701 v1

effectuate a sale of the Sellers' assets is likely to lead to more instability among the Sellers' senior management, thereby depleting the value of the Sellers' estates.

38.     Accordingly, the Sellers have separately requested that this Court set a hearing date of March 6, 2015 for consideration of the Bidding Procedures.

## II.    The Bidding Procedures Are in the Best Interests of the Sellers, Their Estates and Their Creditors

### A.    *The Proposed Noticing of the Bidding Procedures Is Effective and Sufficient Notice*

39.     The Sellers seek to sell the Stalking Horse Bid Assets through a well-publicized Sale and Auction.  In January 2015, the Sellers engaged with several potential purchasers of the Sellers' assets, one of whom is now the Stalking Horse Bidder.  The Sellers intend to contact all interested purchases promptly after entry of the Bidding Procedures Order.  The intraoperative monitoring services sector in which the Sellers conduct their business is relatively small in terms of potential acquirers.  As a result, the group of potential acquirers can be relatively easily identified, and the Sellers have developed a list of Contact Parties who will be contacted and may receive a copy of the Information Package.  The list encompasses those Contact Parties the Sellers believe may be interested in pursuing a Sale and who the Sellers reasonably believe have the financial resources to consummate a Sale.

40.     Under Bankruptcy Rules 2002(a) and (c), the Sellers must notify their creditors of the proposed sale of the Stalking Horse Bid Assets, including a disclosure of (a) the time and place of any auction, (b) the terms and conditions of the sale, and (c) the deadline to file objections.  The Sellers will also serve the Sale Notice on (a) the Office of the United States Trustee for the District of Delaware; (b) the Stalking Horse Bidder; (c) the Sellers' landlords; (d) the Internal Revenue Service; and (e) all entities who are known to possess or assert a claim against the Sellers.

- 22 -

41.    The foregoing procedures provide effective notice of the Sale, the Bidding Procedures, and the Auction to interested parties and will promote a broad marketing process while minimizing costs to the estates. Accordingly, the Sellers respectfully request that the Court find that the proposed notice procedures set forth in this Motion are sufficient and that no other or further notice of the Sale, the Bidding Procedures or the Auction is required.

**B.    *The Bidding Procedures Will Maximize Value***

42.    Appropriate bid procedures should promote "an open and fair public sale designed to maximize value for the estate." See In re Edwards, 228 B.R. 552, 561 (Bankr. E.D. Pa. 1998); see also In re Dura Auto. Sys., Inc., No. 06-11202, 2007 WL 7728109, at *91 (Bankr. D. Del. Aug. 15, 2007) (approving bid procedures when they "allow the [d]ebtors to conduct the [a]uction in a controlled, fair and open fashion . . . increasing the likelihood that the [d]ebtors will receive the best possible consideration for the [s]ale [a]ssets by helping ensure a competitive and fair bidding process"). And the paramount goal in any proposed sale of property of the estate is to maximize the proceeds from such sale, in accordance with the Sellers' "duty to maximize the value of the estate." See Commodity Futures Trading Comm'n v. Weintraub, 471 U.S. 343, 352 (1985); In re Smart World Techs., LLC, 423 F.3d 166, 175 (2d. Cir 2005) (noting, in the context of settlement legal claims that were part of a § 363 sale, that the Bankruptcy Code "requires the debtor to [manage the estate property] in a way that maximizes the estate's value"); In re Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3d Cir. 2004) (noting that the debtor-in-possession has a "fiduciary duty to maximize the value of the bankruptcy estate") (internal quotation marks omitted); Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) ("a primary objective of the Code [is] to enhance the value of the estate at hand") ; Dura Auto., 2007 WL 7728109, at *91 ("The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.").

- 23 -

43.    Indeed, procedures that promote increased competitive bidding are required for sales of estate assets because they advance the goal of maximizing the value received by the estate by helping to "secure for the benefit of creditors the best possible bid." In re Fin. News Network Inc., 980 F.2d 165, 169 (2d. Cir 1992); see also Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992) (bidding procedures that "encourage bidding . . . maximize the value of the debtor's assets"); Dura Auto., 2007 WL 7728109, at *91 ("[C]ourts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.").

44.    The proposed Bidding Procedures will ensure a competitive, open, and fair bidding process, increasing the odds of the Sellers' estates receiving the best consideration possible for the Bid Assets. The Bidding Procedures will also encourage active bidding by parties with a serious interest in purchasing the Bid Assets, financial capacity to close a Sale and ability to act with the speed necessary under the circumstances, and thereby generate the highest or otherwise best offer reasonably available at the Auction for the Bid Assets.

45.    The Bidding Procedures are also consistent with other procedures previously approved by courts in this and other districts and appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

46.    Accordingly, the Sellers submit that the Bidding Procedures are reasonable, appropriate, and within the Sellers' sound business judgment under the circumstances because they will maximize the value to be received by the Sellers' estates.

C.    *The Stalking Horse Protections are Reasonable and Necessary*

47.    To compensate the Stalking Horse Bidder for serving as a "stalking horse" whose bid will be subject to higher or better offers, the Sellers seek authority to pay the Stalking Horse

- 24 -

Bidder the Stalking Horse Protections if the Court approves a sale of the Bid Assets to another Qualified Bidder and such sale closes.

48.     Bidding incentives such as a break-up fee or expense reimbursement encourage a potential purchaser to invest the requisite time, money, and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor's assets, despite the inherent risks and uncertainties of the chapter 11 process. The proposed Stalking Horse Protections are reasonable, given the benefits to the estates of having the Stalking Horse Agreement as a definitive agreement and the risk to Stalking Horse Bidder that a third-party offer ultimately may be accepted. Accordingly, the Stalking Horse Protections are necessary to preserve and enhance the value of the Sellers' estates.

49.     The United States Court of Appeals for the Third Circuit has established standards for determining the appropriateness of bidding incentives in the bankruptcy context. In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999), the Court found that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of section 503(b) of the Bankruptcy Code govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some benefit to the debtor's estate. See id. at 53-7-383 (holding that break-up fees can only be approved if they are "necessary to preserve the value of [the debtor's] estate"); see also In re Homelife Corp., No. 01-2412, 2002 WL 31115654, at *2 (D. Del. Sept. 20, 2002) (declining to reconsider bankruptcy court's approval of bidding procedures that included a $750,000 termination fee because the fee "was appropriate and in the best interests of all the constituencies of the bankruptcy estate").

- 25 -

50.    The O'Brien court identified at least two instances in which bidding incentives benefit the estate. First, benefit may be found if "assurance of a breakup fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Id. at 537. Second, where the availability of bidding incentives induce a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth." Id. The Third Circuit has further refined this test to clarify that, to justify a break-up fee, the proposed purchaser would not have entered into a stalking horse purchase agreement without assurance of a breakup fee. In re Reliant Energy Channelview LP, 594 F.3d 200, 208 (3d. Cir. 2010) (affirming bankruptcy court's denial of break-up fee because it was not necessary to preserve stalking horse bid).

51.    The Stalking Horse Protections satisfy this standard. The Stalking Horse Agreement, and in particular the Stalking Horse Protections, are the product of good faith, arm's length negotiations. The Stalking Horse Protections are fair and reasonable in amount, particularly in view of Stalking Horse Bidder's efforts to date and the risk to Stalking Horse Bidder of not acquiring the Bid Assets. The Stalking Horse Bidder would not have entered into the Stalking Horse Agreement without these provisions. The Stalking Horse Protections thus have "induc[ed] a bid that otherwise would not have been made and without which bidding would [be] limited." O'Brien, 181 F.3d at 537. Similarly, the Stalking Horse Bidder's offer provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [Bid Assets will be] sold will reflect [their] true worth." Id.

- 26 -

52.     The mere existence of the Stalking Horse Protections permits the Sellers to insist that competing bids for the Bid Assets be materially higher or otherwise better than the Stalking Horse Bidder's bid, a clear benefit to the Sellers' estates. Further, Section 8.4 of the Stalking Horse Agreement provides that (i) the approval of the Break-Up Fee and the Expense Reimbursement is an integral part of the transactions contemplated in the Stalking Horse Agreement, (ii) in the absence of the Sellers' obligation to pay the Break-Up Fee and the Expense Reimbursement, the Stalking Horse Bidder would not have entered into the Stalking Horse Agreement; and (iii) the entry by the Stalking Horse Bidder into the Stalking Horse Agreement is necessary for the preservation of the Sellers' estates and is beneficial to the Sellers because, in the Sellers' business judgment, it will enhance the Sellers' ability to maximize the value of their assets for the benefit of their creditors.

53.     In sum, the Sellers' ability to offer the Stalking Horse Protections enables the Sellers to ensure that the sale of the Bid Assets will be to a contractually-committed bidder at a price the Sellers believe to be fair. At the same time, the Stalking Horse Protections provide the Sellers with the potential of even greater benefit to the estate. Accordingly, the Stalking Horse Protections should be approved.

**D.      *The Proposed Procedures for the Assumption and Assignment of Executory Contracts and Unexpired Leases Are Fair and Adequate***

54.     The Sellers seek authority under sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Assumed Contracts (as defined in the Stalking Horse Agreement) to the Stalking Horse Bidder. This Motion and the Bidding Procedures Order set forth the process the Sellers will undertake to serve Notices of Assignment and Cure and how and when counterparties to Assumed Contracts must file and serve Assignment and Cure Objections.

55.    In order to maximize the value of the Sellers' estates and the benefits that accrue to the creditors and other parties in interest, the Sellers seek to preserve and sell the assets of their business as a going concern. To that end, the Sellers must assume and assign to the Stalking Horse Bidder certain contracts related to the operation of their business. The Notice of Assignment and Cure is reasonably calculated to provide each Counterparty with notice of (i) the proposed assumption and assignment of an Assumed Contract, (ii) any cure amounts associated with such assumption and assignment, (iii) the identity of the assignee or its designee, and (iv) the Assignment and Cure Objection Deadline by which such Counterparty must object to such assumption and assignment.

56.    Thus, the Assignment and Cure Objection Deadline strikes a fair balance between protecting the interests of each Counterparty and serving the principle of expediency, which dictates the pace of this Transaction. A longer Assignment and Cure Objection Deadline would increase the likelihood of diminution of the Sellers' assets, thereby reducing the likelihood of a successful Closing, without an appreciable benefit to the Counterparties.

E.    ***The Assumed Contracts Schedule Contains Confidential Commercial Information, and Therefore Authorization to File the Confidential Schedules Under Seal Is Required and Necessary***

57.    The Sellers are requesting authority to file Schedules 1.1(a)(v)(i) (Assumed Contracts) and 6.6 (Non-Competes) to the Stalking Horse Agreement (the "Confidential Schedules") under seal. The Confidential Schedules contain information identifying (i) contract counterparties with which the Sellers conduct business and (ii) many of the Debtors employees.

58.    Although the public has a common law "right of access to judicial proceedings and records," In re Cendant Corp., 260 F.3d 183, 192 (3d Cir. 2001), the Bankruptcy Code requires courts, in appropriate circumstances, to protect the businesses of debtor corporations by limiting the public's access, placing papers under seal, or otherwise entering orders to prohibit

- 28 -

the dissemination of sensitive information.  See 11 U.S.C. § 107(b), Fed. R. Bankr. P. 9018, 1007(j); see also Cendant, 260 F.3d 194 (the public's right of access "is not absolute") (quoting Littlejohn v. BIC Corp., 851 F.2d 673, 678 (3d Cir. 1988)); Leucadia, Inc. v. Applied Extrusion Tech., Inc., 998 F.2d 157, 165 (3d Cir. 1993) ("Although the right of access is firmly entrenched, so also is the correlative principle that the right is not absolute.") (internal quotation marks omitted).

59.    In proceedings under title 11, the limits on the public's right of access are a matter of statute.  See 11 U.S.C. § 107(b).  Specifically, section 107(b) provides that "[o]n request of a party in interest, the bankruptcy court shall . . . protect an entity with respect to a trade secret or confidential research, development, or commercial information . . . ."  11 U.S.C. § 107(b).  Bankruptcy Rule 9018 implements section 107(b) by providing that "[o]n motion, or on its own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information . . . ."  Fed. R. Bankr. P. 9018.  Bankruptcy Rule 1007(j) further provides authority for the court, "for cause shown," to "direct the impounding" of schedules of assets and liabilities and statements of financial affairs.  Fed. R. Bankr. P. 1007(j).

60.    Courts in Delaware define commercial information as "information which would result in 'an unfair advantage to competitors by providing them information as to the operations of the debtor.'"  In re Alterra Healthcare Corp., 353 B.R. 66, 75 (Bankr. D. Del. 2006)  (quoting Video Software Dealers Assoc. v. Orion Pictures Corp. (In re Orion Pictures Corp.), 21 F.3d 24, 27-78 (2d Cir. 1994)).  An order sealing commercial information is appropriate where the disclosure of the commercial information could "reasonably be expected to cause [] commercial injury" and the information is "critical" to the operations of the entity seeking protection, such

that the information's "disclosure will unfairly benefit that entity's competitors." See Alterra

Healthcare, 353 B.R. at 75-76 (citations omitted); In re Mum Servs., Inc., 279 B.R. 478, 484

(Bankr. D. Del. 2002) (noting that § 107(b) "was intended to avoid affording an unfair advantage

to competitors by providing them information as to the commercial operations of the debtor")

(internal citations omitted).  Further, confidential commercial information does not need to rise

to the level of a trade secret to be entitled to protection under section 107(b). See, e.g., Orion

Pictures, 21 F.3d at 28 ("courts interpreting § 107(b) need not require that commercial

information be the equivalent of a trade secret before protecting such information.").

61.     Many courts have recognized that lists of subcontractors, suppliers, customers,

and other business partners can constitute trade secrets. See, e.g., Hudson Hotels Corp. v.

Choice Hotels Int'l, Inc., 995 F.2d 1173, 1176-77 (2d Cir. 1993) (noting that "[c]ompilations of

information, traditionally viewed and protected under trade secret law, are items like

customer and supplier lists and pricing and cost information."), abrogated on other grounds by

Nadel v. Play-By-Play Toys and Novelties, Inc., 208 F.3d 368 (2d Cir. 2000); Mattern &

Assocs., LLC v. Seidel, 678 F.supp.d 256, 269 (D. Del. 2010) (recognizing that customer lists

are trade secrets); Fastenal Co. v. Crawford, 609 F. Supp. 2d. 650, 671-672 (E.D. Ky. 2009)

(upholding jury verdict that protected customer list and pricing information as trade secrets);

Liveware Publ'g, Inc. v. Best Software, Inc., 252 F.Supp.2d 74, 85 (D. Del. 2007) ("[A customer

list] is precisely the type of business information which is regularly accorded trade secret

status."); Ackerman v. Kimball Int'l, Inc., 634 N.E. 2d 778, 782-784 (Ind. App. 1994) , vacated

in part on other grounds, 652 N.E.2d 507 (Ind. 1995) (customer and supplier lists and pricing

information were protected by the court as trade secrets); T-N-T Motorsports, Inc. v. Hennessey

Motorsports, Inc., 965 S.W. 2d 18, 21-23 (Tex. App. 1998) (upholding temporary restraining order to protect vendor list, among other things, as a trade secret).

62.    Further, bankruptcy courts have impounded and/or sealed such lists as confidential commercial information pursuant to section 107(b). See, e.g., In re Nortel Networks Inc., No. 09-10138, 2011 WL 1661524, at *3 (Bankr. D. Del. May 2, 2011) (sealing lists of the debtor's contract and license counterparties pursuant to § 107(b)); In re The Frontier Group, LLC, 256 B.R. 771, 773-774 (Bankr. E.D. Tenn. 2000) (sealing list of creditors as confidential commercial information due to potential for harm to the debtor from competitor use); In re Nunn, 49 B.R. 963, 965 (Bankr. E.D. Va. 1985) (sealing list of creditors in the debtor's schedules as confidential commercial information due to potential for harm to a third-party from competitor use); cf. In re Meyrowitz, Case No. 06-31660, 2006 Bankr. LEXIS 2931, *10-11 (Bankr. N.D. Tex. Oct. 26, 2006) (sealing list of investors in potential transaction as confidential commercial information due to potential harm from competitor use); In re Northstar Energy, Inc., 315 B.R. 425, 429-430 (Bankr. E.D. Tex. 2004) (sealing list of investors in all documents filed with the bankruptcy court, including the debtor's schedules, as confidential commercial information due to potential harm from competitor use).

63.    The information contained in the Confidential Schedules is in the nature of trade secrets and/or confidential commercial information of the Sellers.  The nature of the Sellers' business is such that their continued operation relies to a significant degree on their relationships with various healthcare providers to which the Sellers' provide IOM services (the Sellers' core service offering).  The Sellers anticipate that, immediately upon becoming aware of these Chapter 11 Cases, their competitors will attempt to interfere with the Sellers' relationships with these healthcare providers.  If successful, this would have a significant adverse impact on the

#32674701 v1

Sellers' ability to continue as a going concern. In fact, the Sellers are already aware of a number of instances in which this has occurred, and shortly prior to the Petition Date, the Sellers filed a complaint and sought emergency injunctive relief against its competitor, Medsurant Holdings, LLC and its CEO, Jordan Klear.

64.     Additionally, the technologists employed by the Sellers and the physicians employed by the Affiliated Practices are critical to the Sellers' ability to continue as a going concern. In fact, one of the conditions to the Sellers' obligation to consummate the Sale is that a certain minimum number of individuals who are offered employment by the Buyer must accept such employment. The Sellers have no doubt that, immediately upon becoming aware of these Chapter 11 Cases, their competitors will attempt to poach the technologists and physicians employed by the Sellers and the Affiliated Practices. Again, the Sellers are already aware of several instances where this has happened in the weeks leading up to the Petition Date. Disclosure of the healthcare providers with which the Sellers' contract would unfairly benefit the Sellers' competitors and cause harm to the Sellers and their clients.

65.     If the Sellers' competitors are successful in any of the foregoing, this would have a significant adverse impact on the Sellers' ability to continue as a going concern. For these reasons, the Sellers believe there is a high likelihood of harm to the Sellers' business if the Confidential Schedules are disclosed to the public.

66.     Accordingly, the Sellers respectfully submit that an order sealing the Confidential Schedules is necessary and appropriate and that the relief requested in this Motion should be granted.

III.    **A Hearing to Approve the Sale On or Before March 24, 2015 (If No Qualified Bids Other than from the Stalking Horse Bidder are Received) or March 31, 2015 (If a Qualified Bid Other than from the Stalking Horse Bidder is Received) is Necessary**

67.    The Sellers further request that the Sale Approval Hearing be scheduled on or before March 24, 2015 (if no Qualified Bids other than from the Stalking Horse Bidder are received) or March 31, 2015 (if one or more Qualified Bids other than from the Stalking Horse Bidder are received). Similarly, the Sellers request that the Bid Deadline be set for March 20, 2015 at 4:00 p.m. (prevailing Eastern Time), and that the Auction, if any, be scheduled for March 27, 2015, commencing at 10:00 a.m. (prevailing Eastern Time). The arguments for expediency outlined above also hold true for each of these dates, most notably the Sale Approval Hearing. The Sellers have a limited financing period to fund business operations, run the Auction, and close and consummate the Sale.

68.    The availability of the Stalking Horse Agreement from the date of this Motion to all parties in interest, as well as the requirement that Qualified Bids be based on the Stalking Horse Agreement, should provide any parties in interest with sufficient notice of how such an agreement and the Sale contemplated thereby would affect its interests.

IV.    **Approval of the Proposed Sale Transaction Is Warranted and in the Best Interests of the Sellers' Estates**

A.    *The Sale of the Stalking Horse Bid Assets is Authorized by Section 363 as a Sound Exercise of the Sellers' Business Judgment*

69.    Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). A debtor in possession is given these rights by section 1107(a) of the Bankruptcy Code. See 11 U.S.C. § 1107(a). Moreover, section 105(a) of the Bankruptcy Code provides that bankruptcy courts "may issue any order, process, or judgment

- 33 -

that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

70.    Bankruptcy Courts have routinely authorized sales of a debtor's assets under Section 363(b) where the sale is based upon the sound business judgment of the debtor. Dura Auto., 2007 WL 7728109, at *92 (citing In re Martin, 91 F.3d at 395) ("[B]ankruptcy courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor."); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir.1983) ("[T]here must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b)."); In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986) (requiring a finding of good faith for the authorization of a sale of assets); In re Montgomery Ward Holding Corp., 242 B.R 147, 153 (D. Del. 1999) (authorizing debtor's Section 363(b) motion upon a showing of debtor's sound business purpose for such actions).

71.    In Delaware, once a debtor has articulated a valid business justification, the business judgment rule operates as a presumption "'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" Continuing Creditors' Comm. of Star Telecomm., Inc. v. Edgecomb, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988)); Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008) ("The business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best

- 34 -

interests of the company.") (internal citations omitted). Thus, this Court should grant the relief requested in this Motion if the Sellers demonstrate a sound business justification for the requested relief. In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (D. Del. 1991) (affirming the bankruptcy court's approval of a § 363 sale when there was "a valid business purpose"); see also In re Worldspace, Inc., 08-12412, 2010 WL 4739929, at *2 (Bankr. D. Del. June 2, 2010) (approving debtors' sale of assets pursuant to § 363(b) because the debtors "have shown good and sufficient business justification"); In re Velocity Express Corp., No. 09-13294, at *4 (Bankr. D. Del. Nov. 3, 2009) (approving debtors' § 363(b) sale because "[d]ebtors have demonstrated . . . good, sufficient and sound business purposes and justifications").

72.    In determining whether to approve a proposed asset sale, courts have considered the following factors: (a) whether the sale is justified by a sound business reason; (b) whether interested parties were provided with adequate and reasonable notice of the sale; (c) whether the sale price is reasonable; and (d) whether the purchaser is proceeding in good faith. See, e.g., In re Delaware & Hudson Ry. Co., 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987). The proposed Sale satisfies all of these factors.

A.    Sound Business Reasons Exist for the Sale

73.    The proposed Sale pursuant to the Stalking Horse Agreement (as may be modified at the Auction) is supported by sound business justifications. The Sellers firmly believe that creditors will receive more value through a prompt sale of the Bid Assets than through continued operations and that a prompt sale is necessary to maximize the value of the Bid Assets for the estate.

74.    The Sellers have determined that the Sale according to the proposed Bidding Procedures will enable the Sellers to obtain the highest or otherwise best offers for the Stalking Horse Bid Assets and maximize the value of the Stalking Horse Bid Assets for the Sellers'

- 35 -

estates. The Sellers' primary assets are their exceptional base of professionals and relationships with healthcare providers. The Sellers have determined, in their reasonable business judgment, that the Stalking Horse Bid Assets will have the greatest value if promptly sold, while its employee base and healthcare provider relationships remain wholly intact.

B.      Adequate Notice of the Sale is Being Provided

75.      In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private sale or by public auction. Further, pursuant to Bankruptcy Rule 2002, 21-day notice is sufficient notice of the proposed use, sale, or lease of property of the estate other than in the ordinary course of business. Under Bankruptcy Rule 9006(f), an additional three days are added to any service by mail. Bankruptcy Rule 9006(c) allows this Court to reduce these notice requirements for cause. Subject to Bankruptcy Rule 6004, the notice of a proposed use, sale, or lease of property required under Bankruptcy Rule 2002(a)(2) must include the time and place of any public sale, the terms and conditions of any private sale, and the time fixed for filing objections. See Fed. R. Bankr. P. 2002(c)(1). Moreover, the notice of a proposed use, sale, or lease of property is sufficient if it generally describes the property. Id.

76.      The Sellers propose to mail the Sale Notice, substantially in the form of **Exhibit E** hereto, to all persons entitled to notice under the Bankruptcy Code and the Bankruptcy Rules on the first business day following entry of the Bidding Procedures Order. Given the nature of the Sellers' business and the Sellers' rapidly declining liquidity, requiring 24 days between mailing and an Auction poses risk to the going concern value of the business. Therefore, cause exists to reduce the notice requirements of Rule 2002 to permit the Auction and the Sale to proceed on the timeline that the Stalking Horse Bidder has required.

- 36 -

77.    The Sellers respectfully submit that the notice, procedures, and rules set forth in the Motion satisfy the notice requirements of the Bankruptcy Rules and section 363(b) of the Bankruptcy Code and constitute good and sufficient notice, and that no other or further notice is required.

C.    The Consideration Offered is Fair and Reasonable

78.    Pursuant to the proposed Bidding Procedures, the Sellers and their professionals will continue to market their business and solicit offers for the Stalking Horse Bid Assets from the date on which the Bidding Procedures Order is entered up to and during the Auction, ensuring that the Sellers will receive the highest or otherwise best offer for the business, whether from Stalking Horse Bidder or from another Successful Bidder. Accordingly, the Sellers submit that the Sale will result in consideration that is fair and reasonable.

D.    The Stalking Horse Bidder is Proceeding in Good Faith

79.    The Stalking Horse Agreement requires as a condition to closing that the Sale Order include a finding that the Stalking Horse Bidder is a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Sellers have disclosed and requested the Court's approval of the terms and conditions of the proposed sale and intend to provide notice as directed by the Court. Furthermore, the Sellers will be prepared to introduce evidence at the Sale Approval Hearing regarding the conduct of the Auction and the arm's length nature of the negotiation of the Stalking Horse Agreement. Accordingly, the Sale pursuant to the Stalking Horse Agreement has been proposed, and is, in good faith.

**B.    *The Sale of the Stalking Horse Bid Assets Free and Clear of Liens, Claims, Encumbrances, Obligations, Liabilities, Contractual Commitments or Interests of Any Kind or Nature Whatsoever Is Authorized by Sections 105(a) and 363(f)***

80.    The Stalking Horse Bid Assets should be sold free and clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code) ("Claims and Interests"), encumbrances,

obligations, liabilities, contractual commitments or interests of any kind or nature whatsoever

pursuant to section 363(f) of the Bankruptcy Code, with any such Claims and Interests attaching

to the net sale proceeds of the Stalking Horse Bid Assets, as and to the extent applicable.  Section

363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims,

interests and encumbrances if:

> (1)    applicable nonbankruptcy law permits sale of such property free
> and clear of such interests;
>
> (2)    such entity consents;
>
> (3)    such interest is a lien and the price at which such property is to be
> sold is greater than the value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    such entity could be compelled, in a legal or equitable proceeding,
> to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

81.    Section 105(a) of the Bankruptcy Code supplements this provision by providing

that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to

carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

82.    Because "[s]ection 363(f) is in the disjunctive, the sale free of the interest

concerned may occur if any one of the conditions of § 363(f) have been met."  In re Dundee

Equity Corp., No. 89-B-10233, 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6,

1992); In re Kellstrom Industries, Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) (same); Citicorp

Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (same);

Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930

F.2d 1132, 1147 n.24 (6th Cir. 1991) (noting that the court may approve the sale "free and clear"

provided at least one of the subsections of section 363(f) of the Bankruptcy Code is met).

#32674701 v1

83.    At the very least, section 363(f)(2) of the Bankruptcy Code will be met in the Sale
because the Stalking Horse Bidder, which holds the debt outstanding under the Loan
Commitments and is the provider of the DIP Financing necessary to facilitate the sale process,
has consented to the Sale.

84.    Although the Sellers are not aware of any creditors, other than the Stalking Horse
Bidder, that hold liens in the Stalking Horse Bid Assets, such lien holders, to the extent they
exist, will also receive adequate protection in the Sale.  Such liens, if any, will attach to the cash
reserved for winding down the Sellers' operations pursuant to the Stalking Horse Agreement.
Those liens will attach in the same order of priority, with the same validity, force, and effect that
such creditor had prior to such sale, and subject to any claims and defenses the Sellers and their
estates may possess with respect thereto.  Accordingly, section 363(f) of the Bankruptcy Code
authorizes the Sale of the Stalking Horse Bid Assets free and clear of any such Claims and
Interests.

### C.    *The Stalking Horse Bid Assets and Assumed Contracts Should Be Sold Free and Clear of Any Successor Liability*

85.    Under the terms of any agreement, the Successful Bidder likely will not be liable
for any of the Sellers' liabilities as a successor under any theory of law or equity to the Sellers'
businesses or otherwise, unless expressly assumed.  Significant precedent exists demonstrating
that claims against a winning bidder are directed to the proceeds of a free and clear sale of
property and may not subsequently be asserted against a Stalking Horse Bidder.

86.    Section 363(f) of the Bankruptcy Code provides for the sale of assets "free and
clear of any interests," but the term "any interest" is not defined anywhere in the Bankruptcy
Code.  In re Downtown Athletic Club of N.Y. City, 2000 U.S. Dist. LEXIS 7917 at *9 (S.D.N.Y.
June 9, 2000) (approving sale free and clear of leasehold interests); see also Folger Adam

- 39 -

Security, Inc. v. DeMatteis/MacGregor, JV, 209 F.3d 252, 257 (3d Cir. 2000) ("The term 'any interest' as used in section 363(f), is not defined anywhere in the Bankruptcy Code."). Courts construe the term "interest" in line with its plain meaning to include interests other than simply liens, and courts give a "generally broad interpretation of 'any interest' as utilized under § 363(f)." In re Downtown Athletic Club, 2000 U.S. Dist. LEXIS 7917 at *11(citing In re Lady H Coal Co., Inc., 193 B.R. 233, 246 (Bankr. S.D.W. Va. 1996)); see also In re Trans World Airlines, Inc., 322 F.3d 283, 289-90 (3d Cir. 2003) (finding that any interests that "arise from the property being sold" may qualify as "interests" under section 363(f)). As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co., 99 F.3d 573, 581-82 (4th Cir. 1996), the scope of section 363(f) is not limited to *in rem* interests. Thus, Leckie held that debtors could sell their assets under § 363(f) free and clear of successor liability that otherwise would have arisen under a federal statute. Id. See also In re Trans World Airlines, 322 F.3d at 290 ("Indeed, to equate interests in property with only *in rem* interests such as liens would be inconsistent with section 363(f)(3), which contemplates that a lien is but one type of interest.").

87.    Courts consistently hold that "stalking horse" bidders in section 363 sales take free from successor liability resulting from pre-existing claims. See id. (sale order barring successor liability on account of employment and voucher claims consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); In re Specialty Packaging Holdings, Inc., 2010 WL 2822104, at *4 (Bankr. D. Del. Mar. 24, 2010) (approving a sale of assets under section 363(f) "free and clear of any and all liens, claims, interests, encumbrances, and successor liabilities"); The Ninth Ave. Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy);

- 40 -

In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in

free and clear sale included free and clear of Title VII employment discrimination and civil

rights claims of debtor's employees); In re Hoffman, 53 B.R. 874, 876-77 (Bankr. D.R.I. 1985)

(transfer of liquor license free and clear of any interest permissible even though the estate had

unpaid taxes); Am. Living Sys. v. Bonapfel (In re All Am. of Ashburn, Inc.), 56 B.R. 186, 190

(Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of

assets free and clear); WBQ P'ship v. Virginia Dept. of Med. Assistance Servs. (In re WBQ

P'ship), 189 B.R. 97, 104-05 (Bankr E.D. Va. 1995) (Commonwealth of Virginia's right to

recapture depreciation is an "interest" as used in section 363(f)).[6]

88.     An order purporting to authorize the sale of the Stalking Horse Bid Assets free

and clear of any interests would be thwarted if claimants could later use that sale to assert claims

against the Stalking Horse Bidder.  Under section 363(f) of the Bankruptcy Code, the Stalking

Horse Bidder is entitled to know that the Stalking Horse Bid Assets are not infected with latent

claims that will be asserted against the Stalking Horse Bidder after the Transaction is completed.

89.     Accordingly, the Sale Order should provide that the Stalking Horse Bidder is not

liable as a successor under any theory of successor liability, whether in law or in equity, for any

liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations,

liabilities, contractual commitments or interests of any kind or nature whatsoever that encumber

or relate to the Stalking Horse Bid Assets.

---

[6] Further, courts concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims have found that section 105(a) of the Bankruptcy Code provides the requisite authority.  See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of liens does not prevent such a sale, as the court's authority to permit such a sale is implicit in the court's equitable power when necessary to carry out the provisions of title 11).

**D.**    ***The Stalking Horse Bidder Will Be a Good Faith Purchaser and
Is Entitled to the Full Protection of Section 363(m) and the Transfer and Sale
of the Acquired Assets Will Not Violate Section 363(n)***

90.    Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under
> subsection (b) or (c) of this section of a sale or lease of property
> does not affect the validity of a sale or lease under such
> authorization to an entity that purchased or leased such property in
> good faith, whether or not such entity knew of the pendency of the
> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m). While the Bankruptcy Code does not define "good faith," the Third

Circuit Court of Appeals in Abbot Dairies held that the:

> requirement that a purchaser act in good faith ... speaks to the
> integrity of his conduct in the course of the sale proceedings.
> Typically, the misconduct that would destroy a purchaser's good
> faith status at a judicial sale involves fraud, collusion between the
> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders."

788 F. 2d at 147 (quoting In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1197-98 (7th Cir. 1978)

(interpreting Bankruptcy Rule 805, the precursor of section 363(m) of the Bankruptcy Code).

91.    As such, a party would have to show "fraud, collusion between the [Stalking

Horse Bidder] and other bidders or the [Sellers,] or an attempt to take grossly unfair advantage of

other bidders" to demonstrate a lack of good faith. See In re Tempo Technology Corp., 202 B.R.

363, 370 (D. Del. 1996) (rejecting good faith challenge by unsecured creditors at sale hearing).

92.    By the time of execution of the Stalking Horse Agreement, the Sellers and the

Stalking Horse Bidder will have engaged, and have already engaged, in thorough arm's length

negotiations over the terms of the Stalking Horse Agreement. In addition, the Stalking Horse

Bidder must comply with the terms and conditions of the Bidding Procedures Order. The Sellers

will also monitor compliance with section 363(n) of the Bankruptcy Code. Thus, the Stalking

#32674701 v1

Horse Bidder should receive the protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code.

93.    The Sellers request that the Court make a finding at the Sale Approval Hearing that the Agreement reached with the Stalking Horse Bidder was negotiated at arm's length and is entitled to the full protections of section 363(m) of the Bankruptcy Code.

### E.    *Assumption and Assignment of the Assumed Contracts Is Authorized by Section 365 of the Bankruptcy Code*

94.    Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor in possession, "subject to the court's approval," to "assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code lists the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee —
>
> (A)    cures or provides adequate assurance that the trustee will promptly cure, such default . . .;
>
> (B)    compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)    provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

95.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." In re Fleming Companies, Inc., 499 F.3d 300, 307 (3d Cir. 2007) (adequate assurance of future performance requires "practical, pragmatic construction," and "must be determined by

- 43 -

consideration of the facts of the proposed assumption"); In re Prime Motor Inns, Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("the degree of assurance necessary falls considerably short of an absolute guaranty"); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

96.     In the present case, the Sellers' assumption and assignment of the Assumed Contracts to the Successful Bidder will meet the business judgment standard and satisfy the requirements of section 365 of the Bankruptcy Code. As discussed above, the transactions contemplated by the Agreement will maximize the value of the Sellers' estates. The Sellers cannot obtain these benefits without the assumption and assignment of the Assumed Contracts, which are a material part of the Stalking Horse Bid Assets to be sold. Accordingly, assuming the Assumed Contracts is a sound exercise of the Sellers' business judgment.

97.     The Sellers may assign an executory contract or an unexpired lease, whether or not there has been a default under the agreement, so long as it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code and provides adequate assurance of future performance by the assignee. See 11 U.S.C. § 365(f)(2). And an assignee may provide adequate assurance by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating performance is "adequately assured" when the assignee has "financial resources" and has "expressed willingness to devote sufficient funding" to the business to provide a "strong likelihood of succeeding"); In re Dura Automotive Systems, Inc., 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) ("Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.").

- 44 -

98.     With respect to the Stalking Horse Bidder, the entity that will be the assignee of the Assumed Contracts is financially viable, well-known in the healthcare sector, and has experience in the business currently operated by the Sellers (the provision of IOM services). Pursuant to the Bidding Procedures, the Sellers will require any other Qualified Bidder to provide information with its bid sufficient to prove adequate assurance of future performance. Furthermore, as set forth above, counterparties to Assumed Contracts will have the opportunity to object to adequate assurance of future performance by the Stalking Horse Bidder. Accordingly, the assumption and assignment of the Assumed Contracts as set forth herein should be approved.

99.     Further, the Sellers request that the Sale Order provide that (a) anti-assignment provisions in the Assumed Contracts shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts and (b) such anti-assignment provisions are unenforceable pursuant to section 365(f) of the Bankruptcy Code. Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions. Section 365(f)(1) provides, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . .

11 U.S.C. § 365(f)(1). Section 365(f)(1) thus invalidates contractual provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. See, e.g., In re Fleming Companies, Inc., 499 F.3d 300, 307 (3d. Cir 2007) ("Section 365(f)(1) is not limited to explicit anti-assignment provisions. Provisions which are so restrictive that they constitute *de facto* anti-assignment provisions are also rendered unenforceable."); Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.), 127 F. 3d 904, 911 (9th Cir. 1997) ("no principle

- 45 -

of bankruptcy or contract law precludes us from permitting the Sellers here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365") cert. denied, 522 U.S. 1148 (1998). And Section 365(f)(3) prohibits enforcement of contractual provisions that would bar assignment by creating a right to modify or terminate the contract or lease upon proposed assumption or assignment. See, e.g., In re Rickel Home Centers, Inc., 240 B.R. 826, 831-832 (D. Del. 1999) (all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

### F. *The Court Should Waive or Reduce the Time Periods Set Forth in Rules 6004(h) and 6006(d)*

100.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." And Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign and executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Sellers request that the Court waive these 14-day stays and provide for the Sale Order to be effective immediately upon entry on the docket.

101.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay period, a leading treatise suggests that courts should eliminate the 14-day stay to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 Alan N. Resnick, et al., Collier on Bankruptcy ¶ 6004.10 (15th rev. ed. 2008). Further, if an objection is filed and overruled, and

- 46 -

the objecting party informs the court of its intent to appeal, the court may reduce the stay to the amount of time actually necessary to file such an appeal. Id.

102.    To maximize the value received for the Stalking Horse Bid Assets, the Sellers seek to close the Transaction as soon as possible after the Sale Approval Hearing. Accordingly, the Sellers respectfully request that the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

### G.    *The Automatic Stay Should Be Lifted for the Stalking Horse Bidder*

103.    Finally, pursuant to the Bidding Procedures Order, the Sellers respectfully request that the Bankruptcy Court lift the automatic stay pursuant to section 362 of the Bankruptcy Code, to allow the Stalking Horse Bidder (i) to deliver any notice provided for in the Stalking Horse Agreement and (ii) to take any and all actions permitted under the Stalking Horse Agreement in accordance with the terms and conditions thereof, without further order of the Bankruptcy Court.

### Notice

104.    The Sellers have provided notice of this Motion on the date hereof via facsimile, overnight delivery, and/or hand delivery to: (a) the Office of the United States Trustee for the District of Delaware (Attn: Tiiara N.A. Patton); (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the Stalking Horse Bidder; (d) the Debtors' landlords; (e) the Internal Revenue Service; (f) the Office of the United States Attorney for each state in which the Debtors operate; (g) the Office of the Attorney General for each state in which the Debtors operate; (h) the National Association of Attorneys General; (i) the Securities and Exchange Commission; (j) all potential buyers previously identified or solicited by the Sellers or their advisors and any additional parties who have previously expressed an interest to the Sellers or their advisors in potentially acquiring the Sellers' assets; (k) other potentially interested parties identified by the

- 47 -

Sellers or their advisors; and (l) all parties entitled to notice pursuant to Local Rule 9013-1(m). The Sellers submit that, under the circumstances, no other or further notice is required.

## No Prior Request

105.    No prior request for the relief sought herein has been made by the Sellers to this Court or any other court.

#32674701 v1

WHEREFORE, the Sellers respectfully request that this Court: enter (a) the Bidding Procedures Hearing Order; (b) the Bidding Procedures Order (i) approving the Bidding Procedures, (ii) authorizing the Sellers to enter into the Stalking Horse Agreement, (iii) authorizing the payment of Stalking Horse Protections, (iv) setting the dates for the Bid Deadline, Auction (if needed) and Sale Approval Hearing, (v) establishing notice procedures and approving forms of notice, (vi) approving procedures related to the assumption and assignment of executory contracts and unexpired leases and (vii) authorizing the Sellers to file the Confidential Schedules under seal pursuant to Section 107(b) of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure; and (c) the Sale Order (i) approving the sale of the Sellers' assets outside the ordinary course of business, (ii) authorizing the Sale free and clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, contractual commitments or interests of any kind or nature whatsoever, (iii) approving the Stalking Horse Agreement and (iv) approving the assumption and assignment to the Successful Bidder of certain executory contracts and unexpired leases related to the Transaction.

- 49 -

Dated: February 24, 2015
      Wilmington, Delaware

Respectfully submitted,

/s/   Donald J. Detweiler
PEPPER HAMILTON LLP
Donald J. Detweiler (DE No. 3087)
John H. Schanne II (DE No. 5260)
Hercules Plaza, Suite 5100
1313 Market Street
P.O. Box 1709
Wilmington, Delaware 19899-1709
Telephone: (302) 777-6500
Facsimile:  (302) 421-8390
Email:      detweilerd@pepperlaw.com
           schannej@pepperlaw.com

-and-

MCDERMOTT WILL & EMERY LLP
Timothy W. Walsh (*pro hac vice* pending)
Darren Azman (*pro hac vice* pending)
340 Madison Avenue
New York, New York 10173-1922
Telephone:(212) 547-5400
Facsimile: (212) 547-5444
Email:      twwalsh@mwe.com
           dazman@mwe.com

*Proposed Counsel to the Debtors and Debtors in Possession*