ASSET PURCHASE AGREEMENT

by and among

SPECIALTYCARE IOM SERVICES, LLC
and

THE SELLERS NAMED HEREIN

Dated February 24, 2015

## TABLE OF CONTENTS

Page

ARTICLE I    THE TRANSACTION.................................................................... 2

    1.1.    Purchase and Sale of Acquired Assets; Assumed Liabilities.................... 2

ARTICLE II    PURCHASE PRICE; CLOSING ...................................................... 6

    2.1.    Purchase Price; Payment; Deposit ....................................................... 6

    2.2.    Bulk Sales Laws ................................................................................ 6

    2.3.    Closing Date ...................................................................................... 6

    2.4.    Closing Deliveries .............................................................................. 6

    2.5.    Delivery of Acquired Assets ............................................................... 7

ARTICLE III    REPRESENTATIONS AND WARRANTIES OF BUYER .......... 7

    3.1.    Organization ...................................................................................... 7

    3.2.    Authority ........................................................................................... 7

    3.3.    No Conflict ........................................................................................ 7

    3.4.    Consents ............................................................................................ 8

ARTICLE IV    REPRESENTATIONS AND WARRANTIES OF SELLERS ........ 8

    4.1.    Due Diligence Materials ..................................................................... 8

    4.2.    Litigation ........................................................................................... 8

    4.3.    Obligations Under the Credit Agreement ............................................. 8

    4.4.    Assumed Contracts Schedule .............................................................. 9

ARTICLE V    COVENANTS ............................................................................... 9

    5.1.    Exclusivity ........................................................................................ 9

    5.2.    Access ............................................................................................... 9

    5.3.    Commercially Reasonable Efforts ....................................................... 9

    5.4.    Notification ...................................................................................... 10

    5.5.    No Inconsistent Action ..................................................................... 10

    5.6.    Further Assurances ........................................................................... 10

    5.7.    Specific Enforcement of Covenants ................................................... 11

    5.8.    Employee Matters ............................................................................ 11

    5.9.    Commencement of Chapter 11 Cases and Bankruptcy Court Orders.... 12

    5.10.    Assumption and Assignment of Assumed Contracts ........................... 13

    5.11.    Sellers' Consent to Debt Purchase .................................................... 13

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| 5.12. | Insurance | 14 |
| ARTICLE VI | CONDITIONS TO BUYER'S OBLIGATIONS | 14 |
| 6.1. | Debt Purchase | 14 |
| 6.2. | Termination of Loan Commitments | 14 |
| 6.3. | DIP Financing | 14 |
| 6.4. | Sale Order. Bankruptcy Court has entered the Sale Order | 14 |
| 6.5. | Cure Costs | 14 |
| 6.6. | Assumed Contracts | 14 |
| 6.7. | Covenants and Agreements Performed | 14 |
| 6.8. | Delivery of Agreements | 14 |
| 6.9. | No Prohibition or Proceedings | 15 |
| 6.10. | No Injunction or Statute | 15 |
| 6.11. | Physician Practice Entities | 15 |
| 6.12. | Material Adverse Effect | 15 |
| ARTICLE VII | CONDITIONS TO THE SELLERS' OBLIGATIONS | 15 |
| 7.1. | Covenants and Agreements Performed | 15 |
| 7.2. | Delivery of Agreements | 16 |
| 7.3. | No Prohibition or Proceedings | 16 |
| 7.4. | Mutual Release | 16 |
| 7.5. | No Injunction or Statute | 16 |
| ARTICLE VIII | TERMINATION PRIOR TO CLOSING | 16 |
| 8.1. | Termination | 16 |
| 8.2. | Effect of Termination | 17 |
| 8.3. | Effect on Obligations | 17 |
| 8.4. | Break-Up Fee; Expense Reimbursement | 17 |
| ARTICLE IX | TAX MATTERS | 18 |
| 9.1. | Allocation | 18 |
| 9.2. | Transfer Taxes | 18 |
| 9.3. | Wage Reporting | 18 |
| 9.4. | Cooperation on Tax Matters | 18 |

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE X       POST-CLOSING SUPPORT ......................................................... 18
    10.1.   Post-Closing Support ......................................................... 18
    10.2.   Billing Software Maintenance ............................................. 19
ARTICLE XI      MISCELLANEOUS ..................................................... 19
    11.1.   Interpretive Provisions ......................................................... 19
    11.2.   Entire Agreement ................................................................. 19
    11.3.   Successors and Assigns ........................................................ 19
    11.4.   Headings ............................................................................... 19
    11.5.   Modification and Waiver ..................................................... 19
    11.6.   Expenses ............................................................................... 20
    11.7.   Notices ................................................................................. 20
    11.8.   Governing Law; Consent to Jurisdiction ............................. 21
    11.9.   Public Announcements ......................................................... 21
    11.10.  No Third Party Beneficiaries ............................................... 21
    11.11.  Counterparts ......................................................................... 22
ARTICLE XII     CERTAIN DEFINITIONS ......................................... 22

## EXHIBITS

Exhibit A    Form of Sale Order
Exhibit B    Bidding Procedures

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a)(v)(i) | Assumed Contracts |
| Schedule 1.1(b)(iii) | Excluded Contracts |
| Schedule 4.2 | Litigation |
| Schedule 6.6 | Non-Competes |
| Schedule 10.1 | Post-Closing Support |
| Schedule 12.64 | Professional Fees |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (the "Agreement"), dated February 24, 2015, is among SpecialtyCare IOM Services, LLC, a Delaware limited liability company ("Buyer"), and ProNerve Holdings, LLC, a Delaware limited liability company ("Holdings"), ProNerve, LLC, a Delaware limited liability company (the "Company"), Boulder Intraoperative Monitoring, LLC, a Colorado limited liability company, Colorado Intraoperative Monitoring, LLC, a Delaware limited liability company, Denver South Intraoperative Monitoring, LLC, a Delaware limited liability company, Eugene Intraoperative Monitoring, LLC, a Delaware limited liability company, ProNerve Technologies, LLC, a Delaware limited liability company, Riverside Intraoperative Monitoring, LLC, a Delaware limited liability company, and Topeka Intraoperative Monitoring, LLC, a Delaware limited liability company (collectively, the "Subsidiaries" and, together with Holdings and the Company, the "Sellers").

### RECITALS

A.      Shortly after the date hereof, the Sellers intend to file voluntary petitions (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

B.      The Company entered into that certain Credit Agreement (the "Credit Agreement"), dated December 20, 2012, among the Company, as Borrower, Holdings and the Subsidiaries, as Guarantors, General Electric Capital Corporation, as agent (the "Agent"), and General Electric Capital Corporation and Regions Capital Markets, as Lenders (the "Lenders"), among other parties.  Pursuant to the Credit Agreement, the Lenders agreed to extend to the Company (i) term loans in the aggregate principal amount of $30 million, (ii) delayed draw term loans in an aggregate principal amount not to exceed $10 million, and (iii) revolving loans in an aggregate principal amount not to exceed $10 million (collectively, the "Loan Commitments").

C.      Buyer has agreed to provide the Company with a $2.5 million principal amount debtor in possession credit facility (the "DIP Financing") pursuant to that certain Debtor In Possession Credit (the "DIP Financing Agreement"), dated as of February 24, 2015, between the Company, as Borrower, the Subsidiaries, as Guarantors, and Buyer.

D.      The Board of Managers (or similar governing body) of each Seller has determined that, based upon its consideration of the available alternatives, and subject to the approval of the Bankruptcy Court and the provisions in this Agreement, a sale, assignment, and assumption of the Acquired Assets and Assumed Liabilities pursuant to this Agreement under Sections 363 and 365 of the Bankruptcy Code is in the best interests of such Seller.

E.      Upon the terms and subject to the conditions set forth in this Agreement, and as authorized under Sections 363 and 365 of the Bankruptcy Code, the Sellers propose to sell and transfer, and Buyer proposes to buy and assume, certain of the assets and liabilities of the Sellers.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and for other good and valuable consideration, the receipt and adequacy of

which are hereby acknowledged, and upon the terms and subject to the conditions hereinafter set forth, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I
## THE TRANSACTION

1.1.     Purchase and Sale of Acquired Assets; Assumed Liabilities.

(a)     Purchase and Sale of Acquired Assets.  Subject to the terms and conditions hereof, at the Closing, each Seller shall sell, convey, transfer, assign and deliver to Buyer, and Buyer shall purchase from each Seller, all of such Seller's right, title and interest in and to all of such Seller's property and assets, real, personal or mixed, tangible and intangible, excluding only the Excluded Assets (the "Acquired Assets"), free and clear of all Encumbrances other than Permitted Encumbrances, including the following:

(i)     all cash and cash equivalents, security and like deposits, securities instruments and other investments and all bank accounts remaining after Sellers retain cash in the amount of up to $790,000.00 plus the Professional Fees;

(ii)     all trade and other notes and accounts receivable, advance payments, deposits (including deposits on inventory), prepaid items and expenses, deferred charges, rights of offset and credits and claims for refund;

(iii)     all fixed assets and other personal property and interests therein, wherever located, including all vehicles, tools, parts and supplies, fuel, machinery, equipment, furniture, furnishing, appliances, fixtures, office equipment and supplies, owned and licensed computer hardware and software and related documentation (including any source code or systems documentation associated therewith), stored data, communication equipment, trade fixtures and leasehold improvements;

(iv)     all rights, remedies and benefits of Sellers arising under or relating to any of the Acquired Assets or the Assumed Liabilities, including rights, remedies and benefits arising out of express or implied warranties from manufacturers or suppliers of equipment or inventory purchased or ordered by the Sellers prior to the Closing Date (and in any case, any component thereof), and all claims and causes of action arising therefrom;

(v)     subject to Section 5.10, all rights under the Contracts listed on Schedule 1.1(a)(v) and Schedule 6.6 hereof, and all non disclosure agreements previously signed with prospective buyers for the Sellers' assets and business whether or not listed on either Schedule 1.1(a)(v) hereof (the "NDAs") or Schedule 6.6 hereof, except for any such Contracts that the Buyer elects to treat as Excluded Contracts at or before the Closing (together with the NDAs, the "Assumed Contracts" and, collectively, Schedule 1.1(a)(v) and Schedule 6.6 hereof, the "Assumed Contracts Schedule");

(vi)     subject to Section 1.1(b), all information, files, records, correspondence, data, plans, and recorded knowledge, including customer and supplier lists, relating to the Acquired Assets and the Sellers' Business;

(vii)    telephone, email addresses, and fax numbers;

(viii)    all goodwill, choses in action, causes of action, judgments, actions, claims and rights of any kind as against others (whether by contract or otherwise) relating to any of the Acquired Assets (including the Assigned Intellectual Property) or the Assumed Liabilities;

(ix)    originals of manuals, documents, correspondence, sales and credit reports, customer lists, literature, brochures, advertising or promotional material and the like;

(x)    all Intellectual Property owned (in whole or part) by the Sellers, together with all registrations and applications for the foregoing, all common law rights in the foregoing, all rights of action arising from the foregoing, including all claims for damages by reason of infringement of the foregoing and all present, past and future rights to sue and collect damages or seek injunctive relief for any such infringement;

(xi)    any Permits to the extent their transfer is permitted by applicable Law;

(xii)    all of Sellers' books and records pertaining primarily to Sellers' Business, including, without limitation, all books of account; provided, however, that Buyer shall preserve all books and records and similar financial and other records relating to business books and records, operating data and plans, together with all files, contracts, instruments and other documents pertaining to Sellers' Business or the Acquired Assets and Sellers shall have the right of reasonable access to and examination of such books and records, including the right to make copies thereof, for a period of three (3) years from the Closing Date upon reasonable notice to Buyer and during normal business hours; provided further, that Buyer shall have reasonable access during regular business hours to the Tax Returns, Tax books and records and similar financial and other records of each Seller which relate to income Taxes and are reasonably relevant to Buyer, including for purposes of making summaries and copies thereof, as they pertain to the Business or the Acquired Assets upon reasonable notice to Sellers and as reasonably redacted by Sellers; and provided further, that in the event that any Seller desires to destroy or dispose of any such records, such Seller shall first offer to deliver redacted copies of any or all of such Tax Returns, Tax books and records and similar financial and other records relating to income Taxes payable with respect to the Business as Buyer may request;

(xiii)    all of the Sellers' rights to receive refunds, payments or overpayments, clawbacks or other amounts (whether from a workers' compensation administrator or otherwise) in respect or any and all workers' compensation matters, claims, potential claims, purported claims and similar related items; and

(xiv)    all insurance policies and benefits, including insurance rights and proceeds and including any accounts receivable credit insurance policy, rights and proceeds.

(b)    Excluded Assets.  Notwithstanding anything herein to the contrary, from and after the Closing, the Sellers shall retain all of their right, title and interest in and to, and there shall be excluded from the sale, conveyance, assignment or transfer to Buyer hereunder, and the Acquired Assets shall not include, solely the following assets and properties (such retained assets and properties being the "Excluded Assets"):

- 3 -

(i)    any contracts with respect to, and any provider numbers under, government programs (including Medicare and Medicaid programs and such other similar federal, state or local reimbursement or governmental programs), private and managed care payors, fiscal intermediaries or other third party payors, in each case, relating to Seller or its affiliates;

(ii)    all medical records arising prior to the Closing relating to customers of the Sellers;

(iii)    all Leases for real property (the "Excluded Leases");

(iv)    all Contracts not set forth on the Assumed Contracts Schedule or, if set forth on the Assumed Contracts Schedule, that Buyer elects by written notice to Sellers in accordance with Section 5.10 hereof to remove from the Assumed Contracts Schedule (together with the Excluded Leases and the Rejected Contracts, the "Excluded Contracts");

(v)    the avoidance or preference actions for the benefit of any Seller under the Bankruptcy Code;

(vi)    all rights of the Sellers under this Agreement and any Ancillary Agreement;

(vii)    all assets (whether in trust or otherwise) with respect to any Benefit Plan of the Sellers; and

(viii)    any assets that Buyer elects to treat as Excluded Assets on or prior to Closing.

(c)    Assumed Liabilities.  Subject to the terms and conditions hereof, at the Closing, Buyer shall assume and agree to fully pay, discharge, satisfy and perform, all of the following liabilities and obligations of the Sellers (the "Assumed Liabilities"):

(i)    Cure Costs with respect to Assumed Contracts;

(ii)    liabilities and obligations arising after the Closing Date relating to or arising out of the Assumed Contracts, but excluding, for the avoidance of doubt, any and all liabilities or obligations under any Assumed Contracts of any nature, whether due or to become due, whether accrued, absolute, contingent or otherwise, whether or not existing on the Closing Date, arising out of any transactions entered into or any state of facts existing, or the use, ownership, possession or operation of the Acquired Assets or the conduct of any Seller's business prior to the Closing Date other than the Cure Costs;

(iii)    liabilities and obligations arising after the Closing Date relating to or arising out of the Acquired Assets, but excluding, for the avoidance of doubt, any and all liabilities or obligations of any nature, whether due or to become due, whether accrued, absolute, contingent or otherwise, whether or not existing on the Closing Date, arising out of any transactions entered into or any state of facts existing, or the use, ownership, possession or

- 4 -

operation of the Acquired Assets or the conduct of any Seller's business prior to the Closing Date other than liabilities of the type described in Section (iv) hereof; and

(iv)    accounts payable relating to the Acquired Assets arising in the ordinary course of business after the Closing Date.

(d)    Excluded Liabilities.  Notwithstanding anything contained herein to the contrary, the Excluded Liabilities shall not be assumed by Buyer, but instead shall be retained, performed, paid or discharged by the Sellers.  The term "Excluded Liabilities" as used herein means any and all liabilities or obligations of any Seller or any of its affiliates of any nature, whether due or to become due, whether accrued, absolute, contingent or otherwise, existing on the Closing Date, or arising out of any transactions entered into or any state of facts existing, or the use, ownership, possession or operation of the Acquired Assets or the conduct of any Seller's business prior to the Closing Date, excepting only the Assumed Liabilities, including (without limitation) the following:

(i)    any overbillings or improper billings made by Sellers or their affiliates or overpayments received by Sellers or their affiliates under Medicare, Medicaid or any other government program, private program or other payor arrangement and all liabilities relating to Sellers' or their affiliates' provider numbers and participation in governmental programs and private programs;

(ii)    any obligation or liability for Taxes incurred by any Seller in respect of any pre-Closing Tax period or portion thereof;

(iii)    any claim, obligation or liability in connection with or arising from or relating to any Excluded Asset, including any Taxes associated therewith;

(iv)    any Debt, including the Loan Commitments and the DIP Financing;

(v)    any fees, costs and expenses (including legal fees and accounting fees) incurred by any Seller in connection with the transactions contemplated by this Agreement or the Chapter 11 Cases, including all fees, costs and expenses incurred in connection with or by virtue of (A) the negotiation, preparation and review of this Agreement (including the exhibits and schedules hereto) and all Ancillary Agreements, (B) the preparation and submission of any filing or notice required to be made or given in connection with any of the transactions contemplated by this Agreement, and the obtaining of any consent required to be obtained in connection with any of such transactions, and (C) the negotiation, preparation and review of the DIP Financing; and

(vi)    any obligation or liability of any Seller arising out of this Agreement and any Ancillary Agreement.

## ARTICLE II
### Purchase Price; CLOSING

2.1.    Purchase Price; Payment; Deposit.

(a)    The purchase price (the "Purchase Price") for the Acquired Assets is (i) $35 million *plus* (ii) Cure Costs with respect to Assumed Contracts, *plus* (iii) the assumption by Buyer of the Assumed Liabilities. The portion of the Purchase Price payable under subsection (i) hereof shall be paid by means of a credit against, first, all amounts due and owing under the DIP Financing Agreement as of the Closing Date and, second, the Prepetition Loan Amount.

(b)    Buyer shall pay and deliver an amount equal to the undisputed Cure Cost with respect to each Assumed Contract to such contract counterparty by wire transfer of immediately available funds to the account of such contract counterparty provided by the Sellers in writing to Buyer, with such payment being made no later than two Business Days after the Closing Date, or if Buyer has not received wire transfer instructions with respect to an Assumed Contract counterparty within five Business Days prior to the Closing Date, by check mailed to the address listed for the Assumed Contract counterparty on Schedule 1.1(a)(v) hereto no later than two Business Days after the Closing Date.

(c)    Buyer shall fund the DIP Financing subject to and in accordance with its terms. Proceeds from the DIP Financing, and, to the extent such proceeds are less than $900,000, amounts outstanding under the Credit Agreement in the aggregate amount of $900,000 shall be deemed Buyer's deposit under this Agreement (the "Deposit").

2.2.    Bulk Sales Laws. Buyer hereby waives compliance by the Sellers with the requirements and provisions of any "bulk-transfer" Laws that may apply to the sale and transfer of the Acquired Assets to Buyer. Pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Acquired Assets shall be free and clear of any and all Encumbrances, other than Permitted Encumbrances, in each case pursuant to Section 363(f) of the Bankruptcy Code, whether arising prior to or subsequent to the date on which the Chapter 11 Cases were commenced, including any liens or claims arising out of the "bulk-transfer" Laws.

2.3.    Closing Date. The closing of the transactions contemplated hereby (the "Closing") shall take place remotely on a date selected by Buyer that is no later than the third Business Day after all of the conditions set forth in ARTICLE VI and ARTICLE VII have been satisfied (other than those conditions that by their nature are only capable of being satisfied at the Closing, but subject to the fulfillment or waiver of such conditions at the Closing) or waived by Buyer in its sole and absolute discretion, or at such other place, time, or date as Buyer and the Sellers may agree in writing (such time and date being referred to herein as the "Closing Date"). For financial accounting and tax purposes, to the extent permitted by Law, the Closing shall be deemed to have become effective as of 12:01 a.m. (EST) on the Closing Date.

2.4.    Closing Deliveries.

(a)    Deliveries by Buyer to the Sellers. At the Closing (or prior thereto), Buyer shall deliver or cause to be delivered the following to the Sellers, to the extent applicable with respect to Closing:

- 6 -

(i)    copies of resolutions duly adopted by the governing body of Buyer, authorizing and approving their performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein; and

(ii)    such other instruments and documents as the Sellers reasonably deem necessary to effect the transactions contemplated hereby.

(b)    <u>Deliveries by the Sellers to Buyer</u>.  At the Closing (or prior thereto), the Sellers shall deliver or cause to be delivered the following to Buyer:

(i)    all transfer documents with respect to the Acquired Assets, as may reasonably be requested by Buyer;

(ii)    a duly executed certificate from the Company prepared in accordance with Treasury regulations Section 1.1445-2 and dated as of the Closing Date certifying that such Seller is not a foreign person; and

(iii)    such other instruments and documents as Buyer reasonably deems necessary to effect the transactions contemplated hereby.

2.5.    <u>Delivery of Acquired Assets</u>.  At Closing, Sellers shall place Buyer in full possession and control of the Acquired Assets being acquired at the Closing.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Sellers as follows:

3.1.    <u>Organization</u>.  Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware, and has all requisite corporate power and authority to carry on its business as it is now being conducted, and to execute, deliver, and perform this Agreement and each Ancillary Agreement to which it is a party, and to consummate the transactions contemplated hereby and thereby.

3.2.    <u>Authority</u>.  The execution, delivery, and performance by Buyer of this Agreement, and each Ancillary Agreement to which Buyer is a party, and the consummation by Buyer of the transactions contemplated hereby and thereby have been duly authorized by all necessary limited liability company action on the part of Buyer.  This Agreement has been, and each Ancillary Agreement to which Buyer is a party will be at Closing, duly and validly executed and delivered by Buyer and constitutes, or will constitute, the valid and binding obligation of Buyer, enforceable against Buyer in accordance with its respective terms, except as such enforcement shall be limited by bankruptcy, insolvency, moratorium or similar law affecting creditors' rights generally and subject to general principles of equity.

3.3.    <u>No Conflict</u>.  Neither Buyer's execution and delivery of this Agreement or any Ancillary Agreements nor Buyer's consummation of the transactions contemplated herein will conflict with or result in a breach of any provision of Buyer's governing documents or any Law or Order to which Buyer is party or by which Buyer is bound.  The Buyer is not party to or

bound by any contract under which (a) the execution, delivery or performance by the Buyer of the transactions contemplated herein will (i) constitute a default, breach or event of acceleration or (ii) amend, or give the counterparty thereto any right to amend, any material right or obligation of Buyer thereunder or (b) performance by Buyer according to the terms of this Agreement or the Ancillary Documents may be prohibited, prevented or delayed.

3.4.    Consents. Except for the consent, approvals, authorization, exemptions or filings with Authorities in connection with the commencement of the Chapter 11 Cases and the entry of the Bid Procedures Order and the Sale Order, no consent, approval, or authorization of, or exemption by, or filing with, any Authority is required to be obtained or made by Buyer in connection with the execution, delivery and performance by Buyer of this Agreement or any Ancillary Agreement to which Buyer is a party.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers jointly and severally make the following representations and warranties to Buyer with respect to itself and each other Seller, as applicable, each of which shall be true and correct as of the date of this Agreement and as of the Closing Date (except to the extent expressly relating to a specific date, in which event it shall be true and correct as of such date) and shall be unaffected by any investigation heretofore or hereafter made by or on behalf of Buyer:

4.1.    Due Diligence Materials. All materials furnished by or on behalf of any Seller to Buyer as part of due diligence or otherwise as an inducement for Buyer to consummate the transactions contemplated herein are, to the best of such Seller's knowledge, true and correct copies and complete in all material respects.

4.2.    Litigation. Other than the Chapter 11 Cases, and other than as listed on Schedule 4.2 hereto, there are no lawsuits, administrative or other proceedings or investigations relating to the ownership or use of the Acquired Assets or conduct of business by Sellers or otherwise affecting the Acquired Assets or the Business pending, or, to the Sellers' knowledge, threatened against any Seller. Other than pursuant to the Chapter 11 Cases, there are no judgments, orders or decrees of any Authority binding on any Seller that relate to the Acquired Assets or otherwise affect the Acquired Assets. No Seller is in violation of any term of any judgment, decree, injunction or order entered by any court or Authority and outstanding against it relating to or with respect to the Business or any of the Acquired Assets.

4.3.    Obligations Under the Credit Agreement. As of the date hereof, $43,176,850.17 is due and owing under the Credit Agreement (the "Prepetition Loan Amount"). Subject to Permitted Liens (as defined in the Credit Agreement) repayment of the Prepetition Loan Amount is secured by properly perfected, first priority liens on substantially all the assets of the Sellers. The Sellers acknowledge and agree that they have no defense to payment of the Prepetition Loan Amount, and such repayment obligation is not subject to any right of setoff or recoupment. The Sellers hereby waive any right to challenge the Prepetition Loan Amount, the Credit Agreement and the Permitted Liens on any grounds.

- 8 -

4.4.    Assumed Contracts Schedule. The Assumed Contracts Schedule sets forth the Sellers' best estimate of the best estimate of the Cure Costs for each executory contract or unexpired lease listed therein. The Sellers shall provide prompt written notice to Buyer of any material changes to the Cure Costs of which the Sellers become aware from and after the date hereof.

## ARTICLE V
## COVENANTS

5.1.    Exclusivity. Except as may be required by the Bankruptcy Court in connection with higher and better offers or potentially higher and better offers or any related auction, none of the Sellers nor any of their officers, directors, employees, affiliates, representatives or advisors will, directly or indirectly, initiate, solicit or knowingly encourage (including by way of furnishing non-public information or assistance), or take any other action to facilitate, any inquiries or the making of any bid proposal by any Person other than Buyer and its affiliates.

5.2.    Access. Prior to the Closing, upon reasonable notice from Buyer, the Sellers shall afford to the officers, attorneys, accountants or other authorized representatives of Buyer reasonable access during normal business hours to the employees, Acquired Assets, facilities and books and records of such Seller relating to the Acquired Assets then owned or previously owned and/or operated by such Seller so as to afford Buyer full opportunity to make such review, examination and investigation of such Acquired Assets as Buyer determines are reasonably necessary in connection with the consummation of the transactions contemplated hereby. Buyer shall be permitted to make extracts from or to make copies of such books and records as may be reasonably necessary in connection therewith. Prior to the Closing, the Sellers shall, and shall cause each Seller to, promptly furnish Buyer with access to such maintenance records, operating data and other information relating to the Acquired Assets then owned and/or operated by such Seller as Buyer may reasonably request. If practicable, prior to filing with the Bankruptcy Court (and in any event no later than concurrently with any such filing), the Sellers shall deliver to Buyer copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed by the Sellers in the Chapter 11 Cases. The Sellers shall promptly provide to Buyer all documents and materials relating to the proposed sale of the Acquired Assets, Assumed Contracts or any portion thereof, including, without limitation, with respect to competing bids and objections to Cure Costs, and otherwise cooperate with Buyer, to the extent reasonably necessary in connection with Buyer's preparation for or participation in any part of the Chapter 11 Cases in which Buyer's participation is necessary, required or reasonably appropriate. The Sellers shall deliver to Buyer all pleadings, motions, notices, statements, schedules, applications, reports and other papers filed after the date hereof by any Seller or by any other party in any other judicial or administrative proceeding concurrently with such filing (if by a Seller) or as soon as practicable after receipt (if by another party). In addition, the Sellers shall, and shall cause the other Sellers to, consult with Buyer with respect to any written or oral communication concerning, in whole or in part, the transactions contemplated by this Agreement.

5.3.    Commercially Reasonable Efforts. Prior to the Closing, each party hereto shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or

cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement, including to (i) obtain any other consents or approvals as are necessary in connection with the consummation of the transactions contemplated hereby, (ii) effect all registrations and filings as are necessary or desirable in connection with the consummation of the transactions contemplated hereby, (iii) defend any lawsuits or other legal proceedings, whether judicial or administrative, whether brought by private parties or Authorities or officials, challenging this Agreement or the consummation of the transactions contemplated hereby, and (iv) furnish to each other such information and assistance and to consult with each other with respect to the terms of any registration, filing, application or undertaking as may be reasonably requested in connection with the foregoing.

　　　　5.4.　　Notification.

　　　　(a)　　The Sellers shall promptly notify Buyer, and Buyer shall promptly notify Sellers, of any litigation, arbitration or administrative proceeding pending or, to their knowledge, threatened against any Seller or Buyer, as the case may be, that challenges or would materially affect the transactions contemplated hereby.

　　　　(b)　　The Sellers shall promptly, and in no event later than two Business Days after receipt, notify Buyer of any material correspondence related to alleged defaults, amendments, Cure Costs, or termination of Assumed Contracts. For the avoidance of doubt, such material correspondence shall not include communications related to the day-to-day provision of services under such Assumed Contracts.

　　　　(c)　　The Sellers shall provide prompt written notice to Buyer of any change in any of the information contained in the representations and warranties and covenants made by Sellers in Article IV and V hereof, the due diligence information provided by the Sellers to Buyer, or any exhibits or schedules referred to herein or attached hereto and shall promptly furnish any information that Buyer may reasonably request in relation to such change; *provided, however*, that such notice shall not operate to cure any breach of the representations and warranties made by the Sellers in Article IV hereof or any exhibits or schedules referred to herein or attached hereto.

　　　　(d)　　The Sellers shall promptly notify Buyer, and Buyer shall promptly notify the Sellers, of the occurrence of a Material Adverse Effect.

　　　　5.5.　　No Inconsistent Action.　Neither Buyer nor any of the Sellers shall take any action that is materially inconsistent with its obligations under this Agreement, and the Sellers shall cause the other Sellers to refrain from taking any such action.

　　　　5.6.　　Further Assurances.

　　　　(a)　　Between the date of this Agreement and Closing, at the direction of the Buyer, the Sellers will use commercially reasonable efforts to enforce their rights under the Assumed Contracts. If, however, enforcing such rights will result in the Sellers incurring costs exceeding the DIP Budget (as such term is defined in the DIP Financing Agreement entered into contemporaneously herewith), then Sellers shall have no obligation to enforce such rights unless

Buyer agrees to reimburse Sellers for reasonably incurred out-of-pocket expenses in pursuing the same.

(b)     After the Closing, each party hereto shall, at the request of any other party hereto, execute and deliver any further instruments or documents and take all such further action as the requesting party may reasonably request in order to evidence the consummation of the transactions contemplated hereby.

(c)     After the Closing, each Seller shall promptly transfer or deliver to Buyer cash, checks (which shall be properly endorsed) or other property that any Seller may receive in respect of any deposit, prepaid expense, receivable or other item that constitutes part of the Acquired Assets or relates to the Assumed Liabilities.  After the Closing, Buyer shall promptly transfer or deliver to the Sellers cash, checks (which shall be properly endorsed) or other property that Buyer may receive in respect of any item that is an Excluded Asset or relates to the Excluded Liabilities.

(d)     From and after the Closing Date, Buyer and the Sellers shall furnish or cause to be furnished to each other, upon reasonable request, as promptly as practicable, such information and reasonable assistance relating to the Acquired Assets (including reasonable access to books and records and employees who have direct knowledge regarding the Acquired Assets) as is reasonably necessary for (i) the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax; (ii) winding down the Sellers' operations, and (iii) any other reasonable business purpose relating to (x) the Sellers' ownership of the Acquired Assets or the Assumed Liabilities before the Closing or (y) the Buyer's ownership of the Acquired Assets or the Assumed Liabilities after the Closing.

5.7.    Specific Enforcement of Covenants.  The Sellers acknowledge that irreparable damage would occur in the event that any of the covenants and agreements of the Sellers set forth in this Agreement were not timely performed in accordance with their specific terms or were otherwise breached.  It is accordingly agreed that Buyer shall be entitled to an injunction or injunctions to prevent or cure any breach of such covenants and agreements of Sellers and to enforce specifically the terms and provisions thereof, this being in addition to any other remedy to which it may be entitled at law or in equity, it being understood that the Bankruptcy Court shall have exclusive jurisdiction over such matters; *provided, however*, that in the event the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction with respect to any matter provided for in this sentence or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

5.8.    Employee Matters.

(a)     Buyer shall extend offers of employment (which may be for employment with Buyer or any of its affiliates) to certain of the Sellers' employees as of the Closing, and all acceptances of such offers shall be effective immediately after the Closing (the "Employee Transfer Offers").  To the extent permitted under Buyer's employee benefit plans, programs, and

arrangements, and if within Buyer's control, each Transferred Employee may participate in all of Buyer's employee benefit plans in accordance with the terms of those plans, to the same extent and in the same manner as new employees of Buyer.

(b)    With respect to any employee benefit plans, programs, and arrangements of Buyer in which the Transferred Employees participate after the Closing, to the extent permitted under such employee benefit plans, programs, and arrangements, and if within Buyer's control, Buyer shall (i) waive all limitations as to pre-existing conditions, exclusions and waiting periods with respect to participation and coverage requirements applicable to the Transferred Employees to the extent such limitations were waived or otherwise satisfied under the comparable benefit plans, and (ii) recognize all service of the Transferred Employees with the Sellers for purposes of eligibility to participate, but only to the same extent such service would be taken into account under a comparable Benefit Plan of the Sellers immediately prior to the Closing.

5.9.    Commencement of Chapter 11 Cases and Bankruptcy Court Orders.

(a)    No later than two Business Days after the date hereof, each of the Sellers shall file with the Bankruptcy Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

(b)    No later than three calendar days after the Petition Date, the Sellers shall file motions in the Bankruptcy Court in form and substance satisfactory to Buyer:

(i)    seeking shortened notice for a hearing on entry of the Bid Procedures Order in accordance with Local Rule 6004-1(c) to a date that is no later than ten calendar days after the Petition Date; and

(ii)    requesting that the Bankruptcy Court enter the Bid Procedures Order (the "Bid Procedures Motion") approving the Bidding Procedures, that include a Bid Deadline that is no later than 14 calendar days after the entry of the Bid Procedures Order;

(iii)    requesting that if no Qualified Bid is received by the Bid Deadline, for a hearing on entry of the Sale Order to occur no later than two Business Days after the Bid Deadline, and for the Closing to occur no later than 35 calendar days after the Petition Date;

(iv)    requesting that if a Qualified Bid is received, for a hearing on entry of the Sale Order to occur no later than two Business Days after the Auction is held (if an Auction is held), and for the Closing to occur no later than 60 calendar days after the Petition Date.

(c)    If the Sale Order or any other Orders of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to any such Order), the Sellers shall consult with Buyer regarding the status of any such actions and, at Buyer's request, diligently defend against such appeal, petition or motion and use their reasonable best efforts to obtain an expedited resolution of any such appeal, petition or motion.

(d)     The Sellers shall consult with Buyer and its representatives concerning the Sale Order, any other Orders of the Bankruptcy Court and the bankruptcy proceedings in connection therewith and provide Buyer with copies of requested applications, pleadings, notices, proposed orders and other documents relating to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court. The Sellers further covenant and agree that, after the Closing, the terms of any reorganization plan it submits to the Bankruptcy Court or any other court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction contemplated by or approved pursuant to the Sale Order.

5.10.   Assumption and Assignment of Assumed Contracts.

(a)     Concurrently with the filing of the Bid Procedures Motion, the Sellers shall provide written notice, in form and substance acceptable to Buyer, to each of the counterparties to the Contracts listed on the Assumed Contracts Schedule that, at the option of Buyer, the Sellers may assume and assign to Buyer such counterparty's Contract, notifying each such counterparty of the proposed Cure Costs for such Contract, and advising each such counterparty of the deadline to object to the assumption or assignment of its Contract or the amount of the Cure Costs arising prior to Closing under such Contract.

(b)     At or prior to the Closing, Buyer may elect to exclude any Contract as an Assumed Contract (in which case it shall become an Excluded Contract) by providing to the Sellers written notice of its election to exclude such Contract.

(c)     If a party to a Contract set forth on the Assumed Contracts Schedule timely objects to the assumption or assignment or the amount of the Cure Costs payable with respect to such Contract, the Sellers shall request that the Bankruptcy Court hear and determine such objection on an expedited basis. If such objection has not been resolved prior to the Closing (whether by an order of the Bankruptcy Court or by agreement of Buyer and the Contract counterparty), Buyer may elect, in its sole and absolute discretion, one of the following options:  (i) treat such Contract as an Excluded Contract, (ii) defer the Closing until the resolution of such objection (by order of the Bankruptcy Court or by agreement of Buyer and the Contract counterparty), or (iii) temporarily treat the Contract as an Excluded Contract (a "Designated Contract"), proceed to Closing, and determine whether to treat the Designated Contract as an Assumed Contract or an Excluded Contract within two Business Days after resolution of such objection (whether by an order of the Bankruptcy Court or by agreement of Buyer and the Contract counterparty).

(d)     Without the prior written consent of Buyer, prior to Closing the Sellers shall not assume or reject any Contract.

5.11.   Sellers' Consent to Debt Purchase. The Sellers hereby consent to the assignment or transfer of the interests of the Lenders and the Agent under the Credit Agreement and related security documents and interests to Buyer and agree that, to the extent necessary, Specialty Care Services Group, LLC, American Securities, L.P., and their respective affiliates shall not be a Prohibited Assignee, as such term is defined in the Credit Agreement.

5.12.    Insurance. Sellers shall maintain in full force and effect insurance covering the Acquired Assets through the Closing Date.

## ARTICLE VI
## CONDITIONS TO BUYER'S OBLIGATIONS

The obligation of Buyer to consummate the transactions contemplated hereby at the Closing shall be subject to the satisfaction or waiver on or prior to the Closing Date of all of the following conditions:

6.1.    Debt Purchase. Concurrently with the execution of this Agreement, the Lenders and the Agent shall have assigned or otherwise transferred their interests in the Credit Agreement and related security documents to the Buyer for an amount not to exceed $4.25 million pursuant to agreements in form and substance satisfactory to Buyer.

6.2.    Termination of Loan Commitments. Upon the occurrence of the Debt Purchase, the parties agree that the Term Loan Commitments, Delayed Draw Term Loan Commitments, and the Revolving Loan Commitments (each as defined in the Credit Agreement) shall terminate, and Buyer shall have no obligation to fund additional advances under the Credit Agreement.

6.3.    DIP Financing. Concurrently with the execution of this Agreement, and in no event later than one Business Day after the execution of this Agreement, the Company shall have entered into the DIP Financing Agreement with Buyer. The Bankruptcy Court shall have entered orders in form and substance satisfactory to Buyer approving and authorizing the DIP Financing and use of cash collateral, and no defaults exist under such orders or the DIP Financing Agreement.

6.4.    Sale Order. Bankruptcy Court has entered the Sale Order.

6.5.    Cure Costs. The aggregate estimated Cure Costs on the date of this Agreement for all Contracts listed on the Assumed Contracts Schedule (other than the Non-Competes) that are Assumed Contracts at Closing shall not exceed the aggregate actual Cure Costs for such Assumed Contracts at Closing by more than 50%, provided however that neither the Assumed Contracts listed on Schedule 6.6 (the "Non-Competes") nor the NDAs shall be included in the calculation of aggregate actual Cure Costs.

6.6.    Assumed Contracts. The Bankruptcy Court has not entered an Order determining that any Assumed Contract may not be assumed by any of the Sellers or assigned to Buyer.

6.7.    Covenants and Agreements Performed. The Sellers shall have performed or complied with in all material respects all covenants required by this Agreement to be performed or satisfied before the Closing.

6.8.    Delivery of Agreements. The Sellers shall have delivered all agreements (including the Ancillary Agreements) required by this Agreement to be delivered to Buyer before the Closing.

6.9. <u>No Prohibition or Proceedings</u>. No litigation, action, investigation, inquiry or request for information by any Authority and no legal or administrative proceeding shall have been instituted that seeks to restrict, limit, prohibit or enjoin the transactions contemplated by this Agreement.

6.10. <u>No Injunction or Statute</u>. No statute, rule, regulation, executive order, decree, injunction or other order enacted, entered, promulgated, enforced or issued by any Authority preventing consummation of the transactions contemplated by this Agreement shall be in effect on the Closing Date.

6.11. <u>Physician Practice Entities</u>. Each of Norman Wang, M.D., Inc., ProNerve Physicians (GA), LLC, ProNerve Physicians (IL), LLC, ProNerve Physicians (IN), LLC, ProNerve Physicians (NJ), LLC, Pro Physician (NY), LLC, and ProNerve Physicians (WI), Ltd., (the "<u>Physician Practice Entities</u>"), shall have executed an agreement in a form satisfactory to Buyer, effective on Closing, which (a) shall release all claims against the Buyer and Sellers; (b) may include an agreement by the Physician Practice Entities relating to payments of amounts under Management Services Agreements to which they are a party; (c) shall require the assignment or transfer by the Physician Practice Entities of their rights under all customer contracts to which they are a party to the Buyer, to the extent they are Assumed Contracts and legally assignable (it being understood that Buyer and its affiliates will have no recourse against the Sellers or the Physician Practice Entities, at law or in equity, for the failure to obtain any counterparty consents or deliver any counterparty notices that may be required under such customer contracts); (d) may require the transfer to Buyer or its designee (at Buyer's sole option) of any other assets of such Physician Practice Entities to the extent legally assignable; and (e) shall provide for the dissolution of the Physician Practice Entities by their respective member-equity holders reasonably promptly after the Physician Practice Entities and the Sellers have finished collecting any receivables billed for services rendered before the Closing, but in no event later than 18 months after the Closing (the "<u>PRP Agreement</u>"). Sellers shall use commercially reasonable efforts to procure the entry by the Physician Practice Entities into the PRP Agreement and the performance by the Physician Practice Entities of their obligations thereunder.

6.12. <u>Material Adverse Effect</u>. At the Closing Date, there is no, and since the date hereof, there has not been a Material Adverse Effect.

ARTICLE VII
<u>CONDITIONS TO THE SELLERS' OBLIGATIONS</u>

The obligations of the Sellers to consummate the transactions contemplated hereby at the Closing shall be subject to the satisfaction or waiver on or prior to the Closing Date of all of the following conditions:

7.1. <u>Covenants and Agreements Performed</u>. Buyer shall have performed or complied with in all material respects all covenants required by this Agreement to be performed or satisfied before the Closing.

7.2.    Delivery of Agreements.  Buyer shall have delivered all agreements (including the Ancillary Agreements) required by this Agreement to be delivered to the Sellers before the Closing.

7.3.    No Prohibition or Proceedings.  No litigation, action, investigation, inquiry or request for information by any Authority and no legal or administrative proceeding shall have been instituted that seeks to restrict, limit, prohibit or enjoin the transactions contemplated by this Agreement.

7.4.    Mutual Release.  The Buyer shall have executed a release of all claims, effective on Closing, in favor of the Physician Practice Entities, in a form satisfactory to the Physician Practice Entities and the Sellers.

7.5.    No Injunction or Statute.  No statute, rule, regulation, executive order, decree, injunction or other order enacted, entered, promulgated, enforced or issued by any Authority preventing consummation of the transactions contemplated by this Agreement shall be in effect on the Closing Date.

7.6.    Debt Purchase.  Concurrently with the execution of this Agreement, the Lenders and the Agent shall have assigned or otherwise transferred their interests in the Credit Agreement and related security documents to the Buyer for an amount not to exceed $4.25 million pursuant to agreements in form and substance satisfactory to Buyer.

ARTICLE VIII
TERMINATION PRIOR TO CLOSING

8.1.    Termination.  This Agreement may be terminated at any time prior to the Closing upon the occurrence of any of the following:

(a)    By the mutual written consent of Buyer and the Company on behalf of the Sellers;

(b)    By Buyer if the Closing has not occurred on or prior to the date that is the earlier of (i) 60 calendar days after the Petition Date and (ii) two Business Days after entry of the Sale Order; provided, however, that the right to terminate this Agreement pursuant to this Section 8.1(b) shall not be available to the Buyer if the Buyer's failure to perform any of Buyer's obligations under this Agreement required to be performed by it at or prior to the Closing has been the cause of, or resulted in, the failure of the Closing to occur;

(c)    By Buyer (i) if, other than with respect to deviations from any deadlines or milestones in this Agreement (and except as provided in Section 8.1(b) and this Section 8.1 (c)(iii)), the Bankruptcy Court refuses to enter the Bid Procedures Order, (ii) if no Auction is held, the Closing has not occurred on or prior to the date that is 35 calendar days after the Petition Date; and (iii) if an Auction is held, the Closing has not occurred on or prior to the date that is 60 calendar days after the Petition Date.

(d)    By Buyer if (i) the Bankruptcy Court issues an order granting leave to any Person to commence an appeal from the Bid Procedures Order; or (ii) if the Bankruptcy Court

requires an Auction, the Bid Procedures Order or the Sale Order shall have been stayed, vacated, modified or supplemented without Buyer's prior written consent;

(e)     By Buyer or the Company on behalf of the Sellers if the Sellers comply with the Bid Procedures Order and accept a Qualified Bid (as defined in the Bid Procedures Order) from a Person other than Buyer or its permitted transferee;

(f)     By the Sellers by written notice to Buyer if there has been a material breach by Buyer of any of the covenants or agreements made by Buyer in this Agreement, and such breach (if curable) has not been cured or waived within 10 calendar days after written notice of the same; or

(g)     By Buyer in its sole and absolute discretion, by written notice to the Sellers, for any reason other than as set forth above.

If Sellers fail to perform following entry of the Sale Order and are not entitled to terminate this Agreement pursuant to Section 8.1(f) hereof, then Buyer may seek an order from the Bankruptcy Court directing specific performance of this Agreement by the Sellers.

8.2.     Effect of Termination. Sellers agree to waive any and all claims, rights and remedies against Buyer in the event that Buyer terminates the Agreement in accordance with the terms of this Article VIII. If the Closing does not occur and this Agreement is terminated pursuant to Section 8.1(f) or Section 8.1(g) hereof (the "Termination Event"), the Sellers' sole remedy shall be to credit the Deposit against amounts repayable under the DIP Financing.

8.3.     Effect on Obligations. Termination of this Agreement pursuant to Section 8.1 shall terminate all obligations of the parties hereunder, except for their obligations under Article VIII and Article XI hereof.

8.4.     Break-Up Fee; Expense Reimbursement. If this Agreement is terminated in accordance with Section 8.1(e), then the Sellers shall, no later than three (3) Business Days after the date on which closing of the Alternative Transaction occurs, pay Buyer the Expense Reimbursement and an amount equal to $270,000 (the "Break-Up Fee"). The Expense Reimbursement shall constitute an administrative expense of the Sellers with priority over any and all administrative expenses of the kind specified in Section 503(b) of the Bankruptcy Code until paid, notwithstanding Section 507(a) of the Bankruptcy Code, and (ii) the Break-Up Fee shall constitute an administrative expense of the Sellers of the kind specified in Section 503(b) of the Bankruptcy Code. The parties to this Agreement hereby acknowledge that (i) the approval of the Break-Up Fee and the Expense Reimbursement is an integral part of the transactions contemplated herein, (ii) in the absence of the Sellers' obligation to pay the Break-Up Fee and the Expense Reimbursement, Buyer would not have entered into this Agreement; (iii) the entry by Buyer into this Agreement is necessary for the preservation of the Sellers' estates and is beneficial to the Sellers because, in the Sellers' business judgment, it will enhance the Sellers' ability to maximize the value of their assets for the benefit of their creditors, (iv) the Break-Up Fee and the Expense Reimbursement are reasonable in relation to Buyer's efforts and to the magnitude of the transactions contemplated herein and the Buyer's lost opportunities resulting from the time spent pursuing such transactions, and (v) the Break-Up Fee and the Expense

Reimbursement are intended to cover any reimbursement of expenses of Buyer in the event of a termination upon the occurrence of the events set forth in Section 8.1(e).

## ARTICLE IX
## TAX MATTERS

9.1.    Allocation. The Purchase Price and other relevant items (including the Assumed Liabilities) shall be allocated for purposes of this Agreement and for federal, state, local and foreign Tax purposes in accordance with a statement delivered by Buyer to the Sellers as soon as reasonably practicable after the Close Date (the "Allocation Statement"). The Allocation Statement shall be prepared by Buyer in a manner consistent with (x) the requirements of Section 1060 of the Code, and any corresponding requirements of any state, local or foreign Tax Law and (y) the principles and methodology prepared by Buyer and delivered to the Sellers no less than three Business Days prior to the Closing Date.

9.2.    Transfer Taxes. All Taxes, including all state and local and all recording and filing fees (collectively, the "Transfer Taxes"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets or otherwise as a result of the transactions contemplated by this Agreement, and that are not exempt under Section 1146(a) of the Bankruptcy Code, shall be borne by Buyer. Buyer and the Sellers shall cooperate to (a) determine the amount of Transfer Taxes payable in connection with the transactions contemplated under this Agreement, (b) provide all requisite exemption certificates and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate taxing authorities.

9.3.    Wage Reporting. As of the Closing, the Sellers agree to join in any election made by Buyer regarding the procedure to be utilized with respect to wage reporting set forth in Revenue Procedure 2004-53.

9.4.    Cooperation on Tax Matters. Buyer and the Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as is practicable, such information and assistance relating to the Sellers and the Acquired Assets (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Buyer and the Sellers shall retain all books and records with respect to Taxes for any period up to and including the Closing Date, pertaining to the Sellers and the Acquired Assets or the Assumed Liabilities, for at least 7 years following the Closing Date. At the end of such period, each party shall provide the others with at least 30 calendar days prior written notice before destroying such books and records, during which period the party receiving such notice can elect to take possession, at its own expense, of such books and records.

## ARTICLE X
## POST-CLOSING SUPPORT

10.1.    Post-Closing Support. At Buyer's election, Sellers shall provide Buyer with the services set forth on Schedule 10.1 hereof until the earlier of six months after the

Closing Date and the date on which Buyer notifies Sellers that such post-closing support is no longer required, and Buyer shall compensate Sellers for such services at the amount set forth in <u>Schedule 10.1</u>.

10.2.    <u>Billing Software Maintenance</u>. To the extent necessary to perform the post-Closing services under <u>Section 10.1</u> hereof, the Sellers shall use commercially reasonable efforts to retain their invoicing and billing software.

ARTICLE XI
MISCELLANEOUS

11.1.    <u>Interpretive Provisions</u>.

(a)    Whenever used in this Agreement, (i) "including" (or any variation thereof) means including without limitation,  and (ii) any reference to gender shall include all genders.

(b)    The parties acknowledge and agree that (i) each party and its counsel have reviewed the terms and provisions of this Agreement and have contributed to its drafting, (ii) the normal rule of construction, to the effect that any ambiguities are resolved against the drafting party, shall not be employed in the interpretation of it, and (iii) the terms and provisions of this Agreement shall be construed fairly as to all parties hereto and not in favor of or against any party, regardless of which party was generally responsible for the preparation of this Agreement.

11.2.    <u>Entire Agreement</u>. This Agreement (including the certificates, schedules and exhibits attached hereto) together with the Ancillary Agreements constitute the sole understanding and agreement of the parties with respect to the subject matter hereof.

11.3.    <u>Successors and Assigns</u>. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties hereto; *provided, however*, that this Agreement may not be assigned by any Seller without the prior written consent of Buyer or be assigned by Buyer without the prior written consent of the Sellers, except that (i) Buyer may, at its election and provided it remains liable for its obligations hereunder, assign this Agreement to one or more affiliates of Buyer, and Buyer or any such assignee may make a collateral assignment of its rights (but not its obligations) under this Agreement to any lender providing financing to Buyer in connection with the Closing.

11.4.    <u>Headings</u>. The headings of the Articles, Sections, and paragraphs of this Agreement are inserted for convenience only and shall not be deemed to constitute part of this Agreement or to affect the construction hereof.

11.5.    <u>Modification and Waiver</u>. No amendment, modification, or alteration of the terms or provisions of this Agreement shall be binding unless the same shall be in writing and duly executed by Buyer and the Company on behalf of the Sellers, except that any of the terms or provisions of this Agreement may be waived in writing at any time by the party that is entitled to the benefits of such waived terms or provisions. No single waiver of any of the provisions of this Agreement shall be deemed to or shall constitute, absent an express statement otherwise, a continuous waiver of such provision or a waiver of any other provision hereof

- 19 -

(whether or not similar). No delay on the part of any party in exercising any right, power, or privilege hereunder shall operate as a waiver thereof.

11.6. Expenses. Except as otherwise expressly provided herein, each of the parties hereto shall bear the expenses incurred by that party incident to this Agreement and the transactions contemplated hereby, including all fees and disbursements of counsel and accountants retained by such party, whether or not the transactions contemplated hereby shall be consummated.

11.7. Notices. All notices and other communications required or permitted under this Agreement (a) must be in writing, (b) will be duly given (i) when delivered personally to the recipient or sent to the recipient by email or (ii) one Business Day after being sent to the recipient by nationally recognized overnight private carrier (charges prepaid) and (c) addressed as follows (as applicable):

to the Sellers, to:

ProNerve, LLC
Attention: George Pillari, Chief Executive Officer
7600 E. Orchard Road, Suite 200 N
Greenwood Village, CO 80111

gpillari@alvarezandmarsal.com

with a copy to:

McDermott Will & Emery LLP
Attention: Timothy W. Walsh
340 Madison Avenue
New York, NY 10173

twwalsh@mwe.com

to Buyer to:

SpecialtyCare IOM Services, LLC
Attention: Eric Schondorf, General Counsel
299 Park Avenue, 34th Floor
New York, NY 10171

eschondorf@american-securities.com

with a copy to:

Weil, Gotshal & Manges LLP
Attention: Debra A. Dandeneau
767 Fifth Avenue

New York, NY 10153

debra.dandeneau@weil.com

or at such other contact details for a party as shall be specified by like notice.

      11.8.   Governing Law; Consent to Jurisdiction. This Agreement and any claim related directly or indirectly to this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the principles of conflicts of law thereof that would defer to the substantive laws of any other jurisdiction. The parties agree that, during the period from the Petition Date until the date on which the Chapter 11 Cases are closed or dismissed (the "Bankruptcy Period"), the Bankruptcy Court shall have exclusive jurisdiction to resolve any controversy, claim or dispute arising out of or relating to this Agreement or any other agreement entered into in connection herewith. The parties further agree that, after the Bankruptcy Period, any action or proceeding with respect to such controversy, claim or dispute shall be brought against any of the parties exclusively in either the United States District Court for the Southern District of New York or any state court of the state of New York, and each of the parties hereby consents to the personal jurisdiction of such court and the Bankruptcy Court (and to the appropriate appellate courts) in any such action or proceeding and waives any objection, including any objection to the laying of venue or on the grounds of forum non conveniens, which any of them may now or hereafter have to the bringing of such action or proceeding in such respective jurisdictions. Each party hereby irrevocably consents to the service of process of any of the aforesaid courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the other parties to such action or proceeding. Each party acknowledges and agrees that any controversy that may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury.

      11.9.   Public Announcements. Prior to the commencement of the Chapter 11 Cases, neither any Seller nor Buyer shall make any public statements or announcements with respect to this Agreement and the transactions contemplated herein without the prior written consent of the other party except as may be required by law; provided, however, that the foregoing does not apply to communications made by any party hereto with respect to evaluating, documenting, or negotiating this Agreement. From the commencement of the Chapter 11 Cases until Closing, neither any Seller nor Buyer shall make any public statements, including any press releases, with respect to this Agreement and the transactions contemplated herein without the prior written consent of the other party (which consent shall not be unreasonably withheld) except as may be required by law. If a public statement is required to be made by law, the parties shall consult with each other in advance as to the contents and timing thereof.

      11.10.  No Third Party Beneficiaries. This Agreement is intended and agreed to be solely for the benefit of the parties hereto and their permitted successors and assigns, and no other party shall be entitled to rely on this Agreement or accrue any benefit, claim, or right of any kind whatsoever pursuant to, under, by, or through this Agreement.

11.11.   Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall for all purposes be deemed to be an original and all of which shall constitute the same instrument.  Delivery of an executed signature page of this Agreement by electronic transmission shall be as effective as delivery of a manually executed counterpart thereof.

ARTICLE XII
CERTAIN DEFINITIONS

12.1.   "Acquired Assets" has the meaning ascribed to it in Section 1.1(a).

12.2.   "Agent" has the meaning ascribed to it in the Recitals to this Agreement.

12.3.   "Allocation Statement" has the meaning ascribed to it in Section 9.1.

12.4.   "Alternative Transaction" means (i) any assignment, transfer, conveyance, grant, sale, pledge, exchange, tender, or any other direct or indirect disposition (whether by merger or otherwise) or encumbrance of all or any part of the Acquired Assets or the Sellers' Business or any rights thereto or therein by any Seller (other than the transfer thereof to Buyer or its affiliates in accordance with this Agreement) or (ii) any assignment, transfer, conveyance, grant, sale, pledge, exchange, tender, or any other direct or indirect disposition (whether by merger or otherwise) or encumbrance of all or any portion of the equity interests in any Seller, in each case whether structured or effected (or contemplated to be structured or effected) as an agreement, a plan of reorganization, or otherwise.

12.5.   "Ancillary Agreement" means any agreement, exhibit, schedule, statement, document or certificate executed or delivered in accordance with, in connection with or required by this Agreement, and any other agreement or certificate specifically identified as an Ancillary Agreement for purposes of this Agreement.

12.6.   "Assumed Contracts" has the meaning ascribed to it in Section 1.1(a)(v).

12.7.   "Assumed Contracts Schedule" has the meaning ascribed to it in Section 1.1(a)(v).

12.8.   "Assumed Liabilities" has the meaning ascribed to it in Section 1.1(c).

12.9.   "Auction" means the public sale of the Acquired Assets contemplated by the Bid Procedures Order.

12.10.  "Authority" means the United States of America or any other nation, any state or other political subdivision thereof, or any entity, agency, court or authority (foreign, federal, state or local) exercising executive, legislative, judicial, regulatory or administrative functions of government or any arbitrator or mediator.

- 22 -

12.11. "Bankruptcy Code" has the meaning ascribed to it in the Recitals to this Agreement.

12.12. "Bankruptcy Court" has the meaning ascribed to it in the Recitals to this Agreement.

12.13. "Bankruptcy Period" has the meaning ascribed to it in Section 11.8.

12.14. "Benefit Plans" means all "employee benefit plans," as defined in Section 3(3) of ERISA and all other retirement, profit sharing, bonus, stock, stock option, equity-based, profits interest, employment, change in control, health, life, disability, group insurance, savings, deferred compensation, incentive compensation, paid time off, severance, salary continuation and other fringe benefit arrangements, plans, programs, contracts, policies, or practices maintained, contributed to, or required to be contributed to by any Seller or any ERISA Affiliate for the benefit of any current or former employee, officer, director, member, partner or independent contractor of any Seller or with respect to which any Seller or any ERISA Affiliate may have any liability.

12.15. "Bid Deadline" has the meaning ascribed to it in the Bidding Procedures.

12.16. "Bid Procedures Motion" has the meaning ascribed to it in Section 5.9(b).

12.17. "Bid Procedures Order" means the order of the Bankruptcy Court in form and substance acceptable to Buyer, (i) fixing the date, time and location of the hearing to approve consummation of the transactions contemplated by this Agreement, (ii) fixing the time, date and location of an auction, (iii) approving Buyer as the "stalking horse" bidder as part of the Auction, (iv) approving the Break-up Fee, (v) approving the form and manner of sale notice and bidding procedures notice, (vi) approving procedures for the assumption and, if necessary, assignment of executory contracts and unexpired leases, (vii) containing such other appropriate buyer protections as may be required by Buyer, and (viii) otherwise approving the Bidding Procedures.

12.18. "Bidding Procedures" means the bidding procedures attached as Exhibit B hereto.

12.19. "Business" means providing management, administrative, and back-office services in support of professional practice entities that provide intraoperative monitoring services to patients.

12.20. "Business Day" means any day other than a day on which banks in the State of New York are required or authorized to be closed.

12.21. "Buyer" has the meaning ascribed to it in the preamble to this Agreement.

12.22. "Chapter 11 Cases" has the meaning ascribed to it in the Recitals to this Agreement.

12.23. "Closing" has the meaning ascribed to it in Section 2.3.

12.24. "Closing Date" has the meaning ascribed to it in Section 2.3.

12.25. "Code" means the Internal Revenue Code of 1986, as amended.

12.26. "Company" has the meaning ascribed to it in the preamble to this Agreement.

12.27. "Contracts" means all written or oral agreements, contracts, leases, or commitments to which any Seller is a party or by which any Seller or any of their properties or assets is bound as of the date hereof and between the date hereof and the Closing Date.

12.28. "Credit Agreement" has the meaning ascribed to it in the Recitals to this Agreement.

12.29. "Cure Costs" means all liabilities of any nature of the applicable Seller or Sellers arising under an Assumed Contract prior to the Closing Date, whether due or to become due, whether accrued, absolute, contingent or otherwise, so long as such liabilities arise out of or relate to events occurring prior to the Closing Date.

12.30. "Cure Costs Cap" shall have the meaning ascribed to it in Section 6.5.

12.31. "Debt" means all principal, interest, premiums, penalties or other obligations related to (a) all indebtedness of any Seller for borrowed money, (b) all obligations (contingent or otherwise) of any Seller for the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and consistent with past practice) (including notes payable to the sellers of such property or services), (c) all obligations of any Seller evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by any Seller, (e) all obligations of any Seller as lessee or lessees under leases that have been or should be, in accordance with GAAP, recorded as capital leases, (f) all obligations, contingent or otherwise, of any Seller under acceptance, letter of credit or similar facilities, (g) all Debt of the type referred to in clauses (a) through (f) above guaranteed directly or indirectly in any manner by any Seller, or in effect guaranteed directly or indirectly by any Seller through an agreement (w) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt, (x) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Debt or to assure the holder of such Debt against loss, (y) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (z) otherwise to assure a creditor against loss; provided, that such Debt referred under this clause (h) is of the type that would be reflected as debt on a balance sheet prepared in accordance with GAAP, and (i) all accrued but unpaid interest (or interest equivalent) to the date of determination, and all prepayment premiums or penalties payable upon repayment of any items of Debt of the type referred to in clauses (a) through (i) above.

12.32. "Deposit" has the meaning ascribed to it in Section 2.1(c).

12.33. "Designated Contract" has the meaning ascribed to it in Section 5.10(c).

12.34. "DIP Financing" has the meaning ascribed to it in the Recitals to this Agreement.

12.35. "DIP Financing Agreement" has the meaning ascribed to it in the Recitals to this Agreement.

12.36. "Employee Transfer Offers" has the meaning ascribed to it in Section 5.8(a).

12.37. "Encumbrances" means any charge, claims (as defined in Section 101(5) of the Bankruptcy Code, including claims for successor liability under any theory of Law or equity), liability, community or other marital property interest, condition, easement, encroachment, encumbrance, license, equitable interest, liens (as defined in Section 101(37) of the Bankruptcy Code), mortgage, deed of trust, option, pledge, security interest, servitude, right of way, right of first refusal, lease, encumbrance, option, or other restriction or third party right, imperfection of title, restrictive covenant, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or any other restrictions.

12.38. "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

12.39. "ERISA Affiliate" means any person, entity, trade or business (whether or not incorporated) that is treated as a single employer with any Seller under Section 414 of the Code.

12.40. "Excluded Assets" has the meaning ascribed to it in Section 1.1(b).

12.41. "Excluded Contracts" has the meaning ascribed to it in Section 1.1(b)(iv).

12.42. "Excluded Leases" has the meaning ascribed to it in Section 1.1(b)(iii).

12.43. "Excluded Liabilities" has the meaning ascribed to it in Section 1.1(d).

12.44. "Expense Reimbursement" means the aggregate amount of the reasonably incurred costs and expenses paid or incurred by or on behalf of Buyer or its affiliates relating to or in connection with (i) the purchase of the Sellers' Business, including the transactions contemplated by this Agreement and any documents or agreements related hereto, (ii) the negotiation, preparation, execution or performance of agreements relating to the purchase of the Sellers' Business, including this Agreement, and certain documents or agreements related thereto, (iii) business, financial, legal, accounting, tax, and other due diligence relating to the Sellers' Business, and (iv) the diligence, analysis, negotiation, preparation, or execution of any contracts or arrangements with any current or prospective lessors, vendors, agents, or payees of the Sellers and the Sellers' Business; *provided, however*, that the Expense Reimbursement shall not exceed $250,000 in the aggregate. The Expense Reimbursement shall be subject to reasonable documentation, which documentation shall, upon written request, be provided to the Sellers, the official committee of unsecured creditors appointed in the Chapter 11 Cases and the Office of the United States Trustee.

12.45. "GAAP" means United States generally accepted accounting principles consistently applied throughout the relevant periods.

12.46."Holdings" has the meaning ascribed to it in the preamble to this Agreement.

12.47. "Intellectual Property" means any and all intellectual property rights and other similar proprietary rights in any jurisdiction, whether registered or unregistered, whether owned or held for use under license, including all rights and interests pertaining to or deriving from: (a) patents and patent applications, reexaminations, extensions and counterparts claiming priority therefrom; inventions, invention disclosures, discoveries and improvements, whether or not patentable; (b) computer software and firmware, including data files, source code, object code and software-related specifications and documentation; (c) works of authorship; (d) trade secrets (including, those trade secrets defined in the Uniform Trade Secrets Act and under corresponding foreign statutory Law and common law), business, technical and know-how information, non-public information, and confidential information and rights to limit the use or disclosure thereof by any Person; (e) trademarks, trade names, service marks, certification marks, service names, brands, trade dress and logos and the goodwill associated therewith; (f) proprietary databases and data compilations and all documentation relating to the foregoing, including manuals, memoranda and records; and (g) domain names; including in each case any registrations of, applications to register, and renewals and extensions of, any of the foregoing with or by any Authority in any jurisdiction.

12.48. "IRS" means Internal Revenue Service.

12.49. "Law" means any federal, state, local, municipal, foreign, international, multinational or other constitution, statute, law, rule, regulation, ordinance, code, principle of common law or treaty.

12.50. "Leases" mean all written or oral leases and subleases of real property to which any Seller is a party (as lessor, lessee, sublessee, licensee or otherwise).

12.51. "Lenders" has the meaning ascribed to it in the Recitals to this Agreement.

12.52. "Local Rules" means the Local Rules For the United States Bankruptcy Court For the District of Delaware, Effective February 1, 2015, as may be amended and supplemented from time to time by the Bankruptcy Court.

12.53. "Loan Commitments" has the meaning ascribed to it in the Recitals to this Agreement.

12.54. "Material Adverse Effect" means any circumstance or event that is material and adverse to the business, properties, operations, assets, liabilities (including contingent liabilities), condition (financial or otherwise), prospects, results of operations or material Contracts of the Sellers; provided, however, the events leading up to the filing of the Chapter 11 Cases and the act and effects caused directly by the filing of the Chapter 11 Cases shall not, in and of itself, be deemed to constitute or give rise to a Material Adverse Effect. The foregoing notwithstanding, no fact, circumstance, change or event will be deemed to be or have a

Material Adverse Effect if it results from (A) changes in economic conditions that generally affect the industry in which the Sellers operate, (B) changes in financial or operating performance because of seasonal variations, (C) changes in applicable Laws and Orders that generally affect the industry in which the Sellers operate, (D) changes in reimbursement rates, policies and procedures of third-party payors or government authorities that generally affect the industry in which the Sellers operate, (E) acts of war, sabotage or terrorism, military actions or the escalation thereof, (F) changes in applicable accounting rules or principles, including changes in GAAP, (G) any action required by this Agreement, or (H) the announcement of the transactions contemplated hereby.

      12.55. "NDAs" shall have the meaning ascribed to it in Section 1.1(a)(v).

      12.56. "Non-Competes" shall have the meaning ascribed to it in Section 6.5.

      12.57. "Order" means any order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction, or other similar determination or finding by, before, or under the supervision of any Authority.

      12.58. "Permits" means all governmental or other industry permits, registrations, certificates, certifications, exemptions, licenses, franchises, consents, approvals and authorizations.

      12.59. "Permitted Encumbrances" means (i) statutory liens for Taxes not yet due, (ii) statutory liens of landlords, carriers, warehousemen, mechanics and materialmen incurred in the ordinary course of business for sums not yet due, (iii) liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security, (iv) zoning Laws and other land use restrictions that do not materially impair the present or anticipate value or use of the encumbered asset, and (v) in the case of leased property, all matters, whether or not of record, affecting the title of the lessor (and any underlying lessor) that do not materially impair the present or anticipate value or use of the encumbered asset.

      12.60. "Person" or "person" means an individual, corporation, partnership, association, limited liability company, trust, unincorporated organization, other entity or group (as group is defined in Section 13(d)(3) of the Exchange Act).

      12.61. "Petition Date" means the date on which the Sellers file voluntary petitions under chapter 11 of the Bankruptcy Code.

      12.62. "Physician Practice Entities" shall have the meaning ascribed to it in Section 6.11.

      12.63. "Prepetition Loan Amount" has the meaning ascribed to it in Section 4.3.

      12.64. "Professional Fees" means an amount equal to the aggregate amount of accrued and unpaid fees and expenses, net of unapplied retainer amounts, owed by Sellers on account of services provided to the Sellers after the Petition Date, but prior to the Closing, by (i) Alvarez & Marsal Healthcare Industry Group, LLC; (ii) McDermott Will & Emery LLP; (iii)

Pepper Hamilton LLP; (iv) Alvarez & Marsal Claims Management Services Group; (v) Garden City Group, LLC; and (vi) counsel retained by any Official Committee of Unsecured Creditors, but as to each such professional, no more than the limit applicable to each such professional as set forth on Schedule 12.64 hereto.

12.65. "PRP Agreement" shall have the meaning ascribed to it in Section 6.11.

12.66. "Purchase Price" has the meaning ascribed to it in Section 2.1(a).

12.67. "Qualified Bid" has the meaning ascribed to it in the Bidding Procedures.

12.68. "Sale Order" means an order in form and substance acceptable to Buyer and substantially in the form as Exhibit A hereto, among other things, (i) approving the transactions contemplated by this Agreement (free and clear of all Encumbrances pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code), (ii) subject to Section 5.10 hereof, approving the assumption by the Sellers and the assignment by the Sellers to Buyer of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, (iii) waiving the automatic stay imposed by Bankruptcy Rule 6004(h), and (iv) containing findings of fact and conclusions of law as requested by Buyer, including that Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code, Buyer has demonstrated adequate assurance of future performance with respect to the Assumed Contracts, and Buyer is not a successor to the Sellers and shall not be liable under any theory of successor liability.

12.69. "Sellers" has the meaning ascribed to it in the preamble to this Agreement.

12.70. "Subsidiaries" has the meaning ascribed to it in the preamble to this Agreement.

12.71. "Tax" means (i) all income taxes (including any tax on or based upon net income, or gross income, or income as specially defined, or earnings, or profits, or selected items of income, earnings, or profits) and all gross receipts, estimated, sales, use, ad valorem, transfer, franchise, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, or windfall profit taxes, unpaid property taxes, environment, alternative, or add-on minimum taxes, custom duties or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts and (ii) any obligation to indemnify or otherwise assume or succeed to any liability described in clause (i) hereof of any other Person whether by contract or under common law doctrine of de facto merger and successor liability or otherwise.

12.72. "Taxing Authority" means any Authority responsible for the collection or assessment of Tax.

12.73. "Tax Return" means any return, report, information return or other document (including any related or supporting information or any amended return) filed or required to be filed with any Taxing Authority or other Authority in connection with the determination, assessment, or collection of any Tax paid or payable or the administration of any laws, regulations, or administrative requirements relating to any such Tax.

- 28 -

12.74.  "Termination Event" has the meaning ascribed to it in Section 8.2.

12.75.  "Transferred Employees" means all of the Sellers' employees who accept offers of employment with Buyer or its affiliates.

12.76.  "Transfer Taxes" has the meaning ascribed to it in Section 9.2.


IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed on its behalf as of the date first above written.

*[Signature Pages Follow]*

**SPECIALTYCARE IOM SERVICES, LLC**

By: _____

Name: Jeffrey Gray

Title: Treasurer and Chief Financial Officer

**PRONERVE HOLDINGS, LLC**

By: _____
Name: George D. Pillari
Title: Chief Executive Officer

**PRONERVE, LLC**

By:    **PRONERVE HOLDINGS, LLC,** its sole member

    By: _____
    Name: George D. Pillari
    Title:  Chief Executive Officer

**BOULDER INTRAOPERATIVE MONITORING, LLC**
**EUGENE INTRAOPERATIVE MONITORING, LLC**
**DENVER SOUTH INTRAOPERATIVE MONITORING, LLC**
**COLORADO INTRAOPERATIVE MONITORING, LLC**
**RIVERSIDE INTRAOPERATIVE MONITORING, LLC**
**TOPEKA INTRAOPERATIVE, LLC**
**PRONERVE TECHNOLOGIES, LLC**

By:  **PRONERVE, LLC,** its sole member

    By:  **PRONERVE HOLDINGS, LLC,** its sole member

    By: _____
    Name: George D. Pillari
    Title:  Chief Executive Officer

[Signature Page to Asset Purchase Agreement]