## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ProNerve Holdings, LLC, *et al.*,[1] | Case No. 15-10373 (KJC) |
| Debtors. | Jointly Administered |
| | Hearing:  March 11, 2015 at 11:00 a.m. (ET)<br>Objection Deadline:  March 10, 2015 at Noon (E.T.) |
| | Re:  Docket Nos. 16, 38 |

**OBJECTION AND RESERVATION OF RIGHTS OF THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS'
MOTION FOR ENTRY OF (A) A BIDDING PROCEDURES ORDER (I)
APPROVING THE BIDDING PROCEDURES, (II) RATIFYING THE
SELLERS' ENTRY INTO THE STALKING HORSE PROTECTIONS, (IV)
SETTING THE DATES FOR THE BID DEADLINE, AUCTION (IF NEEDED)
AND SALE APPROVAL HEARING, (V) ESTABLISHING NOTICE PROCEDURES
<u>AND APPROVING FORMS OF NOTICE, AND (VI) SEEKING RELATED RELIEF</u>**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of ProNerve

Holdings, LLC, *et al.* (the "<u>Debtors</u>"), by and through its proposed counsel, submits this

objection and reservation of rights (the "<u>Objection</u>") to the proposed bidding procedures (the

"<u>Bidding Procedures</u>") contained in the *Debtors' Motion for Entry of (A) a Bidding Procedures*

*Order (I) Approving the Bidding Procedures, (II) Ratifying the Sellers' Entry Into the Stalking*

*Horse Agreement, (III) Authorizing the Payment of Stalking Horse Protections, (IV) Setting the*

*Dates for the Bid Deadline, Auction (If Needed)  and Sale Approval Hearing, (V) Establishing*

*Notice Procedures and Approving Forms of Notice, (VI) Approving Procedures Related to the*

---

[1] The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: ProNerve Holdings, LLC (1653); ProNerve, LLC (2155); Boulder Intraoperative Monitoring, LLC (9147); Colorado Intraoperative Monitoring, LLC (5837); Denver South Intraoperative Monitoring, LLC (3164); Eugene Intraoperative Monitoring, LLC (0718); ProNerve Technologies, LLC (1814); Riverside Intraoperative Monitoring, LLC (6963); and Topeka Intraoperative Monitoring, LLC (6151). The location of the Debtors' corporate headquarters and the service address for all Debtors is 7600 E. Orchard Road, Suite 200 N, Greenwood Village, Colorado 80111.

*Assumption and Assignment of Executory Contracts and Unexpired Leases and (VII) Authorizing the Sellers to File the Confidential Schedules Under Seal; and (B) a Sale Order (I) Approving the Sale of The Sellers' Assets Outside the Ordinary Course of Business (II) Authorizing the Sale Free and Clear of all Liens, Claims and Interests, (III) Approving the Stalking Horse Agreement; (IV) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (V) Granting Related Relief* [Docket No. 16] (the "Sale Motion")[2]. In support of this Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.      By the Sale Motion, the Debtors seek approval of Bidding Procedures, which they say are in the best interests of the Debtors, their estates and creditors. As detailed below, however, the Bidding Procedures are fundamentally unfair to creditors, walling off prospective bidders from participating in the process, and tilting the playing field inappropriately to favor the proposed stalking horse bid proposed by Specialty Care IOM Services, LLC ("Specialty Care"). The Bidding Procedures, if approved will chill bidding by limiting bidders' access to data (ratifying the Debtors' exclusion of bidders from the data room since the Petition Date), limiting the sale process both as to diligence and bid proposal to one week's time, while conducting that process in the shadow of an uninvestigated $43 million credit bid, which is supported by an unnecessary and above-market break-up fee and an inequitable deposit requirement. The Bidding Procedures will ensure that the Debtors' assets are sold this month to a buyer with limited and perhaps inadequate marketing (the Debtors have not employed an investment banker) at a private sale. This is not consistent with the policies of value maximization and fairness to bidders and creditors embodied in the bankruptcy law generally and in Bankruptcy Code section 363(b) specifically.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sale Motion.

2.      The Debtors say that they are working on an exit strategy for the case.  They do not have one yet and their primary tactic before the Court is to seek approval of Bidding Procedures that will effectively transition the assets of the Debtors to Specialty Care in a private sale for limited or no cash consideration to the estates.  They need to do better.  Among other things, they must design Bidding Procedures that promote bidding and enable fair competition for the Debtors' assets.

3.      The Committee was formed just two business days ago, on Friday, March 6, 2015.  The Committee did not and did not retain counsel until mid-afternoon yesterday, Monday, March 9, 2015.  Committee counsel immediately contacted Debtors' counsel to request a brief adjournment of the hearing to approve the Bidding Procedures to March 19, 2015, with an extension of the Committee's time to object until March 16, 2015, to allow the Committee to gain a more informed understanding of the fairness of the Sale, the proposed credit bid and the logic behind the Debtors' extremely abbreviated marketing process.  The Committee also requested that Interested Parties be permitted to resume diligence pending the March 19 hearing.  The Debtors refused the Committee's request for an adjournment and to permit Interested Parties to resume diligence.  In light of the unfair Bidding Procedures and the Debtors' refusal to give the Committee even one week to get up to speed in these cases, the Committee has no choice but to vigorously oppose the Bidding Procedures, the fairness of permitting the Specialty Care credit bid, the level of bid protections requested, and the need for an expedited sale in advance of a plan process based on the Debtors' claimed exigencies, while reserving all of its challenge rights to Specialty Care's liens and claims.

4.      The Committee remains willing to agree to adjourn the hearing on Bidding Procedures until the March 19, 2015 hearing date so long as it is agreed that all Interested Parties

who have signed appropriate non-disclosure agreements be allowed immediate access to the Debtors' data room to begin essential diligence. Otherwise, the Bidding Procedures should not be approved.

## RELEVANT BACKGROUND

### A.    General

5.    On February 24, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

6.    The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' cases (collectively, the "Chapter 11 Cases").

7.    On March 6, 2015, the Office of the United States Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code.

8.    On March 9, 2015, the Committee selected Blank Rome LLP to serve as its counsel.

### B.    Proposed Sale

9.    The Debtors filed the Sale Motion on the Petition Date.

10.    According to the Sale Motion, the Debtors propose to sell substantially all their assets to the highest and best bidder. Specialty Care submitted a bid of up to $35 million via a credit bid, plus payment of certain undisclosed cure costs and assumed liabilities. The Specialty Care asset purchase agreement is attached to the Sale Motion as a stalking horse bid for other bidders to utilize in formulating their bids. *See* Ex. B to Sale Motion (the "APA").

11.    In order to obtain its credit bidding rights, Specialty Care purchased over $43 million in alleged secured debt from the Debtors' prepetition lenders for less than 10 cents on the dollar. The APA provides that Specialty Care bought the prepetition debt for "an amount not to

-4-

exceed $4.25 million." APA § 6.1. To further preserve and protect Specialty Care's credit bid rights, the APA releases the Debtors' claims to challenge Specialty Care's prepetition liens and claims. APA § 4.3 ("The Sellers hereby waive any rights to challenge the Prepetition Loan Amount, the Credit Agreement and the Permitted Liens on any grounds.").

12.     Specialty Care is also the Debtor's DIP lender, providing a facility of $2.5 million. *See* Dkt. Nos. 14, 37. Specialty Care has not provided a dedicated good faith deposit for its bid, but instead has designated that "[p]roceeds from the DIP Financing, and, to the extent such proceeds are less than $900,000, amounts under the Credit Agreement in the aggregate amount of $900,000 shall be deemed [Specialty Care's] deposit under [the APA]". APA §2.1(c).[3] Specialty Care has also bargained for bid protections of up to $520,000, consisting of a $270,000 break-up fee and an expense reimbursement of up to $250,000.

## C.     Marketing

13.     Prior to selecting Specialty Care as the stalking horse, beginning in January, 2015, the Debtors engaged in limited prepetition marketing program. The Debtors did not retain an investment banker. Instead, Alvarez & Marsal Healthcare Industry Group, LLC ("A&M"), the Debtors' restructuring advisor[4], contacted eight potential purchasers, comprised of three strategic companies, one individual, and four financial buyers. Specialty Care was one of the eight parties contacted by A&M.

14.     The Debtors halted their pre-petition marketing process pending approval of the Bidding Procedures. Following the January, 2015 initiation of the Debtors' marketing efforts, six potential purchasers signed confidentiality agreements and obtained access to confidential

---

[3]  In order be a qualified bidder, other parties must submit an earnest money deposit of at least $3,567,000.00, which is 10% of the proposed $35,670,000 Initial Overbid Amount.
[4]  A&M has been retained by the Debtor since November 2013, initially to provide general cash and revenue cycle advices and more recently, to provide the services of Mr. George Pillari to serve as the Debtors' Chief Restructuring Officer and Chief Executive Officer.

information.   These six parties presumably reviewed the confidential information between January and February, 2015.  Meanwhile, the Sale Motion seeks approval to resume the Debtors' marketing process, and to begin sending Information Packages to Contact Parties, including those who previously expressed interest and entered into confidentiality agreements, but only after the Bidding Procedures are approved.

15.     Assuming the Bidding Procedures are approved in their current form on March 11, they provide just nine days for the Debtors to contact existing and new potential Interested Parties and for those parties to submit Qualified Bids.  If any Interested Parties are able to submit Qualified Bids within that nine-day period, those parties are then afforded an additional six days to complete their due diligence, after which time, they must waive any due diligence contingencies and proceed to auction.  The Auction for the Debtors' assets is to occur on March 27, which is only 16 days from the earliest possible date of the approval of the Bidding Procedures.

## OBJECTION

16.     The Committee supports a value maximizing process for dealing with the Debtors' assets.  However, the tremendously compressed timing by which the Debtors seek to market and sell their assets does not afford the Committee sufficient time to evaluate the fairness of the Debtors' sale process.  What it has reviewed is troubling.  The Debtor's Bidding Procedures chill bidding and make it very likely that no bidder aside from Specialty Care will enter into the playing field for these assets.  On top of that, the Debtors seek to approve the ability of Specialty Care to credit bid an amount beyond $43 million, which improperly includes amounts advanced under Specialty Care's DIP credit facility.  Moreover, allowing a credit bid for the full face amount of the acquired prepetition claim, when the debt was acquired solely for the purpose of gaining currency in the Debtors' auction process, could very well be inappropriate

– particularly given that Specialty Care paid only an amount equal to or less than $4.25 million

for the prepetition debt.  Finally the Debtors seek to award Specialty Care with a break-up fee of

$270,000 and expense reimbursement of $250,000 without proving that such protections actually

benefit the estate, much less demonstrating that such bid protections are reasonable in light of the

$4.25 million Specialty Care actually paid for its purported credit bid rights.

17.     For these reasons, the Debtors have not carried their burden to show that the sale

of their assets, to the exclusion of a plan process, and pursuant to the proposed, truncated,

problematic Bidding Procedures, benefits all of their stakeholders, including unsecured creditors.

The process is designed to fail, rendering it unfair and requiring the denial of the sought bid

protections, including Specialty Care's proposed credit bid right and the asserted currency for its

$35 million opening bid.

A.     **The Debtors' Limited Marketing Process Chills Bidding and is Designed to Ensure a Private Sale to Specialty Care.**

18.     The Debtors request a Bid Deadline of March 20 and an Auction on March 27.

Sale Motion ¶ 20.  Because the Debtors ceased marketing their assets as of the Petition Date,

assuming that the Bidding Procedures are approved as of March 11, there will be just nine days

(seven of which are business days) for the Debtors to resume their marketing efforts on a post-

petition basis.  The Committee understands that there are parties who were in the midst of pre-

petition due diligence and were shut out from the Debtors data room prior to the petition date.

The proposed marketing period is objectively insufficient and unfair.

19.     There is no cause for this extraordinarily expedited process.  The Sale Motion

asserts that the Debtors have only 60 days worth of post-petition financing, that the Debtors'

competitors might interfere with their business relationships and seek to poach their employees,

and that the Debtors' senior management has experienced significant turnover in the past three

years.  Sale Motion ¶¶ 34-7.  But the Debtors' alleged exigent circumstances fall flat.  First, as to the limited post-petition financing period of 60 days, if another Qualified Bidder were to prevail at the Auction and require a modest amount of additional time to close the sale, there is no reason to assume that Specialty Care (wearing its hat as DIP Lender) would not permit such a modest extension of time, especially when Specialty Care (wearing its hat at the stalking horse purchaser) would (i) reap a windfall in having its alleged secured position bought out when compared to the $4.25 million it actually paid for that position and (ii) be generously compensated by the proposed expense reimbursement and break-up fee.

20.    Second, as to the Debtors' concerns of interference with their business relationships and employees, the Debtors have identified only Medsurant as a party to have allegedly taken such actions.  Meanwhile, counsel for Medsurant appeared at the first day hearing to specifically deny the Debtors' allegations and to inform the Court that Medsurant was "shut out" of the Debtors' pre-petition marketing process and intended to participate in the Debtors' post-petition marketing process.  Feb. 26, 2015 Hr'g Tr. 25:24 – 26:12.  The Debtors have not made any other specific allegations of competitors thwarting the Debtors' business operations or poaching employees.

21.    Third, the Debtors fail to demonstrate how and why the alleged high turnover of their senior management over the past few years necessitates a truncated marketing of their assets.  Moreover, the Debtors' senior-most management is overseen by A&M, a reputable firm with particular expertise in healthcare restructuring.  As far as the Committee is aware, A&M has not threatened to quit in the event the Debtors' sale and marketing process is lengthened to foster a fairer result.  Nor has the Debtor pointed to any evidence of other actual or likely management losses.

22.      These abbreviated circumstances require that the Court reject the Bidding Procedures. *See In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) (rejecting "emergency" sale to DIP lender in view of the fact that purchaser was an insider, proceeds were not likely to benefit unsecured creditors in any event, three weeks' notice was insufficient, and concern about creditors' committee's investigation "which was not described to the Court and was conducted without discovery, with access to a very small universe of documents, and in the very short and insufficient time dictated by" the insider); *cf.* Transcript of Hearing at 55:12-14, *In re Digital Domain Media Grp., et al.*, No. 12-12568 (Bankr. D. Del. Sept. 28, 2012), ECF No. 248 (approving sale of assets within 13 days of petition, but only where sale proceeds were placed into a segregated account, there was no credit bid, the transaction was not with an insider, and with "great weight and emphasis on the position and input" of creditors' committee).

23.      The false emergency engineered by the Debtors is particularly harmful in this case given (1) that the Stalking Horse Bid does not assure any recoveries to creditors in these case, *see In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989) (notice insufficient where notice "did not inform creditors of the amount expected to be obtained from the auction sale"), and (2) the leverage that Specialty Care has placed on the Debtors given its advantaged position. *See In re Fisker Automotive Holdings, Inc.*, 510 B.R. 55, 60 (Bankr. D. Del. 2014) ("Hybrid if unchecked of its purchase, might well have frozen out other suitors for Fisker's assets.").

24.      Given the foregoing, the Court should deny the Bidding Procedures and force the Debtors to fully and fairly market their assets to afford other bidders the time they need to propose competing bids.

**B.**     **Specialty Care's Credit Bid is Improper and Would Chill Bidding.**

25.     The Sale Motion indicates that Specialty Care seeks to acquire the Debtors' assets via a credit bid in the initial amount of $35 million (and up to $43 million, plus the amount of the DIP Facility), plus undisclosed assumption and cure amounts.  Sale Motion at ¶ 20, Bidding Procedures, p.7.  Along with the unreasonably truncated schedule by which the Debtors seek to market their assets, Specialty Care's credit bid is another example of the Debtors' unfair sale process designed to chill bidding by increasing the dollar threshold for another qualified bidder to assert a competing bid with real currency.

26.     Credit bidding should not be allowed when it would chill bidding and threaten notions of fairness in the bankruptcy process.  In *Philadelphia Newspapers,* the Third Circuit instructed that "[a] court may deny a lender the right to credit bid *in the interest of any policy advanced by the Code*, such as to ensure the success of the reorganization or to foster a competitive bidding environment." *In re Philadelphia Newspapers,* 599 F.3d 298, 315-16 n.14 (3d Cir. 2010) (emphasis added).  *See also Fisker Automotive*, 510 B.R. at 61-2 ("It is the Court's view that Hybrid's rush to purchase and to persist in such effort is inconsistent with notions of fairness in the bankruptcy process."); 11 U.S.C. § 363(k) (permitting credit-bid "unless the court for cause orders otherwise").

27.     Bidders are often wary of competing with a secured creditor.  *See In re Antaeus Technical Servs., Inc*., 345 B.R. 556, 564 (Bankr. W.D. Va. 2005) ("Such a sale is like getting into an auction in which the other party is actually the owner of the property being sold, whose interest is not in actually obtaining the subject property but in playing poker to see what is the highest bid which the independent bidder is willing to make.").

28.     Courts have been particularly cognizant of this risk when an investor purchases secured debt prior to the bankruptcy and applies pressure to foreclose on its new collateral in the

bankruptcy with a bid that offers little to nothing for the estate. *Fisker Automotive*, 510 B.R. at 61; *In re Free Lance-Star Publ'g Co.*, 512 B.R. 798, 806 (Bankr. E.D. Va. 2014) (denying right to credit bid where lender purchased its debt prepetition and "pressed the Debtor 'to walk hand in hand' with it through an expedited bankruptcy sales process" in a "classic loan-to-own scenario").

29.    The APA expressly provides that Specialty Care bought $43 million worth of prepetition indebtedness for an amount of no more than $4.25 million.  APA at § 6.1.  While the Debtors believe that the allegedly secured Specialty Care claims are not subject to challenge (see APA § 4.3), the Committee has had no time to diligence the liens and encumbrances that support Specialty Care's credit bid rights.  Specifically, without limitation, the Committee has had no opportunity to consider whether Specialty Care's liens and security interests attach to and are perfected upon all of the proposed sale assets.  Further, the wide variance between the face amount of the acquired debt and the purchase price for the same, taken together with the extraordinary compression of this limited sale process, raises the question of whether the credit bid right should be permitted at the full face amount – given the lack of fairness in the process at present.  Until the Committee is afforded a reasonable amount of time for relevant diligence, Specialty Care should not be entitled to exchange its $4.25 million debt purchase for over $43 million of credit bid currency.[5]

30.    Additionally, the Sale Motion improperly seeks to permit Specialty Care to credit bid the amount of the DIP.  Credit bidding – even where appropriate – is limited to secured, not administrative, claims. 11 U.S.C. § 363(k).

---

[5]  Any credit bid must remain subject to the rights of the Committee under Bankruptcy Code section 363 and under the DIP financing orders to challenge the Specialty Care's claims and liens. *See In re N.J. Affordable Homes Corp.*, slip op., 2006 WL 2128624 at *16 (Bankr. D.N.J., June 29, 2006).

31.     At this time, Specialty Care should be required to bid cash like any other bidder,

and if its liens are in fact valid, unavoidable, and not subject to challenge, it will receive the

proceeds (allocable to its collateral) from the highest bidder in accordance with its lien status but

no more than that.

**C.     The Break-Up Fee and Expense Reimbursement Should Not be Approved.**

32.     The Motion seeks approval of a $270,000 break-up fee and up to $250,000 in

expense reimbursement, neither of which should be approved.  As an initial matter, the Debtors'

business judgment is afforded no deference with respect to the Bid Protections. *Calpine Corp. v.*

*O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy)*, 181 F.3d 527, 535 (3d Cir. 1999)

(concluding "that the business judgment rule should not be applied" to break-up fees in

bankruptcy); *In re Reliant Energy Channelview LP,* 403 B.R. 308,311 (D. Del. 2009), *aff'd, 594*

F.3d 200, 206 (3d Cir. 2010).  Rather, a break-up fee should be approved only where there has

been a showing "that the fees were actually necessary to preserve the value of the estate." *Id.* at

535; 11 U.S.C. § 503(b)(1)(A).  Thus, anyone seeking a break-up fee in the Third Circuit bears

the significant burden of proving that the break-up fee was "actually necessary to preserve the

value of the estate." *O'Brien*, 181 F.3d at 535.

33.     At a minimum, it is premature for the Court to make a determination on the break-

up fee.  To receive the break-up Fee as an 11 U.S.C. § 503(b) claim, the Debtors will have to

show that having a stalking horse bidder conferred a benefit to the estates in some verifiable

amount. *Cf. In re America West Airlines, Inc*., 166 B.R. 908, 912-13 (Bankr. D. Ariz. 1994) ("the

proposed break-up fee does not meet the standard of [11 U.S.C. §] 503 because it is not

correlated to any transactional cost or expense incurred by the negotiating bidder"); *In re Hupp*

*Industries, Inc*., 140 B.R. 191, 196 (Bankr. N.D. Ohio 1992) (denying break-up fee where

"assertion of unforeseen and unspecified liquidated damages . . . is insufficient to establish" that

a benefit was conferred on estate). These facts obviously cannot be discerned until after the Auction has occurred.

34.    Furthermore, the break-up fee is disproportionately large in comparison to the $4.25 million of actual consideration Specialty Care paid for the right to credit bid.  In fact, a fee of $270,000 on a $4.25 million purchase price exceeds 6% of the price paid, which is well in excess of break-up fees approved by this and other courts in this District.  See, e.g., *In re Chef Solutions Holdings, LLC*, No. 11-13139 (KJC) (Bankr. D. Del. Oct. 19, 2011) [Dkt. No. 129] (approving payment of break-up fee that was 1.6% of the purchase price and finding that it was "reasonable and appropriate in light of the size . . . of the proposed sale"); *In re Palm Harbor*, No. 10-13850 (CSS) (Bankr. D. Del. Jan. 6, 2011) [Dkt. No. 187] (approving break-up fee that was 2.2% of purchase price and finding that it was "reasonable and appropriate . . . in light of the size . . . of the Asset Sale.").  Further, courts have found that the reasonableness of a break-up fee should be compared to the cash portion of the purchase price.  *See, e.g., Sea Island Co. v. Official Comm. of Unsecured Creditors (In re Sea Island Co.)*, 2010 WL 4393269, at \*3 n.1 (Bankr. S.D. Ga. Sept. 15, 2010) (approving break-up fee noting that it was "3% of only the cash consideration, not the total consideration" and listing numerous cases in which courts approved break-up fees of a comparable percentage of the cash purchase price); *see also In re Age Ref, Inc.*, 2010 Bankr. LEXIS 5724, at \*7 n.2 (Bankr. W.D. Tex. Dec. 21, 2010) (noting that a stalking horse purchaser is not "entitled to a break-up fee to the extent that the stalking horse bid is a credit bid.").  The Debtors have not offered any support for such an excessive break-up fee and, as a result, it should be denied as unreasonable.

**D.      Competing Bidders Must Provide a 10% Deposit While Specialty Care Provides None.**

35.      The proposed Bidding Procedures provide that Qualified Bids must be accompanied by a Good Faith Deposit, which is defined as a cash deposit held in escrow in an amount equal to 10% of the gross consideration payable at Closing pursuant to the applicable Bid Documents, as calculated in good faith by the Debtors.  In contrast, Specialty Care was not required to actually post a deposit.  Instead, the Sale Motion provides that Specialty Care has designated a maximum of $900,000 from either its DIP or the prepetition credit agreement to be deemed Specialty Care's deposit under the APA.  *See* APA § 2.1(c).  To the extent that this is even real money, it is unclear why Specialty Care should be able to put up a deposit of only $900,000, which is just 2.5% of its purported $35 million bid, while other parties must post over $3.5 million.  Given that Specialty Care stands to receive a windfall in the event another Qualified Bidder outbids it, surely Specialty Care can contribute more to match the Good Faith Deposit required of others.

**E.      The Stalking Horse Bid Should Not be Approved as a Private Sale.**

36.      Under the Bidding Procedures, if no bids are received by March 20 that compete with that of Specialty Care, the Debtors will cancel their Auction and move forward to sell the assets to Specialty Care in a private sale – a process that would likely exclude any late topping bid at any sale hearing.  Sale Motion ¶ 33.  The Sale Motion does not contain any detail that would justify this limitation on an already truncated process as is required by applicable Local Rules of Bankruptcy Procedure.  See L.B.R. 6004-1(b)(iv)(D).  Needless to say, private sales, while possible in bankruptcy, are disfavored.  *See Fisker, supra; see also Simantob v. Claims Prosecutor, L.L.C. (In re Lahijani),* 325 B.R. 282, 288-289 (B.A.P. 9th Cir. 2005) (courts favor

auctions under section 363 because of the court's obligation "to assure that optimal value is realized by the estate under the circumstances.").

**F.      Reservation of Rights.**

37.     The Committee reserves all of its rights to insist on clarifications and improvements to the APA. At present, the APA lacks important exhibits, schedules and detail on liability assumption contract cures.  In addition, the APA contains conditions, representations and warranties, which may be inappropriate for a seller in a bankruptcy context to give without appropriate qualification, and grants broad releases.

38.     The Committee reserves all of its rights, claims, defenses, and remedies, including, without limitation, the right to amend, modify, or supplement this Objection, to seek discovery, and to raise additional objections during any further hearings, including but not limited to, a final hearing on the sale of the Debtors' assets.


*[Remainder of page intentionally left blank]*

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Committee respectfully requests that the

Court deny the proposed Bidding Procedures as set forth herein and to grant such other relief as

it deems fair and appropriate.

 Dated: March 10, 2015

                                 **BLANK ROME LLP**


By: _/s/ Josef W. Mintz_
Stanley Tarr (DE 5355)
Josef W. Mintz (DE 5644)
1201 N. Market Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 425-6400
Facsimile: (302) 425-6464

-and-

Michael B. Schaedle *(admission pending)*
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Telephone:  (215) 569-5500
Facsimile: (215) 569-5555

*Proposed Counsel for the Official
Committee of Unsecured Creditors*