## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ProNerve Holdings, LLC, *et al.*,[1] | Case No. 15-10373 (KJC) |
| Debtors. | Jointly Administered |
| | **Hearing:  April 10, 2015 at 10:00 a.m. (ET)**<br>**Objection Deadline:  April 8, 2015 (ET)** |
| | **Re:  Docket Nos. 16, 81** |

**THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' OBJECTION TO DEBTORS' MOTION FOR ENTRY OF A SALE ORDER (I) APPROVING THE SALE OF THE SELLERS' ASSETS OUTSIDE THE ORDINARY COURSE OF BUSINESS, (II) AUTHORIZING THE SALE FREE AND CLEAR OF ALL LIENS, CLAIMS, AND INTERESTS, (III) APPROVING THE STALKING HORSE AGREEMENT, (IV) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (V) GRANTIING RELATED RELIEF**

The Official Committee of Unsecured Creditors of ProNerve Holdings, LLC, *et al.* (the "Debtors") hereby objects (this "Objection") to the *Debtors' Motion for Entry of a Sale Order (I) Approving the Sale of the Sellers' Assets  Outside the Ordinary Course of Business (II) Authorizing the Sale Free and Clear of all Liens, Claims and Interests, (III) Approving the Stalking Horse Agreement; (IV) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (V) Granting Related Relief* (Docket No. 16) (the "Sale Motion").[2]  In support of this Objection, the Committee respectfully states as follows:

---

[1]    The Debtors, together with the last four digits of each Debtor's federal tax identification number, are: ProNerve Holdings, LLC (1653); ProNerve, LLC (2155); Boulder Intraoperative Monitoring, LLC (9147); Colorado Intraoperative Monitoring, LLC (5837); Denver South Intraoperative Monitoring, LLC (3164); Eugene Intraoperative Monitoring, LLC (0718); ProNerve Technologies, LLC (1814); Riverside Intraoperative Monitoring, LLC (6963); and Topeka Intraoperative Monitoring, LLC (6151). The location of the Debtors' corporate headquarters and the service address for all Debtors is 7600 E. Orchard Road, Suite 200 N, Greenwood Village, Colorado 80111.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sale Motion.

## PRELIMINARY STATEMENT

1.      By the Sale Motion, the Debtors seek to sell all or substantially all of their assets to SpecialtyCare IOM Services, LLC ("Specialty Care") outside of the ordinary course of the Debtors' business and without the creditor protections of a confirmed chapter 11 plan.  Because the proposed Sale offers no case solution for the Debtors' creditors - other than Specialty Care - it should not be approved.   Specifically, because the Debtors and Specialty Care have orchestrated a sale process based upon an unsupported exigency for the Sale's closing, and implementing procedures designed to favor Specialty Care and to preclude any truly competitive bidding for the Debtors' assets, no evidentiary basis exists to determine whether the Specialty Care credit bid represents fair value for the assets or whether it is in the best interests of the Debtors' estates and their creditors.  Furthermore, because the Committee continues to diligence the validity, extent and amount of Specialty Care's liens and claims related to disclaimed government receivables and the applicability of substantive consolidation, as well as the contrived process for the sale of the Debtors' assets to Specialty Care, this Court should not allow a credit bid in excess of "up to $4.25 million" - the steeply discounted price Specialty Care paid to purchase from GECC (as defined below) the Debtors' prepetition substantially under-secured debt to GECC. Specialty Care claims the debt it purchased is secured by liens on all estate property.

2.      Specialty Care also claims to be a secured creditor of certain affiliates of the Debtors that are not in bankruptcy – the so-called "affiliated practice entities" (the "APEs"). And, if the Debtors have their way, Specialty Care will buy the Debtors' assets (including the APE contracts) for a credit bid of $35 million, leaving the estates with no cash to formulate and fund a chapter 11 plan – all while the Debtors ignored a third-party cash offer at least double the "up to $4.25 million" Specialty Care paid for the debt.  Despite substantial administrative

leverage against the Debtors' estates and over five million dollars of scheduled unsecured claims and "undetermined" scheduled priority claims, neither Specialty Care nor the Debtors have proposed any case solution to the Committee that will enable a collective remedy. The Committee's proposals to the Debtors about a case solution have been rebuffed by the Debtors and Specialty Care to date.

3.     The Committee continues to investigate Specialty Care's liens and claims. Initially, it appears that GECC (and therefore Specialty Care) may have disclaimed its interest in the Debtors/APEs' government receivables when received on deposit and that such disclaimer caused a series of preferences as government receivables were concentrated. Government receivables make up a substantial percentage of the Debtors' top line.

4.     Furthermore, the Committee's investigation to date reveals that there is a substantial identity between and among the Debtors and the APEs. Based on information made available to the Committee to date, there is a substantial possibility that confusion existed among creditors regarding the Debtors and the APEs and the various services provided by each. The Committee is further informed and believes that certain creditors, including GECC, relied on the combined credit of the Debtors and the APEs, while unsecured creditors may have been none the wiser. The inclusion of the APEs' value into the bankruptcy estates may be the only way to ensure a meaningful recovery to the Debtors' unsecured creditors, who may have relied on the breakdown of entity borders between and among these closely-related entities.

5.     With respect to marketing of the Debtors' assets in an effort to obtain higher and better offers, the Debtors have made no postpetition effort to contact bidders and have refused to contact bidders suggested by the Committee, asserting that such initiative is not supportable because of cost. Notwithstanding the lack of any effort by the Debtors to better the Specialty

Care bid, through the efforts of the Committee and its financial advisor, a Cash Bidder (as defined below) has been identified.

6.     Despite the Committee's admonition not to cancel the April 8 auction scheduled by this Court since a buyer has emerged with a cash bid much higher than the price paid by Specialty Care for its debt (a bid that provides a case solution), the Debtors cancelled the April 8 auction and are moving forward with the April 10 Sale Approval Hearing, asking this Court to approve the Transaction which offers unsecured creditors nothing and forces the case into an administrative insolvency.

7.     These Chapter 11 Cases (as defined below) were designed to favor Specialty Care as the purchaser of the Debtors' assets.  Certain Specialty Care obligors (the APEs) that did not file chapter 11 are nevertheless doing business apparently uninhibited by long called and unstayed defaults under the Credit Agreement. Indeed the Transaction under the Sale Motion even purports to grant mutual releases between non-debtor parties, the APEs and Specialty Care, even though there is no confirmed plan.

8.     This structured foreclosure of Specialty Care's debt is fashioned to look like a chapter 11 bankruptcy case sale – geared to capture for the debt purchaser Specialty Care, the enterprise value of the Debtors *and their non-Debtor affiliates* – without truly comporting with the legal principles underpinning a chapter 11 case. That value could not be captured by Specialty Care, as a secured creditor, outside of chapter 11.  Accordingly, it should not be available here outside of a chapter 11 plan process, especially since (i) there is a cash buyer that will provide the value the estates and their creditors deserve, and (ii) there was no real marketing effort. Indeed, the Sale Agreement expressly precludes the Debtors and their agents from

145259.01600/100101414v.1

facilitating another bidder's efforts. *See*, Stalking Horse Agreement, § 5.1.1. Thus Specialty Care's ability to credit bid should be limited to the amount it paid GECC to purchase the debt.

## RELEVANT BACKGROUND

### A.    General

9.    On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee or examiner has been appointed in the Debtors' cases (collectively, the "Chapter 11 Cases"). On March 6, 2015, the Office of the United States Trustee appointed the Committee pursuant to Bankruptcy Code section 1102 (Docket No. 68) and thereafter the Committee selected Blank Rome LLP to serve as its counsel and Carl Marks Advisory Group to serve as its financial advisor.

### B.    Business Operations

10.    The Debtors and the APEs comprise a fully integrated enterprise for the delivery of intraoperative neurophysiologic monitoring ("IOM") services. The Debtors' technologists provide onsite technical support in the operating room, and physicians employed by the APEs provide remote, IOM reading services and oversight. The Debtors bill the APEs for the IOM and management services they provide. The APEs depend on the Debtors for everything from billing and technological support to the ordering of office supplies. The Debtors cannot derive the majority of their revenue without the APEs; the APEs cannot operate without the Debtors.

11.    Upon information and belief, the following facts suggest, at least on a preliminary basis, that substantive consolidation of the Debtors with the APEs may be appropriate:

    a.    The Debtors and each APE are party to a management service agreement, pursuant to which the APEs make certain payments to the Debtors in

exchange for administrative, management, and back-office support services.

b.    The APEs and the Debtors share common management. At one point, David O. Neighbors, a partner in the Debtors' equity sponsor, Waud Capital Partners, was an authorized signatory of each of the Debtors and all but one of the APEs. *See* Forbearance Agreement dated April 11, 2014, Ex. 5 to *Declaration of Ronald M. Winters in Support of the Bid Procedures and Bid Protections Component of the Sale Motion* (Docket. No. 77) (hereinafter the "Winters Declaration"). Debtor ProNerve, LLC is the sole managing member of APE ProNerve Physicians (IN), LLC. (*Id.*)

c.    Upon information and belief, certain of Debtors' equity holders are officers of certain of the APEs. For example, William Case, the Treasurer of several of the APEs, is party to a unit purchase agreement for acquisition of equity in Debtor ProNerve, LLC.

d.    The APEs and the Debtors share the same banking and cash management system. (*See* Debtors' Motion for an Order Authorizing The Debtors to Continue Using Debtors' Bank Accounts, Business Forms, and Cash Management System (Docket No. 8) ¶ 9.) Under the cash management system, virtually all APE funds are routinely swept into accounts owned by the Debtors. (*Id.* at ¶ 12.)

e.    Upon information and belief, the APEs did not maintain bank accounts separate and apart from the Debtors' Cash Management System.

f.    Certain funds belonging to the APEs were routinely deposited into bank accounts owned and titled in the name of the Debtors. (*Id.* at ¶ 12.)

g.    The APEs have guaranteed the Debtors' obligations under the Debtors' prepetition credit agreement. (*See* Guaranty and Security Agreement dated as of December 20, 2012, Ex. 2 to Winters Declaration.)

h.    Upon information and belief, third parties, including GECC (defined below) relied on the overall financial structure of the Debtors, together with the APEs in deciding whether to extend credit to the enterprise as a whole, or to any particular member thereof. (*Id.*)

i.    The APEs have the same business address as the Debtors. (*See* ProNerve, LLC Schedule H (Docket No. 133)).

j.    The APEs share the same legal counsel as the Debtors.

C.      **Prepetition Financing**

12.     According to the Debtors, in December 2012, ProNerve, LLC ("ProNerve") entered into the Credit Agreement, pursuant to which General Electric Capital Corporation ("GECC") and Regions Bank (together with GECC, the "Initial Lenders") agreed to extend ProNerve certain Loan Commitments consisting of term loans in the aggregate principal amount of $30 million, delayed draw term loans in an aggregate principal amount not to exceed $10 million, and revolving loans in an aggregate principal amount not to exceed $10 million. (Pillari Declaration (Docket No. 3), ¶ 19).  The Debtors allege that as of the Petition Date, the aggregate principal amount outstanding under the Loan Commitments is approximately $43,176,850.17. (*Id.*, ¶ 21).

13.     The Debtors assert that the Loan Commitments are secured by substantially all of the assets of the Debtors and the APEs.  (*Id.*, ¶ 20).  However, the last sentence of Section 4.11(b) of the Credit Agreement expressly provides that "[t]he Agent agrees and confirms that Credit Parties will have sole dominion and 'control' (within the meaning of Section 9-104 of the UCC and the common law) over each Segregated Governmental Account and all funds therein and the Agent disclaims any right of any nature whatsoever to control or otherwise direct or make any claim against the funds held in any Segregated Governmental Account from time to time."  (Credit Agreement, § 4.11(b)).

14.     The Committee's investigation to date indicates that on a regular basis, funds were transferred from the so-called Segregated Government Accounts, on which the Initial Lenders' lien and right to make any claims had been disclaimed, to another account within the cash management system on which the Initial Lenders asserted a security interest.  The regular transfer of unencumbered funds over the 90 days, or perhaps 1 year, prior to the Petition Date

-7-

may be avoidable transfers under a number of theories, which are still being investigated by the Committee at this time.

15.     Between the 2012 fiscal year and the Petition Date, the Debtors' experienced mounting losses and diminishing liquidity.  (Pillari Declaration (Docket No. 3), ¶ 25).   In November 2013, ProNerve retained A&M to assist with general revenue cycle and cash collection.  (*Id*.)  The Debtors indicate that in January 2014, A&M's role was expanded to include the services of Mr. Pillari as CRO  (*Id*. at ¶ 26).  However, the Debtors' board minutes produced to the Committee do not indicate Mr. Pillari was formally empowered as CRO until January, 2015.  In fact, the Debtors' board minutes dated November 5, 2014 reflect the Debtors' opposition to the Intial Lenders' then recent proposal to install a CRO.  Moreover, the board minutes indicate Mr. Pillari did not participate at any board meetings in 2014.

16.     The Debtors' financial performance failed to improve following A&M's arrival. The Debtors subsequently entered into a series of forbearance agreements with the Initial Lenders, delaying the exercise by the Initial Lenders of their rights and remedies until at least October, 2014.  (*Id*. at ¶ 27).  It was not until January of 2015, that the Debtors' board, by then reconstituted at GECC's urging, authorized A&M to actively market the Debtors' business for sale.  (*Id*. at ¶ 30).

**D.     DIP Financing**

17.     On the Petition Date, the Debtors filed their *Motion for Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Authorizing Use of Cash Collateral; (III) Granting Adequate Protection; and (IV) Scheduling a Final Hearing* (Docket No. 14) (the "DIP Motion").  Pursuant to the final order approving the DIP Motion (Docket No. 115), the Debtors were authorized to borrow $2.5 million from Specialty Care on a postpetition basis and the Committee's right to seek an order extending the period (the "Challenge Period")

-8-

in which it could challenge the validity, enforceability, priority or extent of Specialty Care's liens on collateral or otherwise assert or prosecute any action for preferences, fraudulent conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses against Specialty Care was fully reserved and preserved.

E.    **Marketing and Sale Process**

18.    Notwithstanding the continuing financial losses, as set forth above, the Debtors and GECC delayed pursuing a sale for almost a year after A&M was employed.  During such time, any value to fund inuring to the benefit of unsecured creditors was reduced (while many of those same creditors continued to extend credit to the Debtors).  In January, 2015, the Debtors' board was replaced with purportedly independent directors and existing management was replaced by A&M personnel. But it was too late; even GECC refused to fund a chapter 11 case, and a month later sold its debt at a steep discount.

19.    In the Sale Motion, the Debtors assert that prior to selecting Specialty Care as the Stalking Horse Bidder, the Debtors engaged in a limited prepetition marketing program.  (Sale Motion, ¶¶ 7,8).  Commencing on or about January 9, 2015, 47 days prior to the Petition Date, the Debtors determined that they did not have time to conduct a full-scale sale process due to liquidity constraints.  Following Mr. Pillari's appointment as the Debtors' CEO, A&M contacted 8 potential purchasers for substantially all of the Debtors' assets.  (*Id.*).  Of those potential purchasers, 4 submitted a non-binding term sheet. (*Id.*).  In late January, the Debtors agreed to a non-binding term for a stalking horse bidder (bidding $12.5 million for the assets) but several days after executing that term sheet, the purchaser stated an intention to withdraw from the sale process. (Sale Motion, ¶ 9).  The Debtors assert that immediately thereafter, they contacted Specialty Care, who previously tendered one of the four non-binding term sheets (offering $9

million in cash) during the initial sale process, and, after negotiations, agreed to a non-binding term sheet for the purchase of the Debtors' assets via a credit bid.  (Sale Motion, ¶ 10).

20.    The Debtors orchestrated Specialty Care's acquisition via a credit bid for reasons unknown to the Committee.  At the hearing to approve the Bidding Procedures, the Debtors' Vice CRO, Mr. Winters testified that, following the withdrawal of the initial bidder, "[w]e then went to Specialty Care and engaged them in discussions.  Ultimately, their bid was reduced from what it originally was."  (Mar. 11. 2015 Hr'g Tr. 27:5-10.)  The so-called "reduction" of Specialty Care's bid referred to by Mr. Winters was realized when Specialty Care's initial cash bid of $9 million "morphed" into a credit bid with no cash consideration to be paid to the Debtors' estates.

21.    For reasons unknown to the Committee, the Debtors did not approach any other parties in an attempt to maximize value, including the two other parties who had submitted prepetition term sheets, to ascertain whether there was interest in purchasing the Initial Lenders' indebtedness.  As Mr. Winters testified, "[t]o my personal knowledge, we did not go to the other two to ask them to do that."  (Mar. 11. 2015 Hr'g Tr. 30:1-2.)

22.    Following the selection of Specialty Care as their stalking horse bidder, as early as January 22, 2015, the Debtors and their advisors halted the marketing process for the Debtors' assets and, consistent with the exclusivity provision of the Stalking Horse Agreement, did not market the assets again until after entry of the Bidding Procedures Order on March 11, 2015 (Docket No. 81).

23.    When asked on cross examination why the Debtors halted their prepetition marketing process, Mr. Winters testified that:

> We are very concerned about confidentiality here. We are very concerned about customer and employee poaching. We wanted these procedures

145259.01600/100101414v.1

> approved so that we could sign the appropriate confidentiality, non-disclosure agreements and move forward with prospective purchasers.

(Mar. 11. 2015 Hr'g Tr. 32:5-9.) To date, despite the Committee's oral and written requests for production of information relating to customer poaching and employee departures arising from the prepetition due diligence into the Debtors' assets, the Committee has not received any documentation substantiating the Debtors' allegations. Meanwhile, the Committee has been informed that at least one potential purchaser of the Debtors' assets, actively interested in continuing diligence to compete for the Debtors' assets, was excluded from the sale process starting on Janaury 22, 2015.

24. On the Petition Date, GECC, Regions Bank, each of the Debtors and Specialty Care entered into the *Resignation of Agent and Appointment of Successor Agent Agreement* pursuant to which the Existing Lenders' (as defined therin) rights the and obligations under the Credit Agreement were transferred to Specialty Care. Also on the Petition Date, Specialty Care and each of the Debtors entered into the Stalking Horse Agreement, which provides for, among other things:

- 4.3. <u>Obligations Under the Credit Agreement</u>. …The Sellers hereby waive any right to challenge the Prepetition Loan Amount, the Credit Agreement and the Permitted Liens on any grounds.

- 5.1.1. <u>Exclusivity</u>. Except as may be required by the Bankruptcy Court in connection with higher and better offers or potentially higher and better offers or any related auction, none of the Sellers nor any of their officers, directors, employees, affiliates, representatives or advisors, will, directly or indirectly, initiate, solicit or knowingly encourage (including by way of furnishing non-public information or assistance), or take any other action to facilitate, any inquiries or the making of any bid proposal by any Person other than Buyer and its affiliates.

- 6.11. <u>Physician Practice Entities</u>. Each of Norman Wang, M.D., Inc., ProNerve Physicians (GA), LLC, ProNerve Physicians (IL), LLC, ProNerve Physicians (IN), LLC, ProNcrve Physicians (NJ), LLC, Pro Physician (NY), LLC, and ProNerve Physicians (WI), Ltd., (the "Physician Practice Entities"), shall have executed an agreement in a form

satisfactory to Buyer, effective on Closing, which (a) shall release all claims against the Buyer and Sellers; (b) may include an agreement by the Physician Practice Entities relating to payments of amounts under Management Services Agreements to which they are a party; (c) shall require the assignment or transfer by the Physician Practice Entities of their rights under all customer contracts to which they are a party to the Buyer, to the extent they are Assumed Contracts and legally assignable (it being understood that Buyer and its affiliates will have no recourse against the Sellers or the Physician Practice Entities, at law or in equity, for the failure to obtain any counterparty consents or deliver any counterparty notices that may be required under such customer contracts); (d) may require the transfer to Buyer or its designee (at Buyer's sole option) of any other assets of such Physician Practice Entities to the extent legally assignable; and (e) shall provide for the dissolution of the Physician Practice Entities by their respective member-equity holders reasonably promptly after the Physician Practice Entities and the Sellers have finished collecting any receivables billed for services rendered before the Closing, but in no event later than 18 months after the Closing (the "PRP Agreement"). Sellers shall use commercially reasonable efforts to procure the entry by the Physician Practice Entities into the PRP Agreement and the performance by the Physician Practice Entities of their obligations thereunder.

- 7.4.  <u>Mutual Release</u>.  The Buyer shall have executed a release of all claims, effective on the Closing, in favor of the Physician Practice Entities, in a form satisfactory to the Physician Practice Entities and the Sellers.

25.    Even though its efforts have been thwarted by the Debtors, and its bid ignored, the Cash Bidder still pursues its effort to purchase the Debtors' businesses for approximately double the amount paid by Specialty Care to buy the GECC debt.

26.    Prior to the expiry of the Bid Deadline, one of the prepetition bidders previously identified by A&M (the "<u>Cash Bidder</u>") submitted a bid for $9 million in cash, plus an assumption of all trade creditor liabilities and assumption of executory contracts (the "<u>Competing Bid</u>").

## OBJECTION

27.    Bankruptcy Code section 363(b) provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the

-12-

estate." 11 U.S.C. § 363(b). In determining whether to authorize the use, sale or lease of property of the estate under section 363(b), courts require the debtor to show that that a valid business justification exists for the sale. *See In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2d Cir. 1983); *In re Lady H Coal Co., Inc.,* 193 B.R. 233, 243 (Bankr. S.D. W. Va. 1996); *In re WBQ Partnership*, 189 B.R. 97, 102 (Bankr. E.D. Va. 1995); *In re Indus. Valley Refrig. & Air Cond. Supplies*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987). In evaluating whether a sound business purpose justifies a sale under section 363(b), courts generally consider whether the parties negotiated and entered into the sale transaction in good faith and whether the price represents fair value. *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986).

28.     While there need not be a showing of an emergency situation for selling substantially all of the debtor's assets:

> There must be some articulated justification, other than appeasement of major creditors, for using, selling, or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b).

*Lionel*, 722 F.2d at 1070.

**A.     In order to sell assets outside of the ordinary course of business and outside of a plan, the Debtors must demonstrate either that the process itself yields value to the estates that can lead to a useful, solvent collective remedy or that it is generally supported by creditors.**

29.     The Sale Motion is an attempt by the Debtors to implement a liquidating chapter 11 in a single step, without the protections to unsecured creditors provided by a chapter 11 plan. The sale here is for the exclusive benefit of Specialty Care. The Debtors essentially seek judicially authorized *carte blanche* to adjust their debts and to grant releases (and to have its property conveyed to Specialty Care released from claims and interests) without giving creditors

-13-

meaningful disclosure and an opportunity to vote, in blatant contravention of the Bankruptcy Code.

30.     A transaction is an impermissible *sub rosa* plan if it disposes of all or substantially all of the debtor's assets without following the Bankruptcy Code's procedural protections in connection with the development and approval of a plan of reorganization or liquidation, such that the sale itself is a *de facto* plan.  *See In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, at \*24 (D. Del. May 20, 2002).  The procedural provisions of the Bankruptcy Code include, among other things, the right to receive a detailed disclosure statement from a debtor and the right to vote on the proposed plan.  *See id.*

31.     Because of the importance of these protections to ensuring that creditors are treated fairly, courts have rejected proposed postpetition agreements between debtors and select creditors that have the effect of dictating material terms of a plan without complying with the Bankruptcy Code's procedural requirements for plan confirmation.  *See PBGC v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983)*, reh'g denied,* 705 F.2d 450 (5th Cir. 1983) ("The debtor and the bankruptcy court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets").  *See also In re Decora*, 2002 U.S. Dist. LEXIS 27031, at \*24 ("the focus of '*sub rosa*' plan analysis is oriented toward those situations in which a debtor proposes to sell 'all' or 'substantially all' of its assets without the benefit of a confirmed plan or a court-approved disclosure statement."); *In re Swallen's, Inc.,* 269 B.R. 634, 638 (BAP 6th Cir. 2001) ("At least when a party in interest objects, a bankruptcy court cannot issue orders that bypass the requirements of Chapter 11, such as disclosure

145259.01600/100101414v.1

statements, voting, and a confirmed plan, and proceed to a direct reorganization on the terms the court thinks best, no matter how expedient that might be.")

32.     It is also a fundamental policy of bankruptcy law that a debtor in possession has "an affirmative, overarching duty to reorganize and maximize estate assets for the benefit of all creditors," not just a select few. *In re R.H. Macy & Co.*, 170 B.R. 69, 74 (Bankr. S.D.N.Y. 1994) (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 527 (1984)).

33.     Any sale transaction that dictates essential terms of a future plan of reorganization or liquidation and seeks to short circuit creditors' rights must go through a plan approval process, which includes disclosure requirements under Bankruptcy Code section 1125, voting requirements under Bankruptcy Code section 1126, the best interest of creditors test under Bankruptcy Code section 1129(a)(7), and the absolute priority rule of Bankruptcy Code section 1129(b)(2)(B).  *See Institutional Creditors of Cont'l Airlines, Inc. v. Cont'l Airlines, Inc. (In re Cont'l Airlines, Inc.),* 780 F.2d 1223, 1226 (5th Cir. 1986)

**B.      Any Bankruptcy Code section 363 sale must properly demonstrate the market value of the Debtors' assets and the related sale process cannot therefore be designed or carried out to so favor a particular buyer that others cannot bid:  in such a <u>circumstance, the buyer's price is not probative of the Debtors' value.</u>**

34.     Courts that have sought to determine the propriety of a section 363 sale whose sole purpose is to liquidate assets for the benefit of a secured creditor have found such use unwarranted and improper.  *In re Encore Healthcare Assocs.,* 312 B.R. 52 (Bankr. W.D.Pa. 2004) (applying the *Lionel* standard and finding no business justification as sole purpose of the section 363 sale was to liquidate assets for benefit of secured creditors); *In re Fremont Battery Co.*, 73 B.R. 277 (Bankr. W.D. Ohio 1987) (same).  For example, the court in *Fremont Battery* found that no business reason justified a proposed sale which would, at best, benefit one creditor

only and "not create proceeds which would inure to the benefit of the unsecured creditors." *Fremont Battery*, 73 B.R. at 279.

35.    Moreover, acquirers in section 363 sales must also be prepared to provide some basic consideration to unsecured creditors.  As the Supreme Court has affirmed, "[a] principal goal of the reorganization provisions of the Bankruptcy Code is to benefit the creditors of the Chapter 11 debtor by preserving going-concern values and thereby enhancing the amounts recovered by all creditors."  *In re Timbers of Inwood Forest Associates, Ltd.,* 808 F.2d 363, 373 (5th Cir. 1987), *aff'd*, 484 U.S. 365 (1988) (emphasis added).  Accordingly, courts have declined to allow section 363 sales of substantially all of a debtor's assets where such sales would leave the debtor's estate with such scant value as to frustrate reorganization. *See In re Braniff Airways, Inc., 7*00 F.2d at 940 (refusing to approve a section 363 sale where the transaction would deplete the estate of virtually all value and leave "little prospect or occasion for further reorganization.")

36.    The Sale Motion seeks approval of a Sale that was conducted through a fast-tracked process and appears to be solely for the benefit of Specialty Care.  Aside from appeasement of Specialty Care and liquidity concerns based on Specialty Care's reluctance to provide additional postpetition financing to protect its investment, the Sale Motion fails to articulate a business reason for the proposed Sale on a rushed schedule.  A Sale that only benefits Specialty Care to the exclusion of the Debtors' unsecured creditors must be denied as it violates the good-faith requirement inherent in all chapter 11 cases.  *See, e.g., In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008) (rejecting "emergency" sale to DIP lender); *In re Digital Domain Media Grp., et al.,* No. 12-12568 (BLS) (Bankr. D. Del. Sept. 28, 2012) ECF No. 48 (approving expedited sale but placing "great weight and emphasis on the position and input of the creditors' committee).

37.    At its core, the Sale Motion amounts to a foreclosure Sale in favor of Specialty Care without any provision for payment of remaining claims.  In order for creditors other than Specialty Care to receive any benefit in these cases, the successful bid must require certain minimum recoveries and protections for the unsecured creditors.  This Court should not permit the Debtors to abuse the chapter 11 process as there is no business justification for the proposed Sale to Specialty Care at a price that is less than half of the amount bid by the Cash Bidder (particularly where, as here, the Cash Bidder has made express an intent to assume all trade liabilities and executory contracts).

C.    **Specialty Care's credit bid does not offer fair and valuable consideration.  In a Bankruptcy Code section 363 sale where value is not demonstrated by the results of a good process, the Debtors must offer valuation evidence that supports the fairness of the price achieved.**

38.    The proposed Sale is likely to render the Debtors' estates administratively insolvent.  It leaves little, if any, cash for the Debtors' estates to cover administrative expenses, let alone provide a source of recovery for unsecured creditors.  Thus, the proposed Sale is also a *sub rosa* plan to the extent that it leaves substantial liabilities with the estates without allocating additional Sale proceeds to satisfy the remaining administrative expenses and priority claims. Specialty Care's bid does not reserve for the payment of post-closing wind-down expenses and other administrative expense claims towards a plan.

39.    A court cannot confirm a chapter 11 plan unless the plan provides for payment in full, in cash, of all administrative expense claims on the plan's effective date.  *See* 11 U.S.C. §1129(a)(9)(A); *In re Hechinger Inv. Co. of Delaware*, 298 F.3d 219, 224 (3d Cir. 2002).  The same is generally true for priority claims under section 507(a) of the Bankruptcy Code.  *See* 11 U.S.C. §1129(a)(9)(B); *In re Armstrong World Industries, Inc.*, 348 B.R. 136, 166 (D. Del. 2006).  Courts typically will not approve a section 363 sale of substantially all of a debtor's

assets where such a sale would leave the debtor's estate with such scant value as to frustrate reorganization. *See In re Braniff Airways,* 700 F.2d 935. Inability to confirm a plan generally constitutes cause to convert or to dismiss a chapter 11 case. 11 U.S.C. § 1112(b). For the Sale to proceed outside of the plan process, the purchase price (particularly with a credit bid) must include an amount of cash sufficient to fund an escrow for the post-sale administrative expenses of the Debtors' estates. And here, because there is no other estate property, the cash must be sufficient to fund a distribution to unsecured creditors. Otherwise, there is no good or legitimate reason to allow the Debtors and Specialty Care to use section 363 to gut the Debtors' chapter 11 estates. If the Debtors and Specialty Care wish to avail themselves of the benefits of chapter 11, they must pay the costs and abide by the rules of the chapter 11 process.

40.    Unless the Sale provides for an escrow of sufficient Sale proceeds to fund a liquidating chapter 11 plan, it is a near certainty that the Debtors will be unable to confirm a plan after the Sale closes. Accordingly, the Sale should not be approved unless the successful bid, as part of the purchase price, provides an adequate amount of cash (to be placed in escrow at the closing of the Sale) to fund a wind-down budget for the administration of the Debtors' remaining assets, including prosecution of litigation and the wind-down of the Debtors' estates.

**D.    Specialty Care's credit bid should be limited and contingent upon the proven validity of their asserted lien and security interest.**

41.    As discussed below, Specialty Care's prepetition claims may be subject to reduction and/or disallowance. Simultaneously herewith, the Committee is filing a motion seeking to extend the period in which the Committee may challenge the liens and claims of Specialty Care related to government receivables and the possible need for substantive consolidation of the APEs into the Debtors' estates (the "Challenge Extension Motion"). It also enables the Committee to fully investigate the activities surrounding the Debtors' choosing of

-18-

Specialty Care as the Stalking Horse Bidder by facilitating purchase of the GECC debt at a steep discount. The Committee awaits further discovery from the Debtors and may require third-party discovery.

42.    Bankruptcy Code section 363(k) allows the holder of a lien securing an allowed claim to bid in a non-ordinary course of business sale, and if successful, to offset its claim against the purchase price of the property (a "credit bid"). Specifically, section 363(k) states:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court *for cause* orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k) (emphasis added).

43.    Section 363(k) provides an obvious advantage among potential bidders to the existing lender because the lender is allowed to bid with its debt, rather than new cash. Courts thus must protect a debtor's estate from loss of value caused by credit bidding in those rare instances where courts allow credit bidding based on disputed claims.

44.    The language of section 363(k) permits the Court to specifically restrict the ability to credit bid. Section 363(k) expressly grants the court discretion to deny a creditor's ability to credit bid "for cause." Although it is not defined within section 363, cause is a "flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis." *In re NJ Affordable Homes Corp.*, Case No., 2006 WL 2128624 at *16 (Bankr. D.N.J. June 29, 2006). *Id.*

45.    Because Specialty Care' alleged prepetition liens and security interests in the government receivables have not been properly tested, and because substantive consolidation of the APEs into the Debtors' estates may be required, the exercise of the Court's discretion under

section 363(k), conditioning their credit bid(s), is appropriate.  Until the Committee's Challenge Period concludes and the underlying investigation completed, the unfettered privilege of a credit bid should not be afforded.

46.     The idea of preventing or conditioning the lender's ability to credit bid or putting in place certain protections that safeguard the debtor's unsecured creditors is not novel.  *See e.g., In re Akard St. Fuels, L.P.*, 2001 WL 1568332 (N.D. Tex. Dec. 4, 2001) (denying lender's ability to credit bid and allowing sale free and clear of all liens under section 363(f)(4) where lender's liens were subject to a challenge and lender was "capable of bidding cash at the auction and later recovering the cash if it proved its liens"); *In re Miami General Hospital, Inc.*, 81 B.R. 682 (S.D. Fla. 1988) (permitting lender's credit bid but preserving the right of the trustee to file an adversary proceeding or otherwise object to the extent, validity and priority of the lender's liens). *See also, Bank of Nova Scotia v. St. Croix Hotel Corp.*, 44 B.R. 277 (D. V.I. 1984).

47.     Even if Specialty Care is allowed to credit bid in these cases, given the current Challenge Deadline, the sale order must make clear that their alleged liens and security interests are not *ipso facto* found valid by the entry of the sale order.  Thus, the Committee requests that if Specialty Care credit bids, the sale order must include the following language:

> This Order shall not (a) prejudice or impair the rights of the Committee to challenge the nature, extent, validity, priority, perfection or amount of Specialty Care' alleged liens, security interests and claims or (b) release Specialty Care from any causes of action which can be brought by or on behalf of the Debtors' estates relating to any of the foregoing.

48.     Moreover, if a credit bid of Specialty Care is approved by the Court, under the circumstances here, it should be limited to the discounted price Specialty Care paid for the GECC debt.

-20-

49.     Alternatively, should this Court decide that Specialty Care may credit bid the full claim amount, the sale order should specifically provide for a cash payment by the credit bidder to the extent the Court grants a challenge or the Committee (or any other party) is successful in challenging Specialty Care's asserted liens and security interests.   For the same reasons, Specialty Care should not receive payment from the proceeds of the Sale until such time as their liens are determined to be valid and to have the priority alleged.  Entry of an order approving the Sale should provide that it is not a waiver of, nor shall it impair the Committee's right to, object to the extent, priority and/or validity of Specialty Care' alleged liens.

50.     Paragraphs 6.11 and 7.4 of the Stalking Horse Agreement provides third-party releases in favor of Specialty Care and the APEs.   The Committee objects to the release provisions in Paragraphs 6.11 and 7.4 of the Stalking Horse Agreement because: (i) the scope of the release encompasses third parties, (ii) such broad third party releases may only be appropriate in the context of a plan of reorganization (not in the context of a sale and certainly not at the outset of a case), and (iii) the scope of the release appears to give Specialty Care a release in capacities other than as "agent" and "secured creditor." Arguably the release provides Specialty Care with a release beyond the scope of the Transaction.  To enable the Committee to diligence Specialty Care in all of its capacities in a period shorter than the sixty (60) days provided under the Local Rules is inappropriate and not fair or reasonable under the circumstances.

51.     Moreover, even if a release could be granted outside of a plan, there is no showing that the Debtors and Specialty Care have met the high standards for such releases under applicable Third Circuit law.   *See e.g. Gillman v. Continental Airlines (In re Continental Airlines)*, 203 F.3d 203 (3d Cir. 2000); *In re Zenith Electronics Corp.* 241 B.R. 92 (Bankr. D. Del. 1999).

## **RESERVATION OF RIGHTS**

52.     The Committee reserves the right to revise, amend or supplement this Objection at any time, including (i) at the Sale Hearing, or (ii) at any subsequent hearing.  The Committee further reserves the right to object at or prior to the Sale Hearing to the Debtors' proposed findings that (i) the prevailing bidder is a good faith purchaser, (ii) that the transfer of the assets does not violate section 363(m), (iii) that the Debtors have engaged in thorough and arm's-length negotiations over the terms of the asset purchase agreement, (iv) that the 14-day stay required by Rule 6004(d) and (h) be excused; and (v) other Sale related issues.


*[Remainder of page intentionally left blank]*

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Committee respectfully requests that the Court deny the Sale Motion as set forth herein and to grant such other relief as it deems fair and appropriate.

Dated: April 8, 2015

**BLANK ROME LLP**


By:    */s/ Stanley B. Tarr*
Stanley Tarr (DE 5355)
Josef W. Mintz (DE 5644)
1201 N. Market Street, Suite 800
Wilmington, DE 19801
Telephone:  (302) 425-6400
Facsimile: (302) 425-6464

-and-

Thomas E. Biron *(admission pending)*
Michael B. Schaedle
One Logan Square
130 North 18th Street
Philadelphia, PA 19103
Telephone:  (215) 569-5500
Facsimile: (215) 569-5555

*Proposed Counsel for the Official
Committee of Unsecured Creditors*

145259.01600/100101414v.1